1
2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

3

_____

4

UNITED STATES OF AMERICA,

5

                        Plaintiff,
                                    DOCKET NO. 1:20-mj-416

6

vs.

7

KALEB FRANKS,

8

                        Defendant.

9

_____/

10

11

        TRANSCRIPT OF DETENTION HEARING

12

    BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

13

            GRAND RAPIDS, MICHIGAN

14

            October 13, 2020

15

16

Court Reporter:          Glenda Trexler
                         Official Court Reporter

17

                         United States District Court
                         685 Federal Building

18

                         110 Michigan Street, N.W.
                         Grand Rapids, Michigan 49503

19

20

Proceedings reported by machine shorthand, transcript produced

21

by computer-aided transcription.

22

23

24

25

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3         MR. NILS R. KESSLER
           UNITED STATES ATTORNEY'S OFFICE
 4         330 Ionia Avenue, N.W.
           P.O. Box 208
 5         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
 6         Email:  Nils.Kessler@usdoj.gov

 7         MR. AUSTIN JACOB HAKES
           UNITED STATES ATTORNEY'S OFFICE
 8         330 Ionia Avenue, N.W.
           P.O. Box 208
 9         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
10         Email:  austin.hakes@usdoj.gov

11    FOR THE DEFENDANT FRANKS:

12         MR. SCOTT GRAHAM
           SCOTT GRAHAM, PLLC
13         1911 West Centre Avenue, Suite C
           Portage, Michigan 49024
14         Phone:  (269) 327-0585
           Email:  sgraham@scottgrahampllc.com

15

16                                 Grand Rapids, Michigan

17                                 October 13, 2020

18                                 2:04 p.m.

