UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                             No. 1:20-mj-416

    vs.                                      Hon. Sally J. Berens
                                                   United States Magistrate Judge

KALEB FRANKS,

        Defendant.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S DETENTION APPEAL

The United States opposes defendant Kaleb Franks' detention appeal. Evidence adduced over two days' hearings established by clear and convincing evidence that Franks knowingly participated in plot to kidnap the Governor of Michigan. Franks trained in combat tactics with semiautomatic weapons, cased the Governor's home at night, and conspired to manufacture untraceable guns to raise money for the conspiracy. No condition or combination of conditions short of detention would reasonably assure the safety of the community.

FACTS

1.      On October 7, 2020, Franks and five co-conspirators were arrested for conspiracy to kidnap the Governor of Michigan. (R. 1: Criminal Complaint, PageID.1.) The facts alleged in the criminal complaint are incorporated by reference.

2.      Over the course of two days (October 13 and 16, 2020) the Court conducted a preliminary examination and detention hearings for the five defendants present in this district, including Franks. (R. 35: Criminal Minute Sheet, PageID.83.) The Court took live testimony from FBI Special Agent Richard J. Trask II at both hearings. (R. 39: Preliminary Hr'g. TR, Vol. I, PageID.87; R. 54: Preliminary Hr'g. TR, Vol II, PageID.277; R. 56: Detention Hr'g. TR,

PageID.384.) The Court received 23 exhibits; including photographs, video recordings, undercover audio recordings, and encrypted chat messages exchanged by the conspirators. (*Id.*) In addition, the Court considered the report prepared by U.S. Probation and Pretrial Services. (R. 23: Pretrial Services Report, PageID.49.)

3. On the first day of the preliminary hearing, SA Trask testified that Adam Fox met "militia" extremists from several states in Dublin, Ohio on June 6, 2020. (R. 39: Prelim. Hr'g. TR, PageID.94.) In the presence of FBI sources, they discussed plots against government officials in several states, including Michigan Governor Gretchen Whitmer. (*Id.*) Fox thereafter contacted members of the Wolverine Watchmen, a local "militia" group to which Franks belonged. (*Id.,* PageID.104.)

4. In July 2020, Franks attended a field training exercise ("FTX") in Wisconsin, where he and several of the other defendants conducted tactical weapons training. (*Id.,* PageID.105-07.) As shown in Gov't Ex. 1, Franks trained with an AR-15 style semiautomatic assault rifle fitted with a suppressor. (*Id.,* PageID. 107). SA Trask explained that suppressors are used in combat to depress the noise and flash of a firearm, thereby concealing the location of the shooter. (*Id.*) Later in July, Franks met co-defendants again in Ohio, where the group discussed attacking Michigan State Police outposts. (*Id.,* PageID.109.) In August 2020, Franks attended a meeting with co-defendants in Munith, Michigan, where Fox raised the idea of kidnapping Governor Whitmer. (*Id.,* PageID.110.)

5. As shown in Gov't Ex. 3, the defendants had by this time already begun using encrypted chat messaging services to communicate. SA Trask testified that in his experience as a counter-terrorism agent, he often observed criminal groups and foreign intelligence services using such encryption to thwart law enforcement surveillance. (*Id.,* PageID.111.) Members of the

2

conspiracy, including Franks, used code names and code words to conceal their identities and intentions. (*Id.,* PageID.117.) For instance, Fox referred to his explosives maker as the "baker," and discussed plans to send out "cupcakes." (*Id.,* PageID.117-18.) Defendant Harris (code name "Beaker") suggested someone dress as a pizza delivery person and shoot the Governor at her door. (*Id.,* PageID.115.) Franks (code name "Red Hot") wrote in the same chat, "Okay, sounds good. I'm up for anything as long as it's well planned." (*Id.,* PageID.116). As seen in Gov't Ex. 5, Franks used the encrypted communications application to share a video of himself practicing quick magazine changes with a semiautomatic assault rifle – a useful skill in a protracted firefight. (*Id.,* PageID.118.)

