THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

KALEB FRANKS,

    Defendant.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

### KALEB FRANKS'S MOTION FOR DISCLOSURE OF ALL RECORDS RELATED TO CONFIDENTIAL HUMAN SOURCES AND MEMORANDUM IN SUPPORT

Kaleb Franks moves for an order directing the government to disclose all records related to the recruiting of, use of, and interaction with, the confidential human sources who participated in the investigation of this matter. In support of this motion, Mr. Franks offers this memorandum of law.

### *Introduction*

Kaleb Franks is charged with conspiring to kidnap Michigan Governor Gretchen Whitmer. The government went forward with this charge despite knowing that Kaleb told a number of people, including government informants, that he was "not cool with offensive kidnapping" and added that he was "just there for training." After hearing Kaleb's unambiguous declaration, these informants, commonly called Confidential Human Sources ("CHS") worked hard under the direction of FBI handlers to induce and persuade him and others to engage in a plan to kidnap

Governor Whitmer. The government has identified at least 12 CHSs by number. (CHS 99252, CHS 97067, CHS 99802, CHS 99900, CHS 59197, CHS 62527, CHS 65724, CHS 36620, CHS 88802, CHS 99325, CHS 99691, and CHS 100614.) The CHSs were assisted by FBI agents working undercover. Kaleb never agreed to participate in a kidnapping plan and will defend the case at trial on that basis.

Kaleb is entitled to raise the alternative defense of entrapment. If a jury finds that Kaleb agreed with anyone to kidnap Governor Whitmer, the same jury could find that Kaleb was induced to participate by government agents. Kaleb is entitled to fully explore and present this defense. To do this, Kaleb needs access to the CHS files maintained by the government. These files are required by FBI and DOJ rules and will provide crucial information regarding entrapment issues that will not be available elsewhere. Kaleb should not be required to engage in the "hide-'n-seek" process that the FBI has applied to this case. *See, e.g.*, RE. 217: Croft's Motion for Early Designation of Witnesses and Exhibits, PageID # 1164-65, 1167.

### *Procedural Background*

This case began with the government filing a criminal complaint on October 6, 2020, charging Mr. Franks and five others with conspiring to kidnap Michigan Governor Gretchen Whitmer, in violation of 18 U.S.C. § 1201(c). *See* RE. 1: Complaint, PageID # 1. Authorities arrested Mr. Franks the following day in Ypsilanti, Michigan. His initial appearance occurred on October 8, 2020. *See* RE. 12: Minutes of First Appearance, PageID # 34. After litigation of the issue, the Court

ordered Mr. Franks detained. *See, e.g.*, RE. 74: Order Affirming Detention Order, PageID # 437-38.

The government indicted Mr. Franks and his codefendants on December 16, 2020. RE. 86: Indictment, PageID # 573-78. This indictment included a single charge: conspiracy to kidnap Governor Whitmer. *See id.* at 573. Codefendant Ty Garbin has pleaded guilty (doing so on January 27, 2021), with the other defendants proceeding toward trial, which is scheduled to begin on October 12, 2021 (with a final pretrial conference on September 23, 2021). *See* RE. 143: Minutes of Garbin Change of Plea, PageID # 759. (A superseding indictment, filed on April 28, 2021, added additional charges against codefendants but did not modify the charge against Mr. Franks. *See* RE. 172: Superseding Indictment, PageID # 961-76.)

### *Factual Background*

When Kaleb Franks set out to train in weaponry and tactics, enjoy time outdoors, and spend a Midwestern summer trying to find respite from the cares of professional and personal obligations and demands, he had no thoughts of harassing the government, staging a coup, or ending up on the national stage as an alleged "terrorist." Only through the diligent efforts of government informants and undercover agents did Mr. Franks end up framed as a lawless agitator.[1]

Until this case, Mr. Franks essentially represented everything the criminal-justice system looks for in someone who has had trouble with the law. Once a heroin user, Mr. Franks went to jail in 2013, but this experience in custody shook him, and

---

[1] Mr. Franks, of course, cannot speak for the intentions of his codefendants, but he believes that a number of them shared his approach to simply enjoying tactical training and camaraderie.

he turned his life around. Since that time, he has remained sober. After his successful completion of two years of drug court in the wake of his nine months in jail (and a HYTA adjudication), Mr. Franks began using his own past experiences as background and turned to helping others who found themselves struggling with addiction.

