# THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

**THE UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**

**KALEB FRANKS,**

        **Defendant.**

**Case No. 1:20-CR-183**

**Hon. Robert J. Jonker
Chief U.S. District Court Judge**

---

## APPEAL OF MAGISTRATE JUDGE'S ORDER DENYING MOTION TO COMPEL

---

Defendant Mr. Kaleb Franks, through his counsel Scott Graham, has moved this Court to compel the government to produce certain materials in discovery, namely materials related to confidential human sources used in the investigation of this case. *See* RE. 258: Motion to Compel, PageID # 1400-17. The government responded to this motion on August 9, 2021. RE. 260: Gov. Resp. to Motion to Compel, PageID # 1427-47. (It also responded to the joint supplements related to the motion. *See* RE. 319: Gov. Resp. to Supp., PageID # 1898-1902.)

On September 2, 2021, Magistrate Judge Sally J. Berens conducted a hearing on this matter. *See* RE. 324: Minutes, PageID # 1940. She issued an order denying the subject motions later that day. *See* RE. 325: Order Denying, PageID # 1941. In that order, she gave her reasoning (provided on the record at the hearing) as supporting this denial. *Id.* A transcript of the hearing has been docketed. *See* RE. 338: Trans. of Motion Hrg., 9/2/21, PageID # 2039-2103. Mr. Franks now asks the Court to consider these objections, vacate

the magistrate judge's order, and grant Mr. Franks's motion to produce the disputed CHS files.

### *Procedural and Jurisdictional Background*

First, to save the Court time and trouble, Mr. Franks will simply incorporate by reference his earlier briefing on these matters (rather than repeat arguments). *See* RE. 258: Motion to Compel, PageID # 1400-17; RE. 286: Reply to Gov. Resp. to Motion to Compel, PageID # 1661-75; RE. 315: Supp. to Motions to Compel, PageID # 1864-80 (with exhibits); RE. 316: Second Supp. to Motions to Compel, PageID # 1881-82.

As another preliminary matter, simply to clarify the applicable authority here, Mr. Franks would point out the relevant jurisdictional issues. On August 13, 2021, the Court referred these matters to Magistrate Judge Sally Berens, in accordance with 28 U.S.C. § 636(b)(1)(A). Also under that section, "A judge of the court may reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). Local Criminal Rule 47.3 likewise offers a means for seeking reconsideration, and Local Criminal Rule 57.1(e) points to Local Civil Rule 72.3 as governing appeals from magistrate-judge rulings; Rule 72.3 provides that a party may appeal a non-dispositive ruling by a magistrate judge. Essentially, under Local Civil Rule 72.3, "A district judge of the court shall consider the appeal and shall set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." L. Civ. R. 72.3(a).

*Legal Discussion*

As a starting point for this appeal, Mr. Franks will discuss the specifics of what he has been seeking with his motion to compel and why these materials are critical for the defense.

**A.    *The government and the defense do not agree on how to define "exculpatory" in the entrapment context, and the defense should be able to review the CHS files to see the evidence related to the government's deployment of CHSs, which goes directly to inducement and efforts to overcome a lack of predisposition.***

Multiple times, the magistrate judge asked the defense where the disconnect lay with regard to what the government had produced and what the defense wanted, so this seems like a key place to start. For example, the magistrate judge queried Adam Fox's attorney:

> So the question I want to bring you back to is what are you asking me to order them to do that is in addition to the normal process of criminal discovery where they review all of this information and produce what is required by law to be produced? Where is the disconnect between what you think you are entitled to and have not received and that they have and what is—is there even any disagreement between what you are asking for and what the Government thinks it is required to produce?

RE. 338: Trans. of Motion Hrg., 9/2/21, PageID # 2064.