19              P R O C E E D I N G S

20         THE COURT:  All right.  We are back on the record to

21    take up the question of bond for Mr. Franks.  Mr. Kessler and

22    Mr. Hakes are here on behalf of the United States and

23    Mr. Graham is here with his client.

24         Is the government still seeking detention?

25         MR. KESSLER:  Yes, Your Honor.
```

1          THE COURT:  You may proceed.

2          MR. KESSLER:  Well, Your Honor, I'm not going to be

3     putting on any additional evidence for this particular

4     defendant.  I will be relying on exhibits that are already in

5     the record.  So I don't know if you want to wait --

6          THE COURT:  It would be helpful to me -- I think I

7     have the information from the Complaint well in hand -- it

8     would be helpful for me to summarize any -- and I have gone

9     through the exhibits -- but it would be helpful if you could

10    point out --

11         MR. KESSLER:  Absolutely.

12         THE COURT:  -- in case I've missed anything among the

13    exhibits and any additional evidence that was put on the record

14    regarding Mr. Franks today.

15         MR. KESSLER:  Yes, Your Honor.  So I would be relying

16    on a couple of the exhibits here.  First off, Exhibit 4 is the

17    one where Mr. Franks, after a discussion about kidnapping or

18    any other plots, he says "I'm up for anything --"

19         Exhibit 18 --

20         THE COURT:  Hang on just a second.

21         MR. KESSLER:  Yes.

22         THE COURT:  All right.

23         MR. KESSLER:  "Up for anything as long as it's

24    well-planned" I believe were the words.

25         THE COURT:  Uh-huh.

1          *MR. KESSLER:*  In Exhibit 18, that's an audio exhibit.

2    The testimony was that the agent believed he was the one who

3    said "Kidnapping, arson, death, I don't care."  To be fair, it

4    was --

5          *THE COURT:*  It was difficult to hear.

6          *MR. KESSLER:*  It was difficult to hear.  But the

7    words were said.  But more to the point, the agent was clear

8    that he thought it was Mr. Franks, but he couldn't be a hundred

9    percent sure.  It could have been one of the other people.  But

10   he was part of the discussion.

11          In Exhibit 10, this is the part where everybody is

12   what they called The Bonfire Chat.  On page 3 of that

13   Mr. Franks was worried about people finding out about their

14   coded language.  He was the one who first proposed that maybe

15   they had a fed, was concerned about there being a fed listening

16   to their encrypted chats.

17          On page 12 of Exhibit 10 -- let me know -- I can see

18   you're writing, so let me know when you're ready.

19          *THE COURT:*  All right.  Page 12.

20          *MR. KESSLER:*  On page 12 of Exhibit 10 he's the one

21   suggesting that they may have been compromised so they should

22   henceforth operate only in their own small unit.

23          He's also worried that if they have their codes, they

24   probably know what their faces look like.  "They" being the

25   feds know what their faces look like.

1              And then in Exhibit 19 on page 3, he was -- I can

2     wait for you to get to that.

3              THE COURT:  All right.

4              MR. KESSLER:  So on Exhibit 19 on page 3, this is

5     part of the discussion about whether they should do a public

6     armed protest at the Capitol, and he, among everybody else,

7     said, "Hard pass on anything in the public."  So clearly

8     concerned about people actually seeing his face.  Those are the

9     exhibits I'll be relying on.

10             Do you want to take any argument while I'm standing

11    here?

12             THE COURT:  Let's have Mr. Graham bring in whatever

13    evidence he wants to put in the record, and then we'll go to

14    argument.

15             MR. KESSLER:  Yes, Your Honor.

16             MR. GRAHAM:  Your Honor, I would -- I'm going to

17    proceed in a second here by way of proffer.  But I would also

18    note, I guess, more by the way of identifying evidence as

19    opposed to argument, on the testimony I suspect the Court

20    was -- had no trouble following whatever theme I was attempting

21    to establish here in questioning.  But in terms of evidence, I

22    think it's clear that there's less certainty about many of the

23    statements in the Complaint than it may appear at first blush.

24    And there appears to be no question about Mr. Franks being a

25    follower and not a leader of this.

1          In regard to that, then, I would move to -- and I'll

2     present argument at the appropriate time.

3          THE COURT:  Before you should begin, Mr. Graham, I

4     will note that I do have your memorandum that you filed and

5     have reviewed that as well.

6          MR. GRAHAM:  Thank you, Your Honor.  And I maintain

7     the position that this is not a presumption case.  The only

8     authority that we found -- and actually I didn't cite Ouedraogo

9     from this district, but it says the same thing, for the same

10    charge, it's not a presumption case regarding bond.  And if the

11    government disagrees, I know they will tell you that.  But it

12    is not a presumption case.

13         So by way of proffer, I would adopt the points made 1

14    through -- 1 through 19 of my written proffer.  And for

15    purposes of evidence to be presented to the Court, since I

16    filed it under restricted access and I had good reason for it,

17    I'd simply adopt those points by way of proffer and ask the

18    Court to refer to those.  The government, of course, has a copy

19    of that, and if they have any dispute or objection.  But that

20    would be what I would offer.  My brief comment on being a

21    follower just evidentiary-wise, and then the proffer, and the

22    fact that this is not a presumption case.  So I would -- that's

23    what I would have by way of evidence.  And then would welcome

24    the chance to argue a bit when appropriate.

25         THE COURT:  All right.  Mr. Kessler, any additional