6. As seen in Gov't Ex. 10 and 11, Franks and his co-defendants engaged in panicked speculation that their encrypted chat group had been infiltrated by law enforcement. (*Id.,* PageID.124-28.) Franks suggested the group might have a "mole" who understood their coded language. (*Id.,* PageID.126-27.) Franks met his co-defendants at Harris' house, where each brought three forms of identification in an attempt to weed out any undercover informants. (*Id.,* PageID.129-130.) Franks cautioned his co-defendants that because they might be "compromised," they should talk in person only, and "operate only in our small unit" until they could establish more secure communications. (*Id.,* PageID.127, 130.) Franks expressed concern that their faces and names might have been exposed. (*Id.*) The group switched to a new encrypted chat application that could be deleted "with the click of a button," so "if the feds try to see what you or anyone said, they can't find anything." (*Id.,* PageID.132.)

7. In late August, Fox and two other individuals (one a government informant) drove to Governor Whitmer's private vacation home in Northern Michigan for a daytime surveillance mission. (*Id.,* PageID.133-37.) Fox took photographs and video of the house and drew a tactical

map on which he noted the distance of state and local law enforcement from the home. (*Id*; Gov't Ex. 12-15.)

8. On September 11-12, 2020, Franks attended an "FTX" with his co-defendants at Ty Garbin's property near Luther, Michigan. (*Id.,* PageID.145.) Fox shared the details of his daytime surveillance with Franks and the other defendants, explained his plan to kidnap Governor Whitmer, and led them on a nighttime surveillance trip to the Governor's home. (*Id.*) Fox, defendant Barry Croft and two other individuals drove to the boat ramp across the lake from the Governor's home. (*Id.,* PageID.152-153.) Along the way Fox inspected the underside of a bridge for places where an explosive device could be placed to retard a law enforcement response. (*Id.;* Gov't Ex. 16, 17.) Franks traveled with Garbin and another individual to the Governor's house, where they attempted to make visual contact with Fox at the boat ramp across the lake. (*Id.,* PageID.147.) The group had discussed using a boat to "exfiltrate" the Governor by water and take her from there to Lake Michigan. (*Id.,* PageID.147-48.)

9. After the group returned to Garbin's property in Luther, they again discussed kidnapping the governor, and joked about how easy it would be to just damage her home. (*Id.,* PageID.154-55; Gov't Ex. 18.) A voice SA Trask identified as most likely belonging to Franks stated, "Kidnapping, arson, death. I don't care." (*Id.*) At the conclusion of the meeting, Franks and the rest of the group agreed to meet for one more FTX and use the intervening time to raise money. (*Id.,* PageID.157.)

10. At Franks' detention hearing on October 27, 2020, SA Trask testified that Franks planned to make money by assembling "ghost guns" (untraceable firearms) for friend who was a convicted drug dealer. (R. 56: Det. Hr'g. TR, PageID.398-99.) The dealer would pay them three times the normal value of the firearms, since he was prohibited from buying guns legally. (*Id.,*

4

PageID.399). Franks obtained parts for two 9mm semiautomatic pistols and an AR-15 semiautomatic assault rifle, which he gave to Garbin and a government informant for assembly. (*Id*.) The finished pistols, which had no serial numbers, were recovered from Franks' residence. (*Id*.)

11.     Shortly before their arrest, Fox communicated with Franks and his co-defendants about an invitation to attend an armed rally at the State Capitol in Lansing. (R. 39: Prelim. Hr'g TR, PageID.159-61.) Garbin stated the group needed to have "Zero, I mean zero, public interaction if we want to continue with our plans." (*Id.,* PageID. 162; Gov't Ex. 19.) Franks agreed, "Hard pass on anything in public." (*Id*.)