After years of sobriety, and after establishing a successful career as a drug-and-alcohol counselor, Mr. Franks moved for, and received, expungement of his possession-of-cocaine conviction. He thus does not live with any sort of felon status. And besides moving beyond this drug-involved past, he has found a supportive fiancée, mended his relationship with his family (he is quite close to his sister and father), and purchased a home. When he participated in tactical, firearm, and first-aid training with others, he did not see himself as varying from the steady, law-abiding path he has so diligently paved for himself over the last several years.

## *Legal Discussion*

Mr. Franks will raise an entrapment defense at trial. He is thus entitled to the government's complete files on all confidential human sources used in this matter.

> A. *Entrapment: evidence in this case establishes that the government assiduously orchestrated creation of the alleged wrongdoing here, using undercover agents and confidential sources to create the "plot" it now presents in its indictment.*

Only through the efforts of "confidential human sources" (CHSs) and undercover agents did the government come up with its allegations here. Everything in this case points toward a defense of entrapment. In the Sixth Circuit,

such a defense has two elements: "One is that the defendant was not already willing to commit the crime. The other is that the government, or someone acting for the government, induced or persuaded the defendant to commit it." Sixth Cir. Pattern Crim. Jury Ins. 6.03 (2021).

Mr. Franks never exhibited any willingness to engage in wrongdoing. Even in the government's own filings, Mr. Franks' unwillingness to break the law in general (much less engage in violent or threatening behavior specifically) comes through. In its complaint, the government had to concede that, "[o]n July 7, 2020, FRANKS attended a meeting at the residence of another militia group member . . . [and] said that he was 'not cool with offensive kidnapping' and added that he was 'just there for training,' or words to that effect." *See* RE. 1-1: Continuation of Complaint, PageID # 6 n.4.

The government, of course, can generally use undercover agents and confidential sources to catch those engaged in crime. It may use "artifice and stratagem" to bring criminals to justice. *See, e.g.*, *Jacobson v. United States*, 503 U.S. 540, 548 (1992). "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.* Even "[e]vidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it." *Id.* at 551. "This obedience may reflect a

5

generalized respect for legality or the fear of prosecution, but for whatever reason, the law's prohibitions are matters of consequence." *Id.* Simply, the Government may not play on an innocent party's weaknesses and beguile that party into committing crimes which they otherwise would not have attempted. *Id.* at 553. "The point is that the government is supposed to catch criminals, not create them." *United States v. Barta*, 776 F.3d 931, 939 (7th Cir. 2015).

Yet here, evidence suggests that confidential informants working for the government "coaxed" and "persuaded," and played on sympathies and friendships, to try to get people to discuss and "plan" a kidnapping to "further a greater good." *Cf. Jacobson*, 503 U.S. at 554 (O'Connor, J., dissenting). No amount of interest in firearm or tactical training can thus equate to predisposition to commit the crime charged here.

> B. *The government possesses materials on the confidential human sources involved in this case that are vital for preparation of a defense here and thus discoverable under* Brady *and Rule 16.*

Under *Brady v. Maryland,* 373 U.S. 83, 87 (1963), of course the "government has an obligation to disclose evidence favorable to the defendant upon request when such evidence is material to the defendant's guilt or innocence." *See, e.g.*, *United States v. Cruz-Velasco*, 224 F.3d 654, 661 (7th Cir. 2000). This "obligation extends to both impeachment and exculpatory evidence." *Id.* A central *Brady* inquiry involves considering whether disputed evidence could affect trial. *See id.* at 662. But *Brady* and Federal Rule of Criminal Procedure 16 do not end the government's obligations at, or relate only to, exculpatory evidence. The government has a duty to share

6

evidence that could assist in preparation of a defense to the charges. *See, e.g.*, *id.* at 665 (addressing government's failure to turn over airline passenger list, and finding that "the government was clearly obligated to disclose the passenger list to the defense as soon as it was received"); *see also* Fed. R. Crim. P. 16(a)(1)(E)(i).