What Mr. Franks wants is the entire CHS file for at least four of the CHSs used by authorities in investigating the defendants here. *See* RE. 338: Trans. of Motion Hrg., 9/2/21, PageID # 2080. The disconnect lies in the government's and the defense's differences in defining "exculpatory evidence" in the context of an entrapment defense. In arguing about entrapment and predisposition, the government has suggested it has turned over all relevant evidence. *See, e.g.*, RE. 338: Trans. of Motion Hrg., 9/2/21, PageID # 2070-71. But it has also emphasized, repeatedly, that it will turn over evidence

that—in its view—constitutes relevant and exculpatory materials. *See id.* at 2073. Again, the problem arises because the government and the defense can and do interpret these terms quite differently. *See id.* at 2075 (counsel explaining, "The disconnect is in the perception of the obligation under the law to provide information"). And at least one government agent has stressed his intent to obfuscate as much as possible with regard to discovery and production. *See id.* at 2076.

In a similar vein, the government believes that some of this material, and the need to disclose it, turns on whether or not a person testifies. *See id.* at 2084. Yet under that theory, material the defense may perceive as exculpatory might never come to light—the government could manipulate the discovery process, and trial itself, by picking and choosing witnesses based (at least in part) on what concomitant evidence it wanted to turn over under *Giglio*. The government has only said that, "[t]o the extent there is anything in the files of those CHSs that would be potentially exculpatory that might tend to back up their—you know, their theory of entrapment, then that's stuff we would turn over and we are going to comply with the Brady and Giglio obligations." *Id.* at 2085. The prosecution has actually affirmed its commitment to *not* turning everything over, saying, "there is a lot of stuff in those kind of files if it's not exculpatory because it doesn't bear on entrapment, and if it's just for impeachment we don't have to turn over stuff like that on witnesses who aren't testifying." *Id.* at 2085-86.

Simply, the parties definitely disagree on what could qualify as exculpatory. And this disagreement seems to extend to the magistrate judge, as well, who said, in relation to Special Agent Chamber's possible financial interest in the investigation, "The suggestion I think in the Government's response was, well, if he is not a witness at trial, and he doesn't

4

have an interest in the trial, then a financial interest is irrelevant." *See id.* at 2089. This tacit acknowledgement of such a position flies in the face of case law that clearly attributes to the prosecution an agent's conduct—and here that conduct would be absolutely relevant and exculpatory, regardless of whether SA Chambers (a key agent handling CHSs and orchestrating CHS interaction with the defendants) testifies at trial.

Regarding this link between SA Chambers and a company looking to peddle its services in the intelligence community, and the prosecution's duty to turn over evidence related to such a link, the government dismissively stated, "It would depend on what we learned, and as far as I know from talking to Agent Chambers, you know, there is no financial interest at all." *Id.* at 2093. "There is nothing," it said, and then continued, "So you know, if we were to find out that there was some financial interest that would make him want to go out and entrap people, of course we would tell the Defense about that." *Id.* This position, however, ignores the government's affirmative duty to investigate these allegations related to SA Chambers and produce for the defense any exculpatory evidence in relation to them. (Mr. Franks will explore this point further below.)

Even if the government has its understanding of entrapment correct (and Mr. Franks vehemently contends the government is wrong), predisposition—as an entrapment-related term of art—does not involve a general predisposition to make bad choices . . . or even to break the law. It involves a predisposition to commit the crime at issue. In *United States v. Hamzeh*, 420 F. Supp. 3d 828 (E.D. Wisc. 2019), a case very similar to the one at hand, a district court in Wisconsin discussed entrapment and the case law related to the defense. Government inducement, of course, "means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not

commit the crime if left to his own devices will do so in response to the government's efforts." *Hamzeh*, 420 F. Supp. 3d at 836 (quoting Seventh Circuit case law) (emphasis added). To establish the defense, a "defendant must show more than that he was offered an 'ordinary opportunity to commit the charged crime.'" *Id.* (citation omitted).   The defendant must point to "plus factors," namely conduct by government agents that created a risk that a person (one who otherwise would not commit the crime if left alone) would do so in response to the government's efforts. *Id.* This "plus-factor conduct" could include: repeated attempts at persuasion; fraudulent representations; threats; coercive tactics; harassment; promises of rewards (beyond those customary for execution of the crime); pleas based on need, sympathy, friendship, and the like. *Id.* at 836-37. Predisposition, for its part, focuses on whether a defendant was an "unwary innocent" or an "unwary criminal" who simply jumped on the opportunity to perpetrate the crime. *Id.* at 837.