```
 1    evidence?
 2              MR. KESSLER:  No, Your Honor.
 3              THE COURT:  All right.  Then I'll take argument.
 4              MR. KESSLER:  So just relying on what we heard during
 5    the prelim and then those other things that I pointed out
 6    to Your Honor, I think it's pretty obvious from the evidence
 7    that this was a serious plot.  I know that Probation when they
 8    make their recommendations they have that caveat in there
 9    saying they can consider everything but the crime itself, which
10    I'm not sure I understand exactly why it works that way, but
11    that's the way it works.  And I would be the first -- and this
12    goes to everybody -- I would be the first to say if this was a
13    credit card fraud case, for most of these people their criminal
14    history and background and et cetera don't make them somebody
15    that would need to be detained, but in this particular case the
16    nature of the offense is very serious.  There's a serious
17    public safety risk.  And I think there's good evidence that
18    they were pretty serious about doing it.
19              The guns and training aside, the fact that they were
20    casing the governor's house at night and he was a participant
21    in that is a pretty serious overt act and a step that shows
22    someone's seriousness in going out to harm somebody else.  I
23    understand Mr. Graham's argument that he's a follower.  And to
24    be honest with you, I'm not even going to dispute that he was
25    less of a leader than Fox.  There are people here who are more
```

1  leaders and people who are more followers. But I don't

2  think -- that might be pertinent to sentencing if we get to

3  that point, but being a follower is not necessarily something

4  that makes you less of a flight risk or less of a risk of

5  danger to the community.

6          I do think there are reasons to believe, you know, he

7  would stick around in a normal case, but in a case like this

8  where you're facing such serious charges and also possibly

9  retaliation from other people associated with the militia

10 movement, there might be a lot of reasons why somebody would

11 want to flee.

12         We also have the fact that in his criminal history,

13 although it's nothing terribly serious, he had a drug offense.

14 And the drugs is not the issue, the issue is that his probation

15 was revoked for not following the court's orders, which I think

16 we have to consider.

17         And the previous conviction that he has, which I

18 understand -- I suppose was nullified under the Holmes Youthful

19 Trainee Act or something along those lines was for home

20 invasion. Which, again, it's just a similarity between that

21 and what was planned in this particular case that's concerning.

22 So I think given the circumstances as a whole, it's a little

23 too much of a risk to let him be out on bond, Your Honor.

24         *THE COURT:* And I take it you're moving on both

25 bases, risk of flight and dangerousness to the community?

1          *MR. KESSLER:*  Yes, Your Honor, although I think the

2     danger to the public is the bigger one.

3          *THE COURT:*  And do you agree with Mr. Graham that

4     there is no presumption in this case?

5          *MR. KESSLER:*  Yeah, I'm not sure where that came

6     from.  I don't think it's a presumption case myself.  You know,

7     I could be wrong.  Probation could know something I don't, but

8     I don't think it is a presumption case.

9          *MR. GRAHAM:*  Your Honor, regarding the presumption

10    issue, I probably created, you know, a tempest in a teapot

11    there by worrying that it might be a presumption case because

12    of the nature of the charge.  So I agree the government has

13    never suggested that it was a presumption case.  I was erring

14    on the safe side, if you will.  So it's not a presumption case.

15          In regard to -- in regard to the two points for the

16    Court to consider:  Flight.  There is absolutely no evidence

17    that he would be a flight risk.  He is a property owner.  He

18    has -- he's a life-long Michigan resident.  He has all of his

19    connections here in Michigan.  He's not going to run because of

20    potential retaliation.  There is just, the way I see it, no

21    evidence whatsoever regarding flight, him being a flight risk.

22          Regarding the danger to the community I would like to

23    take on, head-on the claim by the government that somehow prior

24    convictions should impact the Court's decision.  Someone who

25    has made a mistake -- I'm not sure that there's a better case

1    that you could ever see in terms of someone doing the right

2    thing to put their life on track.  He was an addict.  It is

3    undisputed.  He got into trouble.  Six or seven years ago as

4    part of the Holmes Youthful Trainee Act he got a sentence of