12.     In addition to the facts adduced at the preliminary and detention hearings, the government noted that Franks had an expunged conviction for home invasion, and had his probation revoked on another offense for failure to follow a court's orders. (R. 56: Det. Hr'g TR, PageID.391, citing R. 23: Pretrial Services Report, PageID.52.)

13.     The Court found by clear and convincing evidence that Franks' release would pose a danger to the community and safety concerns for specific individuals. (R. 40: Order of Detention, PageID.249.) The Court also found probable cause to bind the defendants over for further proceedings before the grand jury. (R. 51: Order, PageID.270.)

14.     On October 28, 2020, Franks appealed the Court's detention order. (R. 57: Def.'s Mot. for Revocation of Detention Order, PageID.411). In his brief Franks proffers evidence of his ties to the community, and notes that two defendants charged by the State of Michigan (Brian Higgins and Peter Musico) have had cash bonds set. (R. 57: Def's Mot., PageID.415-16.) Franks also argues that because he did not personally assemble the "ghost guns" seized from his residence, he would not have access to firearms if released on bond. (*Id.,* PageID.416.) Finally,

Franks argues his diabetes places him at heightened risk of COVID-19 while incarcerated. (*Id*.) This information was previously presented to the Court, which advised it would be attentive to issues regarding his medical treatment. (R. 56: Det. Hr'g TR, PageID.395, 408.)

## LAW AND ARGUMENT

Title 18, Section 3145(b) provides that "[i]f a person is ordered detained by a magistrate judge, ... the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." The district court conducts an independent, *de novo* review of the magistrate judge's determination. *United States v. Martinez,* 2012 U.S. Dist. LEXIS 145584, *1. The Court may receive additional evidence or rely on the record of the earlier hearing. (*Id.,* at *2.) (no additional evidence required where the Magistrate Judge had developed a substantial factual record.)

The Bail Reform Act requires the pretrial detention of a defendant if no condition or combination of conditions exist that will reasonably assure the appearance of the person, and the safety of any other person and the community.  18 U.S.C. § 3142(e).  In determining whether to detain the defendant or release him on conditions, the Court must consider:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of 18 U.S.C. § 1591, a federal crime of terrorism, or involves a minor victim or controlled substance, firearm, explosive, or destructive device,

(2) The weight of the evidence against the person,

(3) The history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)   The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004); 18 U.S.C. § 3142(f)(2)(B). Although the district court considers the case for detention *de novo,* reversal is not indicated where no new evidence is elicited "[o]ther than reargument of points made at the time of the initial hearing." *United States v. Payne*, 683 F. Supp. 215, 216 (E.D. Mo. 1988).

Franks presents no new evidence or changed circumstances to justify reversing the Court's determination. That state defendants, Higgins and Musico, have been allowed to post bond is irrelevant, as neither is charged in the conspiracy to kidnap the Governor. Musico did not attend the FTX in Luther. (R. 54: Prelim. Hr'g TR, PageID.343.)  Higgins accompanied Franks on the nighttime surveillance of the Governor's house, but reportedly later withdrew from the kidnapping plot. (*Id*.)

The fact that Franks did not personally assemble the unregistered "ghost guns" is likewise unimportant. It is undisputed that he obtained the parts and had them assembled by co-conspirators with appropriate skills; a feat that can be repeated. Franks' diabetes was also already considered by the Court, which was solicitous of any new information about his condition. Given the seriousness of the charged offense, his condition does not outweigh the risk his release would pose to members of the community.

The factual record for detention was exhaustively developed over two days of contested hearings, and the Court's reasoning was carefully developed and documented. No further hearing is necessary for this Court to adjudicate the defendant's appeal.

7

WHEREFORE, the government requests the defendants appeal be denied.

                                          Respectfully submitted,

                                          ANDREW BYERLY BIRGE
                                          United States Attorney

Dated:  November 9, 2020              /s/ Nils R. Kessler
                                          NILS R. KESSLER
                                          Assistant United States Attorney
                                          P.O. Box 208
                                          Grand Rapids, MI 49501-0208
                                          (616) 456-2404