Here, publicly available materials, as well as discovery materials provided by the government, suggest the government possesses files on the confidential human sources involved in this case, files that could assist in preparation of Mr. Franks' defense. Evidence indicates, for example, that one CHS[2] has a decades-long history of cooperating with the government in exchange for personal benefits. In 1985, he supposedly shared a cell in a Wisconsin jail and then cooperated against a cellmate. Twenty years later, in 2005, this CHS cooperated with authorities against his employer, who was charged with soliciting murder. Basically, this CHS has a decades-long history of acting as a professional snitch for the government.

As Special Agent Henrik Impola testified during state-court proceedings on March 4, 2021, another CHS received something like $54,000 in compensation for his work in this case. *See People v. Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 17-18; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 75-76 *and Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of

---

[2] While the state proceedings in this case (and federal proceedings in other districts) have gone far in opening the door to the identities of certain CHSs, Mr. Franks will, at this point, refrain from offering any identifying labels for them.

Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 216. That CHS has testified that an agent just handed him an envelope one day—and that this envelope contained $2,500, which the agent told him constituted compensation for what the CHS was doing. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 49, 260.[3]

Handlers (agents managing CHSs) would keep detailed notes and reports on their interactions with each CHS. *See, e.g.*, *Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 121; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 72 (affirming a high level of oversight involved), 73-74. SA Impola and his colleague Jason Chambers acted as handlers for the CHS who got paid and who has already testified in state proceedings. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 121; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 71 *and Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 166. (These notes, and investigation records as a whole, however, did not prevent all misunderstandings,

---

[3] SA Impola has called defense counsel in this case "paid liars." If counsel should receive the CHS files, they will have the facts that might make it easier for them to accurately characterize the occasions when envelopes full of cash were produced by FBI agents and handed to CHSs.

mix ups, and errors in handling the investigation. For example, SA Impola testified to that he had erroneously believed—and earlier testified to—Michigan authorities having possession of a suspect's phone that they did not have. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 139-40.)

The CHS who has testified (as appears typical for all CHSs) received "admonishments": directions and instructions related to service as a CHS. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 73; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 166-67. SA Impola even provided this CHS with material support, like medical equipment to have with him during trainings. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 167.

CHSs developed deep personal relationships with those they were influencing and cooperating against. They would dine with people. (For example, on August 9, 2020, a CHS [likely the one who has testified] went to Buffalo Wild Wings with codefendants Harris and Garbin. This CHS also helped codefendant Caserta fix his vehicle.) According to the CHS's testimony in state proceedings, at least certain informants did not know others were also working as confidential sources. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 218. So, these informants

9

worked independently of one another to develop these personal bonds, each working to achieve their goals with their handlers and without the "safety net" of believing another informant could pick up slack in their plans if they missed something. The situation meant they worked with remarkable diligence.

Evidence also (unsurprisingly) indicates extensive cooperation between these sources and their government handlers . . . and materials suggest extensive files on these sources and the evidence they provided. As one example: the CHS with the lengthy history of cooperation seems to have granted agents access to certain Facebook accounts, and the CHS who has testified granted agents access to a variety of accounts. *See, e.g.*, *Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 48 (CHS testifying regarding granting account access). As another example, Special Agent Impola testified during state proceedings that he sometimes talked with the CHS who testified multiple times a day, that the (unsurprisingly, given the roles involved) government allowed for deception from informants, and that the government could authorize illegal conduct from informants (though SA Impola denies seeking such authorization here). *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 19-20.

Evidence also suggests that, before the CHSs got involved in investigating the Wolverine Watchman, the government had no reason to believe that group was

10

engaged in illegal conduct of any sort.[4] *See, e.g., id.* at 22-23. SA Impola testified that the CHS who has testified participated in leadership of the Wolverine Watchmen, and that this CHS led the tactical trainings that figure so prominently in the background of this case:

> Q. And if I'm clear, you knew that your CHS was leading these trainings, the tactical parts of it?
>
> A. Yeah, I specifically instructed our CHS to keep the Wolverine Watchman safe during these trainings, and to take a role so that they didn't hurt themselves.