The CHSs in Mr. Franks's case, of course, played a key role in the actions that the defense will argue qualify as exactly the kind of "plus-factor conduct" that constitutes entrapping inducement. These CHSs engaged in the repeated persuasion, the overbearing pleas to friendship and the like, and the subtle psychological coercion that impelled the behavior that will be at issue during trial. The government crafted its interactions with the defendants on multiple levels, through these CHSs. For example, its selection of strong, militaristic leaders, of men who could become role models for these defendants, played into the entrapment. So the CHSs files, if maintained in accordance with the DOJ's published guidance on files, should reveal critical information regarding things like the government's selection (whether explicit or tacit) of the sort of person who could bring to bear the kind of

psychological persuasion necessary to create the alleged offenses and act as effective (in the government's view) informants.

A government agent's or CHS's creation of scenarios involving a risk that a person, who would not ordinarily commit the crime if left alone, will do so in response to the government's efforts brings up entrapment. In Mr. Franks's case such a scenario arose because the government focused on a band of individuals with unstable personal histories (that left them extraordinarily susceptible to persuasion) and injected into the mix the kind of father-figure, military-hero role models the men craved in their lives. *See Hamzeh*, 420 F. Supp. 3d at 838 (discussing inducement and the creation of this risk); *see also* RE. 285: Fox Reply to Gov. Resp. to Motions to Compel, PageID # 1657 (discussing how "Adam Fox frequently expressed to [CHS] 'Big Dan' and others how [sic] looked up to 'Big Dan' with respect and admiration" and how "Big Dan" portrayed himself, seemingly at the government's behest, as a military hero).

Notes in the CHS files showing a focus on these attributes, or discussing selection of CHSs based on these attributes, or indicating that CHSs should play up these attributes, would constitute one of the many aspects of these files that could be exculpatory for the defense. And from the government's current perspective, as expressed in its briefing and at the hearing on this matter, such notes would likely *not* make the cut for production.

Similar concerns arise with regard to any admonitions to CHSs that would be in the files. Any admonitions to CHSs should be memorialized in the files, but admonitions can be interpreted differently. The admonition of a CHS can bear on overstepping and entrapment for the defense while, for the government, the admonition could appear

irrelevant or even benign. The government simply cannot be left to interpret the subjective meaning (or significance for a jury) of an admonition in the entrapment context.

Likewise, authorizations and findings of necessity (for things like payment to a CHS or permission for a CHS to break the law) can shed light on entrapment tactics but may not appear immediately exculpatory to the prosecution. These aspects of a CHS's file could reveal an agent-handler's strategy regarding inducing a defendant to act in a certain way and pursue certain courses. For example, with regard to the CHS who is currently involved in federal criminal proceedings in another district, filings in that case indicate that the CHS "possessed the firearm charged in the indictment on September 26," and "[o]n that day, he had authorization from the FBI to otherwise engage in illegal conduct," so while "[t]he parties dispute how the form must be read and whether any behavior beyond its parameters nullify it," the point remains that the government authorized this CHS to break the law and possess a firearm in order to further his "mission" in relation to this case against Mr. Franks and his codefendants.

The reasoning behind that authorization seems like it would bear on a need to curry and maintain the defendants' respect . . . even awe. (This CHS's December 2020 statements to Special Agent Impola corroborate this idea of authorization, and March 3, 2021 records from an interview with this CHS show that the government needed him to maintain his Patriot 3%er leadership status to be an effective informant . . . which necessitated exposure to guns and thus authorization to break the law.)

Basically, the government couldn't indict Mr. Franks and his codefendants without leading them into the current allegations, and it couldn't lead them into these allegations without the shepherding influence of CHSs whom the government itself had molded into

images of strong, charismatic, influential "father figures" who catered to the defendants' fondness for guns and military tactics. The CHS files' authorizations would implicitly tell the story of the government's efforts.