5    probation and he got a few months in jail.

6          When he entered jail, since that date in 2013 or '14,

7    he has been sober.  He has been sober.  So he successfully

8    completed HYTA and then he went back and a circuit court

9    expunged the prior possession case which came in the throes of

10   addiction.  So he stands before you, unlike almost anyone else

11   who had had that background, having been completely sober for

12   six or seven years and being such a model -- once he got on

13   track -- such a model at trying to correct his situation that

14   he has gone into the profession of being a peer advocate.  And

15   in fact works for the hospital.  Works for other entities.

16   Works with the 6th Circuit Court in Pontiac advising

17   probationers.

18          So in terms of -- in terms of considering that he

19   should be detained because of the past when he has done

20   everything a human being can do for six or seven years to

21   correct the situation, I really want to take that head-on

22   because I'm not sure what else anybody in the world could ever

23   do in regard to that.

24          Not a hint -- I mean, put this case -- and I

25   understand the seriousness of this case aside -- but if someone

1   is a danger because of what happened in the past, certainly we

2   normally see hints of that. Not not a hint of any trouble

3   again.

4           And I'll move from that directly to this -- to the

5   charge here. Because it is an extremely serious charge. No

6   question about that. It seems clear that the charge itself is

7   very serious. It seems equally clear that his role as not

8   being a leader seems to be -- seems to be undisputed. And the

9   real question becomes based on everything that we know now, or

10  at least the way I evaluate the statute, based on everything we

11  know now, going forward is he a threat to others? Is he a

12  threat to others?

13          And I want to be as candid as I can be with the

14  Court, there were statements made by --

15      *(Whereupon there was a technical issue in the courtroom)*

16          *THE COURT:* We'll take a minute. We're going to take

17  a 10-minute break and figure out how to mute the participants.

18          *MR. GRAHAM:* I hope he's not criticizing my argument.

19          *THE COURT:* I'm not sure. I didn't understand

20  anything that was said there. So rest assured that will not

21  affect me. But let's take a five-minute break and see if we

22  can figure out the technical issue here. I'm sorry to

23  interrupt your flow, Mr. Graham.

24          *THE CLERK:* All rise, please.

25      *(Recess taken from 2:19 p.m. to 2:41 p.m.)*

1              *THE COURT:*  All right.  We went off the record there

2      for a few minutes because of a disruption on the conference

3      line that we have open to assure greater public access to these

4      proceedings.  We're hoping that that is fixed now.  But in any

5      case, we will proceed.

6              Mr. Graham, I'm sorry you got cut off mid argument.

7              *MR. GRAHAM:*  I'll go ahead, then, Your Honor.  Thank

8      you.

9              I think I had worked my way through to the point

10     where I was going to talk specifically about the charges in the

11     Complaint and why the nature of those charges alone do not

12     establish a basis for detention because I think the other

13     points have been covered.

14             And I would like to make one specific point out of

15     my -- out of my written proffer, and that is that Mr. Franks is

16     a Type 1 diabetic.  He's been a Type 1 diabetic.  He is at high

17     risk regarding COVID.  And there are serious challenges -- and

18     no criticism of the way he's being cared for by the

19     Marshal Service -- but there are very significant challenges

20     that go with controlling blood sugar in a setting when someone

21     is a severe diabetic.  He had readings before he was

22     arrested -- because he takes both the 24-hour insulin and then

23     a short quick-acting insulin when he has a meal -- and his

24     normal readings were around a hundred.  I mean controlled

25     around a hundred.  And now they range from mid 200s to 400.

1    Again, no criticism of anyone.  It's just a big, big challenge

2    but something that's important for his overall health, and

3    certainly something he can control aside from the COVID suspect

4    category then or additional risk category.

5             So I'd like to confront just exactly why the nature

6    of the charge against him does not establish that he would be a

7    danger going forward, going forward.  And I want to be as

8    candid as I can with the Court.  Statements that have been

9    quoted, and including, including even if he was on the

10   recording that was admitted as Exhibit 18, you know,

11   Your Honor, there's somewhere between just stupid talk and who