*Id.* at 34-35; *see also id.* at 40 (describing CHS as acting as "training officer"); *see also id.* at 59, 72, 107; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 64 (SA Impola testifying that "[m]y source Dan, Ty Garbin, Paul Bellar, Joe Morrison and Dan Harris were the original members of Wolverine Watchman leadership and then later Brian Puffenburger was added"); *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 251-52 (CHS testifying he held a leadership role). The CHS himself has testified to and confirmed his leadership role. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 127.

---

[4] SA Impola discussed an alleged incident involving a supposed Molotov cocktail, but the agent conceded that no evidence or records indicated the incident had actually occurred. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 23-24, 90, 190.

11

SA Impola likewise affirmed his direct role in telling CHSs what to say to people. For example, he told a CHS what to say to codefendant Adam Fox (he was communicating with the CHS during the CHS's conversation with Fox), including suggesting that Fox come train at Joe Morrison's property in Munith and urging Fox to do so. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 40 (conceding, "I was, we were talking about it, we were talking about what he was saying"), 52-53, 60-61; *see also id.* at 197. And it was *after* hearing Adam Fox supposedly spout off that the CHS who has testified invited Fox to join the trainings. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 176. At least one CHS invited people to use Wire to communicate. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 54-55.

Apparently, the logistics of the entire investigation stemmed from certain attorney-general guidelines on regulating investigations, the tools officers can use to investigate, and methods of conducting investigations. *See id.* at 167. While guidelines on investigations may not raise eyebrows in general, certain guidelines seem to have shifted interest here from looking at a "bunch of memes" to "predication requirements" to an investigation. *See id.* at 166-67. SA Impola testified that "we have to insure that we're not violating any civil rights and that Freedom of Speech is not the only thing we're investigating. That we're

investigation violations of law and threats to national security." *Id.* at 167. Given the government's concessions like the one directly below, these investigative protocols seem especially relevant here, where the CHSs' role in escalating rhetoric seems undisputed:

> On July 7, 2020, FRANKS attended a meeting at the residence of another militia group member, and CHS-2 was in attendance. FRANKS said that he was "not cool with offensive kidnapping" and added that he was "just there for training," or words to that effect. After the meeting, however, FRANKS actively continued to participate in the kidnapping plot, as further described below.

RE. 1-1: Continuation of Complaint, PageID # 6 n.4. SA Impola affirmed:

> Q. So you have guidelines within your organization to prevent you from investigating pure speech alone, is that correct?
>
> A. That's correct.

*See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 167.

In discussing the reaction to Adam Fox supposedly broaching (during a training exercise) the idea of kidnapping the governor, SA Impola has testified that "there was a negative reaction, people were surprised, and they didn't take to it kindly. There was a lot of questions being asked." *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 209. And while SA Impola suggested no one protested the idea as a whole, he conceded that the questions included, "why are you bringing this up." *See id.* In naming members of a smaller group that discussed the alleged kidnapping plot after the larger group expressed negativity toward it, SA Impola

identified only Shawn Fix, Mike Morais, Adam Fox, and Joe Morrison. *See id.* at 210.

The testifying CHS has affirmed that individuals involved in the trainings and conversations at the heart of the allegations here did *not* want to break the law. *See, e.g.*, *Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 269-70.

SA Impola's later testimony at the Jackson hearing subtly confirms that the government aimed to escalate matters. Even if people did discuss storming the Michigan capitol (and Mr. Franks makes not concessions on that point), when they actually visited the capitol, they submitted to COVID-19 temperature checks, answered COVID-related questions, and followed all protocols to legally gain access. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 175; *see also Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 225 *and Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 160. SA Impola even conceded that certain individuals targeted by investigators lacked true plans to "storm" the capitol. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 175-76.

Agents and officers held different "areas of responsibility" (AORs) and dug into individuals' backgrounds (things like phone records and associates) to perform

"threat assessments." *See id.* at 186-87. For Mr. Franks specifically, SA Impola conceded a complete lack of military experience and training. *See id.* at 205. SA Impola also qualified even his description of the initiation of the investigation:

> Well what was concerning was not only did they have a perceived grievance and hatred towards law enforcement, but they were taking overt steps *or at least they were saying* they were taking overt steps to locate law enforcement officers' addresses in order to target them and kill them later.

*Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 70 (emphasis added). SA Impola conceded here at least the potential that his beliefs about the activities at issue rested on mere puffery. All of this evidence underscores the extremely active and coercive role the CHSs played in this matter . . . and the defense's concomitant need for access to all the government's records related to these CHSs.