> **B.** ***The government will not even concede the exculpatory nature of things like financial inducements, despite clear case law on the issues, so this lack of concession, coupled with the agents' problematic behavior in this case, mean that the prosecution cannot be relied on to parse these CHS files for exculpatory material.***

In its written response, and at the hearing on this matter, the government has maintained a position against conceding that things like financial interests in a case constitute exculpatory evidence. *See* RE. 319: Gov. Resp. to Def. Supp., PageID # 1899-1901. It has also tried to distance itself from the allegations related to SA Chambers's financial interests in the investigation.

The prosecution has an affirmative duty to discover exculpatory evidence known to officers acting on its behalf: "Disclosure to the defense is ultimately 'the responsibility of the prosecutor,'" and prosecutors "must 'learn of any favorable evidence known to the others acting on the government's behalf in the case.'" *Lefever v. Ferguson*, 645 F. App`x 438, 448-49 (6th Cir. 2016) (White, J., concurring in part and dissenting in part) (citing cases on duties). The prosecution's "disclosure obligation 'encompasses evidence "known only to police investigators and not to the prosecutor."'" *Id.* at 449. And for their part, officers have an analogous duty to disclose evidence to the prosecution. *Id.*

Yet the government has simply flung away from itself the "hot potato" of Special Agent Chambers's problematic apparent business dealings and cried "not our problem." *See, e.g.*, RE. 319: Gov. Resp. to Def. Supp., PageID # 1902 (claiming it has no duty to

discover and turn over material not in its possession, even if that material relates to a government agent's conduct).

At the hearing here, the government hedged in the extreme. The prosecution stated, "*If* I were to find out that Jayson Chambers had a financial interest in the outcome of the case, *if* that's Brady we are going to tell them [the defense] about it." *See* RE. 338: Trans. of Motion Hrg., 9/2/21, PageID # 2092 (emphasis added). It continued, "So you know, *if* we were to find out that there was some financial interest that would make him want to go out and entrap people, of course we would tell the Defense about that." *Id.* at 2093 (emphasis added). Again, *if* is not the standard here: the prosecution has an affirmative duty to know what its own agents know.

Jurists have explained that things like a government witness's manuscript (for a novel based on a criminal case) could represent "evidence of bias or an interest in [the defendant's] conviction," and "[c]ourts have long held that a financial interest in the outcome of a trial is impeachment evidence, and the authorship of a marketable manuscript is no different." *Lefever*, 645 F. App'x at 450 (White, J., concurring in part and dissenting in part). And an entrapment defense necessarily carries the issue a step further because an officer's credibility as a witness is not the sole issue; rather, the *motivation* to entrap and ensure an indictment comes to the forefront. Courts recognize the defense's right to "exploit skillfully" a paid informant's financial interest in a case. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 132 (2d Cir. 1998). In *Salameh*, the Second Circuit found that the trial court "did not err when he determined that the details of [the informant's] agreement with the FBI and the subject matter of his informant work, *with the exception of his financial interest*, need not be disclosed." *Id.* (emphasis added).

The government is willfully ignoring the implications of SA Chambers's financial interest in the investigation. The government has said, "it is unclear how the finances of Exeintel or FBI regulations on outside employment would tend to exculpate the defendants." RE. 319: Gov. Resp. to Def. Supp., PageID # 1901. When one is considering subjective inducement, however, it seems pellucid that the inducer's increased motivation, based on the hope of future financial gain, will strengthen their efforts to curry favor/instill respect/encourage acquiescence and the like. For Mr. Franks, the government has not shown any predisposition; in fact, as Mr. Franks has repeatedly cited, the government has conceded a lack of predisposition, by recognizing his complete lack of interest in kidnapping, at least *before his exposure* to the government's CHSs (who worked for SA Chambers, who was hoping to parlay this investigation and his success at achieving an indictment into financial gain).[1] *See, e.g.*, RE. 1-1: Continuation of Complaint, PageID # 6 n.4.

The government here has simply refused to recognize basic principles related to its discovery obligations, so it cannot be the one conducting a review of these CHS files for exculpatory material. At the risk of appearing pedantic, counsel must reiterate that an entrapment defense involves two elements: inducement and the absence of predisposition. *See, e.g.*, *United States v. Kebles*, 318 F. App`x 678, 680 (10th Cir. 2009). "Inducement asks whether the government induced the defendant to commit the criminal act" and "'may take the form of persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.'" *Id.* (citation omitted).