12   knows what, but the question becomes if there was something

13   like that, why does it mean that he would be a danger going

14   forward?  The Court has a lot of information and evidence about

15   him, including, including the Probation -- the one thing that I

16   feel confident in saying, everything I said in my written

17   proffer essentially was corroborated by the Pretrial Services

18   investigation.  I think that investigation was thorough and

19   spot-on in terms of its -- in terms of its findings.  And I've

20   made my point about anything I disagree with about a prior

21   conviction.

22            So whatever happened, whatever happened, I don't

23   believe that that alone indicates he would be a danger when the

24   Court could impose a condition such as location monitoring.

25   And Probation/Pretrial Services has recommended that, and I

1    agree with that wholeheartedly.  If you add the condition of

2    location monitoring to the fact that there are no weapons in

3    the house.  They were all taken during the search.  They

4    wouldn't be there anyway because they would not be appropriate

5    there at this point in time.  There are no weapons.  There is

6    nothing else of danger in that house.  There could be location

7    monitoring.  We've spelled out his background in detail in the

8    proffer.  And, you know, Probation does put in the essentially

9    disclaimer that it's not considering presumptions, and we know

10   presumption doesn't apply, and it's not considering the

11   seriousness of the charge or the potential penalty, but it's a

12   thorough report and one I agree with completely.  And I think

13   we have supported their recommendation with what we've offered

14   and with what he has done to try to make himself and his

15   situation better, and so my request to the Court is to grant

16   bond with those conditions and let us go forward from there.

17   So that's my request.  Thank you.

18             *THE COURT:*  Thank you.

19             Mr. Kessler, you have the burden, so you can have the

20   last word if you want any further argument.

21             *MR. KESSLER:*  Your Honor, actually something counsel

22   just said prompts me to want to put the agent back on for just

23   a moment about something that has to do with weaponry, and I'll

24   make it short.

25             *THE COURT:*  All right.

DIRECT EXAMINATION OF RICHARD TRASK

1          MR. KESSLER: Agent Trask.

2          THE COURT: You're still under oath, sir.

3                    DIRECT EXAMINATION

4   BY MR. KESSLER:

5   Q.   Agent Trask, we're going to make this brief, but we just

6   heard a proffer about there being no weapons still with this

7   particular defendant.  It is possible in your experience to get

8   weapons in other ways than buying them through legitimate

9   means?  Correct?

10  A.   Yes.

11  Q.   And I'm not just talking about buying one on the street.

12  Can you briefly tell the judge what a ghost gun is?

13  A.   A ghost gun is basically a weapon that is created that has

14  no serial number or no way to track the weapon.  It's not

15  registered with any agencies.

16  Q.   All right.  And this isn't just theoretical here.  Do you

17  know something about this particular defendant and ghost guns

18  in this case?

19  A.   Yes, we do.

20  Q.   Can you please tell the Court what that is.

21  A.   I do not have specific dates, but it was very recent, the

22  defendant requested Ty Garbin and the CHS to help him in

23  creating two pistols unregistered and then also drilling out a

24  lower receiver.  Those weapons were intended for an individual

25  who is a friend of Kaleb Franks who has a previous conviction.

*DIRECT EXAMINATION OF RICHARD TRASK*

1   He is a dealer.  A drug dealer.  And they believe that he was

2   under surveillance, and so they were going to create those

3   weapons and provide them back to him.  They were going to sell

4   them at a rate of three times what they cost to make.  Those

5   weapons were made and provided -- I believe at this time

6   provided back to Kaleb Franks.  At least the two pistols were.

7   Those weapons were found in either a search of Kaleb Franks' or

8   Ty Garbin's homes.

9   *Q.*   And so Mr. Franks was the one -- you're aware of this

10  whole thing because the CHS was involved in this plot, right?

11  *A.*   That's correct.

12  *Q.*   He was enlisted by Mr. Franks to help make one of the

13  guns?

14  *A.*   That's correct.

15  *Q.*   One you said a lower receiver.  That was for an AR-15

16  semiautomatic assault rifle, correct?

17  *A.*   That's correct.

18  *Q.*   And then the other two other ones were 9-millimeter

19  semiautomatic pistols that this defendant obtained through

20  something other than a federally licensed firearms dealer?

21  *A.*   The way I understand it is he obtained those parts and