   C.   *The defense has tried to work with the government to obtain the records related to the confidential human sources here.*

Counsel believes he has a working relationship with the prosecution. He makes an effort in every case to resolve discovery disputes and obtain materials from the government without the Court's intervention. The government also often takes pains to make additional discovery materials available.

With regard to the records at issue, counsel has spoken with the government. Unfortunately, despite discussions, the sides cannot reach an agreement on the government's release of these materials.

      D.     *The defense seeks disclosure of all records related to the work of, and communication with, the confidential human sources used in this case.*

Given the discovery already provided, counsel's extensive investigation into the allegations here, Mr. Franks' explanations to counsel, news reports, and discussions with other defense counsel and with the prosecution, undersigned counsel believes the government possesses reports, notes, and agent/source communications that were made during the government's investigation in this case . . . materials the government has not provided to the defense, including surveillance reports, agents' rough notes and logs, records related to cooperators' criminal histories/prior cooperation, and text/email/voicemail/social-media-messaging exchanges between informants and agents. Counsel also believes that mental-health records and data records (including records of google searches, phone searches, and social media) exist.[5] Counsel also seeks all records related to government policy and admonitions with regard to confidential human sources, and all protocols related to handling and agent involvement with, and instructions toward, sources. Given the extensive evidence of payment of sources here, counsel asks for disclosure of all materials related to payments made to (or even declined by) CHSs. If sources took (or declined to take) polygraph examinations, counsel would like copies of all records related to those tests (or to a CHS not undergoing testing).

---

[5] For example, testimony during state proceedings explored the testifying CHS's mental health. *See, e.g., Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. III, 3/5/21, at 258-59.

Records indicating a failure to link the defendants here to wrongdoing constitute discoverable material. So, counsel would ask for any materials related to the government's failure to find wrongdoing, all efforts to link Mr. Franks to any political or extremist groups, all government decisions not to follow up on leads or investigate further, and any past investigations of Mr. Franks. Likewise, counsel would like all records related to CHSs' failure to follow agent instructions or government protocols—and any instances of CHSs getting sanctioned, admonished, or chastised.

Courts have concluded that materials like text messages between cooperators and agents constitute discoverable evidence. *See, e.g.*, *United States v. Suarez*, No. 09-932 (JLL), 2010 U.S. Dist. LEXIS 112097, at *28-29 (D.N.J. Oct. 19, 2010) (unpublished) ("The Court thus concludes that it is at least 'reasonably foreseeable' that communications between the cooperating witness and the Government agents instructing him during the investigation would be discoverable in this case."). Failure to produce such materials may result in jury instructions adverse to the government, even if there is no showing of bad faith. *See id.* at *30-*31. In this context, courts have said, "While each agent maintained that none of the cooperating witness's text messages to them contained any information that he believed to be exculpatory, what the cooperating witness may have said to the agents during the crucial meetings and whether he abided by the agents' instructions are fertile ground for cross examination." *Id.* at *16.

### *Conclusion*

Given the allegations here, evidence presented in state-court proceedings, and discovery already produced, Mr. Franks will raise the defense of entrapment at trial. Rule 16 and *Brady* thus call for disclosure of all materials that could contribute to preparation of such a defense. Counsel asks the Court to order the government to produce all materials related to the confidential human sources used in this case, their qualifications and the vetting they underwent, their performance and their communication with agents, and any instructions and admonishments they received (as detailed above), and all other materials discussed above.

Respectfully submitted,

Date: July 12, 2021                **SCOTT GRAHAM PLLC**

By:   /s/ Scott Graham
        Scott Graham
        Attorney for Defendant
Business Address:
        1911 West Centre Avenue, Suite C
        Portage, Michigan 49024
        (269) 327.0585

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Criminal Rule 47.2(b)(ii), counsel asserts that this brief contains 4,554 words, as counted by Microsoft Word, version 16.50. Counsel is seeking, under separate cover, leave to file an oversized memorandum here.

Dated: July 12, 2021

By: /s/ Scott Graham
SCOTT GRAHAM
Attorney for Defendant
Business Address:
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585
sgraham@scottgrahampllc.com