---

[1] It bears pointing out that status as a social-media "influencer" in a field can lead to lucrative opportunities and marketing outlets.

Inducement necessarily involves *subjective factors*, so the government cannot determine the possible exculpatory value of a CHS's actions/words/interactions with others because it cannot evaluate the subjective value of those things.[2]

The government's briefing has demonstrated a choice to willfully ignore the implications of the government's discovery materials, underscoring the inappropriateness of having the prosecution review these files for exculpatory material in the context of an entrapment defense. For example, the government claims the defense did not let a certain text exchange explored in a defense supplement "speak for itself: They inserted a period after 'specifically', entirely changing the meaning. The omitted context shows it was in fact a question, not an edict, because it was immediately followed by an answer: 'That's on the first call.'" *See* RE. 319: Gov. Resp. to Def. Supp., PageID # 1901.

The government's own screenshot of the exchange, however, reveals *no* punctuation at all following the subject text. The text does *not* demonstrate a questioning tone. (And as an aside, modern American English standards, as explained by Bryan Garner in his *Modern English Usage*, approve of placement of periods and commas *within* the closing quotation mark, "whether or not the punctuation so placed is actually a part of the quoted matter.") Rather, the *government* has essentially inserted a question mark where none existed. In fact, the next statement in the text exchange affirms that the command to emphasize a "kill-the-governor" plan will be followed.

---

[2] The government may try to establish predisposition through evidence of similar prior illegal acts or by asking a jury to infer it through a defendant's desire for profit, their eagerness to participate in the transaction, their ready response to the government's inducement offer, or their demonstrated knowledge or experience in the criminal activity. *Kebles*, 318 F. App`x at 680.

The defense sees this text exchange as exculpatory. Obviously, the government does not. Here lies the disconnect and the problem. If this material were in a CHS file, the government would not turn it over. Yet to the defense, it is valuable, material evidence that could affect a jury verdict—and is thus discoverable.

As a final volley, the defense must point out again the serious problems with having Special Agent Impola involved in reviewing any materials. His perjury in *United States v. Gadola*, No. 1:17-CR-80 (W.D. Mich. 2017), demonstrates a clear willingness to break the rules to achieve his investigative ends. This problematic behavior means (1) that he cannot be the person reviewing materials for potential *Brady* issues, and (2) in directing CHSs, he could very well have ordered activity that would constitute entrapment but which may not be readily apparent as such in a vacuum, so supporting materials that would be exculpatory may not immediately appear as such. He's simply cleverer than that.

Of course, the defense cannot say that the agents would be reviewing the materials, but given the nature of the files, it is difficult to believe that the assistant U.S. attorneys themselves are going to review *everything* in the files. It seems natural that they would turn to agents for assistance. And even if they do not turn to SA Impola or SA Chambers or SA Trask, using these men's colleagues seems problematic, given the influence of factors like "team" loyalty.

### Conclusion

Mr. Franks asks the Court to consider all of the briefing on these matters and the arguments at the September 2 hearing. He asks the Court to vacate the magistrate judge's order denying his motion to compel. That order relied on a clearly erroneous understanding

of the government's ability and qualifications to review the contested CHS files and allows

the government to avoid its Due Process obligations, contrary to law.

Date: September 16, 2021        **SCOTT GRAHAM PLLC**

By:   /s/ Scott Graham
         Scott Graham
         Attorney for Defendant
Business Address:
         1911 West Centre Avenue, Suite C
         Portage, Michigan 49024
         (269) 327.0585

## **CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.3(b), counsel asserts that this brief contains fewer than 4,300 words; it contain 3,860 words, as counted by Microsoft Word, version 16.52. Rule 7.3 applies in this context through Local Civil Rule 72.3(a), which applies through Local Criminal Rule 57.1(e).

Respectfully Submitted,

By: /s/ Scott Graham

Dated: September 16, 2021

SCOTT GRAHAM
Attorney for Defendant
Business Address:
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585
sgraham@scottgrahampllc.com