22  provided them to Ty Garbin for putting together the pistols for

23  the deal.

24  *Q.*   And then Ty Garbin gave them back and they were actually

25  seized at his house, correct?

*CROSS-EXAMINATION OF RICHARD TRASK*

1   *A.*   The last -- if I'm recalling correctly, they were provided

2   back to Kaleb Franks and those weapons were seized and there is

3   no serial number attached to them.

4   *Q.*   And that could be done again, right, getting those parts

5   over the internet or through some other gray market dealer?

6   *A.*   That's correct.

7         *MR. KESSLER:*  I have nothing further, Your Honor.

8         *THE COURT:*  Mr. Graham, you may inquire.

9                      CROSS-EXAMINATION

10  *BY MR. GRAHAM:*

11  *Q.*   Agent, whatever those items were, they were seized, they

12  are in the possession of law enforcement, correct?

13  *A.*   They -- they are.

14  *Q.*   And what you're talking about regarding those items,

15  you're talking about a story that's told by someone else to

16  someone else and then relayed to you, right?

17  *A.*   No, that's through the chats on Threema he discusses it,

18  and then they actually conduct a surveillance trip to go out

19  and conduct where they are going to do the deal, as they say.

20  *Q.*   And who is involved?

21  *A.*   Kaleb Franks, Ty Garbin, and the CHS.

22  *Q.*   Just three of them?

23  *A.*   Yes.

24  *Q.*   When you searched his house, when law enforcement searched

25  his house -- I shouldn't say you -- law enforcement took

1   everything that might be an item of danger, correct?

2   A.   I do not have the report back, full report back, but that

3   is what I understand, yes.

4   Q.   Sure.  Policy would be anything that looks like it might

5   relate to the crime, obviously also being firearms here, was

6   seized at that time, right?

7   A.   That is what I understand, yes.

8   Q.   And as best you know, there's nothing in his house now

9   that qualifies as a gun part or something like that?

10  A.   I'm not aware of anything at this point.

11            MR. GRAHAM:  Okay.  Thank you.

12            Thank you, Your Honor.

13            THE COURT:  Mr. Kessler, anything further?

14            MR. KESSLER:  That's the last thing I would add to my

15  argument, Your Honor, I think you understand, I mean it shows

16  that he's not necessarily just going to abide by the law.  He's

17  grinding serial numbers off of those guns, Your Honor.

18            THE COURT:  Because we just heard some new testimony

19  after you had a chance to argue, if you want to be heard on

20  that, you can as well, Mr. Graham.

21            MR. GRAHAM:  Well, Your Honor, I guess I don't

22  understand, because he just said it meant that serial numbers

23  were somehow ground off, and I didn't take that to be the case.

24  My understanding was we're talking about making, making a

25  weapon.  And I guess my real point, though, for the Court is,

1    it happened, it's done.  It's -- they seized the items.  And

2    it's not going to happen again.  It certainly could be the

3    subject of some additional monitoring.  So that would be my

4    point.

5          THE COURT:  All right.  Thank you,

6    Special Agent Trask.

7          THE WITNESS:  Thank you.

8          THE COURT:  This matter is governed by the Bail

9    Reform Act of 1984.  Under the Bail Reform Act I have to

10   release the defendant on bond unless I find either by a

11   preponderance of the evidence that he is a risk of flight or

12   nonappearance or by clear and convincing evidence that he is a

13   danger to the community.

14         I am required to consider the least-restrictive

15   condition or combination of conditions that will reasonably

16   assure his appearance and protect the community, and I have

17   considered each of the possible conditions set out in the

18   statute.  I agree that this is not a presumption case and in

19   any case, even if it were, the burden would still be on the

20   government on both bases.

21         In determining whether there are sufficient

22   conditions to reasonably assure his appearance and the safety

23   of the community, I'm required to consider a number of factors,

24   including the nature and circumstances of the offense charged,

25   the weight of the evidence, and the Sixth Circuit has held that

1    that is the weight of the evidence of dangerousness or risk of
2    flight, the history and characteristics of the defendant, and
3    the nature and seriousness of the danger to any person or the
4    community that would be posed by the defendant's release.

5         Here I agree with Mr. Graham that there is no --
6    insufficient evidence at least to suggest that there is a risk
7    of flight, and so I'm confining my remarks to dangerousness to
8    the community or any other person in the community.

9         I also agree with both counsel really that the
10   primary focus of my inquiry has to be the offense conduct in
11   this case.  The information that was pulled together by
12   Pretrial Services, which mirrors in most respects what is in
13   Mr. Graham's memorandum to the Court, indicates that absent a
14   serious risk to the community, risk of danger to the community
15   by the defendant, the defendant would be an appropriate
16   candidate for bond in this case.

17        I do agree that the prior home invasion second
18   degree, which was expunged under -- or dismissed under HYTA is
19   somewhat relevant given the allegations in this case that
20   involved the kidnapping of Governor Whitmer, however, I don't
21   place a great deal of weight on any of that based on
22   Mr. Franks' fairly clearly demonstrated improvement and work.
23   I note that he is employed.  His prior substance abuse has
24   apparently not repeated.  And the focus of the inquiry really
25   has to be on the dangerousness to the community that is posed

1    as a result of the offense conduct, which I'm going to go

2    through in a minute.

3            I do want to respond to Mr. Graham's argument that he

4    wonders why this is a danger going forward.  First, the only

5    ability that I have -- and I don't have a crystal ball, I don't

6    have any ability to see the future -- but the best predictor of

7    future behavior is past behavior.  And although this particular

8    plot has been unearthed and disrupted, it does not change the

9    fact that there is apparently a movement that -- in which

10   Mr. Franks is alleged to have participated that plots the

11   overthrow of the government by force.  And so that it has --

12   that this particular plot has been disrupted does not mean that

13   that could not continue in the future.

14           In addition, I do note the agent's testimony

15   regarding the creation of the unregistered firearms for a

16   person who could not buy them legally.  I note that that does

17   indicate, is evidence of the ability to begin again in terms of

18   this plot against the government.

19           So just to go through some of the evidence that I

20   have related now to the plot, since that is the primary focus

21   of the inquiry here.  The affidavit for the Complaint lays out

22   a number of instances in which Mr. Franks and others were

23   working together to conspire to attempt this kidnapping.  And

24   as all of the counsel have -- defense counsel have noted along

25   the way, many of these incidents in isolation would not be

1    either illegal or particularly concerning, but it is the

2    repeated involvement in the group together in training

3    exercises coupled with clear discussions of this plot to kidnap

4    Gretchen Whitmer and then also the overt acts of taking steps

5    to do surveillance, for instance, in order to continue the plot

6    or advance the plot that the Court finds concerning.

7            So with regard to Mr. Franks, the first allegation

8    at least that I note in the Complaint is on June 28th where

9    there was this tactical training exercise in Munith, Michigan,

10   that Mr. Franks was involved with.  Shortly after that on

11   July 7 Mr. Franks says that he's not cool with the offense of

12   kidnapping and is just there for the training.  If he had not

13   been involved in conversations going forward regarding the

14   kidnapping, I would take that and credit it as an indication

15   that he did not agree to what was going forward.  However, as I

16   recite these facts, I think it demonstrates that he did not

17   hold to that position.

18           July 10 and 12 Mr. Franks is present at a field

19   training exercise in Wisconsin.  He brought and fired a rifle

20   with a silencer while others constructed IEDS that were tested.

21   Now, I also take Mr. Graham's point that there's no evidence

22   that that silencer was illegal.

23           There is a discussion on July 18 that Mr. Franks is

24   part of in Ohio where the attendees at the exercise discussed

25   attacking a Michigan State Police facility.  And any number of

1   group chats along the way that I won't touch on all of them.

2          That brings us to August 9 where Mr. Franks

3   participated again in a tactical training in Munith.  There's

4   some discussion of kidnapping.  There's discussion of gathering

5   information about the governor's primary residence in Lansing

6   and destroying her boat.

7          In a follow-up chat Franks indicates, "Okay, sounds

8   good.  I'm in for anything as long as it's well-planned."

9          On August 23 the group meets at Harris's residence in

10  Lake Orion and is concerned about infiltration by law

11  enforcement.  That's demonstrated in the text messages as well.

12  And Mr. Franks is involved in that discussion of being

13  concerned about law enforcement infiltration.

14         In the August 23 meeting Franks says "I'm ready to

15  get it on."  And Franks indicates that he spent $4,000 on a

16  helmet and night-vision goggles.  The group discusses

17  surveilling the governor's vacation home.

18         On August 30 Fox shares photos in an encrypted chat

19  with Franks and other people.  There's some discussion,

20  although not by Mr. Franks, of blowing up a bridge.

21         September 12 and 13 is the exercise at Mr. Garbin's

22  property in Luther where Mr. Croft constructs an IED and

23  detonates it.  And there's more discussion of the plot.  And

24  Mr. Franks is included in the nighttime surveillance.  On the

25  way back Mr. Franks is credited with saying "We're doing all

1    the reconnaissance work, so it should go smooth."

2              On September 13 the group gathers again, including

3    Mr. Franks, and it's confirmed that this is the group that's

4    going to kidnap Governor Whitmer.  And they agree to conduct a

5    final training exercise in late-October.

6              On September 14 there's some discussion of not

7    wanting that last exercise to be late in October because it's

8    too late, but the group is discussing, agreeing, or using the

9    time to raise money for explosives and other supplies.

10             On September 17 there's the discussion about not

11   wanting to be involved in the protest at the Capitol so as to

12   avoid public exposure.  And Franks is involved in that as well.

13             And then, of course, on October 7 Mr. Franks is in

14   the group that goes to meet the what turns out to be an

15   undercover officer to make a payment on explosives and tactical

16   gear.

17             I, as I said, credit the counsel's suggestion that

18   the training itself is not illegal, the possession of firearms

19   is itself not illegal, but it is the plot along the way that is

20   clearly very dangerous.  This is a very, very serious crime.

21   And as I said, Mr. Graham's argument is that there can be --

22   there are ways to stop this from being a danger going forward,

23   but even with location monitoring, that is something that can

24   simply be cut off of an ankle.  It is not something that will

25   necessarily keep Mr. Franks in his home and out of trouble.

1          Moreover, his -- the ease with which he could acquire

2     additional weapons makes, in the Court's opinion, there to be

3     clear and convincing evidence that he remains a danger to the

4     community.

5          I do share Mr. Graham's concern about Mr. Franks'

6     diabetes and would ask the parties to keep the Court apprised

7     if that becomes an issue in terms of his treatment while in

8     marshal custody, but I do find by clear and convincing evidence

9     that there is no condition or combination of conditions that

10    will reasonably assure the safety of the community.

11         I haven't gone through the government's exhibits, the

12    text messages and other exhibits that were provided, although

13    those also, I believe, support the conclusion that Mr. Franks

14    is a danger to the community.

15         So, Mr. Franks, what happens next:  You will remain

16    in marshal custody, probably in Newaygo County, pending the

17    trial in this matter.  There will be continued proceedings

18    related to the preliminary hearing later this week.  And from

19    that point if there is probable cause found, then you would be

20    bound over for further proceedings before the grand jury.

21         Mr. Franks, I'm sure you don't agree with my

22    decision.  Do you understand everything that happened in court

23    today?

24              *DEFENDANT FRANKS:*  Yes, Your Honor.

25              *THE COURT:*  All right.  Anything else we have to take

1   up on this defendant, Mr. Kessler?

2            *MR. KESSLER:*  No, Your Honor.  Thank you.

3            *THE COURT:*  Mr. Graham.

4            *MR. GRAHAM:*  No, Your Honor.

5            *THE COURT:*  All right.  We'll be adjourned.

6            *THE CLERK:*  All rise, please.  Court is adjourned.

7        *(Proceeding concluded at 3:03 p.m.)*

8                         *   *   *   *   *

9        I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11        I further certify that the transcript fees and format

12  comply with those prescribed by the court and the Judicial

13  Conference of the United States.

14

15  Date:  October 27, 2020

16

17                         **/s/ Glenda Trexler**

18                         _____
                            Glenda Trexler, CSR-1436, RPR, CRR

19

20

21

22

23

24

25

1                            *EXAMINATION INDEX*

2                                                      *PAGE*

3          *DIRECT EXAMINATION BY MR. KESSLER:          15*

4          *CROSS-EXAMINATION BY MR. GRAHAM:            17*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25