THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

THE UNITED STATES OF AMERICA,

          Plaintiff,

v.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
KALEB JAMES FRANKS,
DANIEL JOSEPH HARRIS,
BRANDON MICHAEL-RAY CASERTA,

          Defendants.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

---

## DEFENDANTS' MOTION IN LIMINE REGARDING ADMISSION OF OUT-OF-COURT STATEMENTS AND MEMORANDUM IN SUPPORT

---

*"We have a saying in my office. Don't let the facts get in the way of a good story."*

    **FBI SA Henrik Impola during December 10, 2020 interrogation of FBI CHS from Wisconsin**

Defendants, through counsel, move this Court to allow for admission at trial of certain out-of-court statements that explain the facts in this case and establish the defenses to the conspiracy charge. Many of the statements are not offered for the truth of their assertions, and thus don't qualify as inadmissible hearsay. Other statements are admissible through various hearsay exceptions. In support of this motion, the defendants offer the following memorandum of law.

### *Introduction*

The charges contained in the superseding indictment are based on a scenario that the FBI created through extensive planning and direction by its agents, who used a network of confidential human sources (CHSs) to manipulate the conduct of various individuals located throughout the United States, including the defendants.

In late September of 2020, despite the absence of evidence of any agreement or plan to kidnap Governor Whitmer, the government decided to arrest and charge some of the persons who the FBI, through its CHSs, had been coordinating. It did so in part by arranging a meeting in Ypsilanti, Michigan, for the purpose of making arrests. The government claims the purpose of this meeting was to make a down payment on a bomb, but the FBI's lead CHS arranged the meeting by telling the defendants: "October 7 [R]ed [now known to be an undercover FBI agent] will be in the area. He has some gear he acquired from previous training[.] [I] told him will take anything. Has a plate carrier, [a few] med kits [and a] couple drop legs."[1]

Always hungry to get new "gear" and often unable to afford it, some of the defendants went with this CHS in order to meet "Red." They were arrested, and all of the defendants were charged by complaint with the conspiracy to kidnap Governor Whitmer that remains in count one of the superseding indictment.[2]

---

[1] Statement of September 27, 2020.

[2] Michigan Attorney General Dana Nessel put it best in an October 8, 2020 interview when she said: "[W]hat I always say is that I would rather have the weakest conspiracy case rather than the strongest homicide."

As this case has progressed toward trial, and as the defense has worked through discovery materials, the defendants have discovered a significant number of statements they will seek to present at trial to establish that they never conspired to kidnap Governor Whitmer and, in the alternative, that they were entrapped.[3] These statements comprise the heart of the defense and fall into three general categories: (1) statements FBI agents made to their CHSs as the agents created and directed the government's plan; (2) statements the CHSs made to defendants as the CHSs pushed the FBI's plan; and (3) statements by the defendants that show the defendants did not intend to kidnap Governor Whitmer.[4]

From counsel's extensive review of the discovery available to this point, the government's case seems to rest heavily on audio recordings, so the admission of out-of-court statements creates a key trial issues . . . and brings into play, as an additional matter, Federal Rule of Evidence 106 and the so-called "rule of completeness," which would have to be explored once the government has announced the recordings and statements it will seek to present at trial. (Rule 106, of course, provides that "If a party introduces all or part of a writing or recorded

---

[3] The defendants have identified qualifying statements to the best of their ability at this time, based on the discovery the government has provided to them. Around November 24, 2021, the defense's coordinating discovery attorney (CDA) in New York received the most recent discovery production, which totals approximately 386 gigabytes, including over 5,000 jail calls (in non-native format and lacking any meta data, including file data identifying call participants), approximately 13,000 documents, and various other files (including additional audio and video). (For reference, some estimators put about 10,000 documents into a gigabyte when estimating electronic storage needs.) The CDA is now processing these materials for counsel's review. If each of these jail calls runs only one minute, the total audio with these calls would run for 95 hours. If each spans the jail-call-duration limit of 15 minutes, these calls would total 1,375 hours.

[4] A number of statements by defendants pushed back against the government plan to "kidnap" Governor Whitmer. Perhaps none is more direct than a statement by Daniel Harris, who told the lead CHS and others: "No snatch and grab. I swear to f…ing God."

3

statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106.)

Against this background, the defendants, through counsel, now move this Court to allow for the admission at trial of certain out-of-court statements, enumerated in a chart at the end of this motion. Many of the statements by FBI agents and CHSs do not qualify as hearsay because they are not offered for the truth of the matters asserted. Certain statements also qualify as admissions by party opponents in this case. Statements by the defendants showing their state of mind or present sense impression fall within one or more exceptions to the hearsay rule, and in some cases, the statements qualify as excited utterances.[5]

### *Brief Procedural Background*

This case began with the government filing a criminal complaint on October 6, 2020, charging the defendants with conspiring to kidnap, in violation of 18 U.S.C. § 1201(c). *See* RE. 1: Complaint, PageID # 1. The government indicted the defendants on December 16, 2020. RE. 86: Indictment, PageID # 573-78. This indictment included a single charge: conspiracy to kidnap Michigan's governor. *See id.* at 573. Only one codefendant has pleaded guilty (doing so on January 27, 2021), with the rest proceeding toward trial. *See* RE. 143: Minutes of Garbin Change of

---

[5] This memorandum identifies some of the statements involved in this motion. But again, the defendants have also compiled a chart (included at the end of this motion and memo) identifying the statements they seek to admit into evidence. The volume of statements and the incomplete discovery complicate this, but the defendants believe that they have identified the general categories of statements involved.

Plea, PageID # 759. A superseding indictment, filed on April 28, 2021, added weapons counts against certain defendants but did not modify the charge against all defendants. *See* RE. 172: Superseding Indictment, PageID # 961-76. Trial currently stands set to begin on March 8, 2022, with a final pretrial conference on February 18, 2022. *See* RE. 347: Order, PageID # 2156.

### *Legal Discussion*

Generally, of course, out-of-court statements do not constitute admissible evidence if a party offers them for the truth of any matters asserted in them. Fed. R. Evid. 801(c) & 802. With the out-of-court statements the defendants seek to put before the jury here, however, the evidentiary rules provide exceptions to the bar against hearsay, making these statements admissible under multiple theories, including the following: (1) certain statements are not offered for the truth of the matter asserted in the statement and are therefore not hearsay; (2) certain statements qualify as non-hearsay as the opposing party's (FBI agents' and confidential human sources') statements under Rules 801(d)(2)(C) and (D); (3) other statements qualify as either related to present sense impressions under Rule 803(1) or then-existing conditions under Rule 803(3) or both (or even as excited utterances under Rule 803(2)).

Exclusion of these statements would deprive the defendants of key constitutional rights: hearsay errors *can* amount to constitutional violations. *See, e.g.*, *United States v. Bishop*, 291 F.3d 1100, 1108 (9th Cir. 2002) (noting that "[n]ot every hearsay error amounts to a constitutional violation" while implying that some

do). To establish such error, a defendant may show that the excluded evidence was important to their defense. *See id.* A hearsay error cannot qualify as harmless error when it prevents the defendant from providing an evidentiary basis for their defense. *Id.* With the entrapment defense, this aspect of the hearsay equation comes to the forefront.

> ### A. The government agents' and confidential human sources' statements are admissible at trial as statements of an opposing party.

Under Federal Rule of Evidence 801, an opposing party's out-of-court statement does not qualify as inadmissible hearsay in certain circumstances. *See* Fed. R. Evid. 801(d)(2). Here, the government's agents' and informants' statements qualify as non-hearsay because they involve either: a government-authorized person making the statement or a government "agent or employee" speaking "on a matter within the scope" of that person's relationship with the government while that relationship existed. *See* Fed. R. Evid. 801(d)(2)(C) & (D).

The Sixth Circuit recognizes that Rule 801 situates government agents and informants as party opponents in criminal matters. For example, in *United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996), the circuit pointed out that "The government concede[d] that Rule 801(d)(2)(D) contemplates that the federal government is a party-opponent of the defendant in a criminal case." And in the instant context, conversing with suspects "on a regular basis in order to establish a trusting relationship" falls within an informant's sphere of government agency. *See Branham*, 97 F.3d at 851. Going beyond these parameters, conversations concerning

6

an entrapment defense do not constitute hearsay because the significance of the statements generally lies in the fact that someone made the statements, rather than in the actual veracity of the assertions, and statements do not qualify as hearsay when they are not offered to prove the truth of the matter asserted. *Compare* Fed. R. Evid. 801(c)(2). In *Branham*, for example, defense counsel offered the parties' conversations as evidence of the defendant's state of mind in support of his entrapment defense, so the truth of the conversations was irrelevant for purposes of the defense: the conversations' significance existed solely with the fact that they were made. *Id.* The defendants here will explore these points further in the following sections.

While some out-of-circuit courts have explicitly disagreed with the *Branham* conclusions, their reasoning is out of date, resting on pre-Federal Rules of Evidence precedent. *See, e.g.*, *United States v. Yildiz*, 355 F.3d 80, 81 (2d Cir. 2004) (citing *Branham* as a case opposed to the *Yildiz* court's position, and also relying on authority pre-dating the Federal Rules of Evidence). Courts routinely acknowledge that the Sixth Circuit allows for presentation of informant statements as party admissions. *See, e.g.*, *United States v. Rodriguez-Landa*, No. 2:13-cr-00484-CAS-1, 2019 U.S. Dist. LEXIS 67298, at *7-8 (C.D. Cal. Apr. 19, 2019) ("Only the Sixth Circuit has permitted the statements of a government informant to constitute a party admission under Rule 801(d)(2)(D)."). And as these courts have recognized, the Sixth Circuit has allowed for such presentation in cases just like the one at hand: where government informants have assiduously cultivated trust over lengthy

periods of time. *See id.* at \*8. While courts with differing views have tried to cabin the Sixth Circuit's decision, their reasoning must come up short in light of the evidentiary rule itself and analogous holdings. *See id.* (trying to argue a lack of reasoning and policy considerations undergirding the Sixth Circuit's position).

These courts have also distinguished informant statements that were not part of "a formalized report." *See id.* In the case here before this Court, though, informants' statements may be part of formalized government reports. Examples abound. An October 20, 2020 FBI FD-302 form (Bates # 00015644) details how agents in this case catalogued informant and suspect statements. This form affirms that "During the course of the investigation, SA Chambers and SA Impola compiled and updated a chat library of texts, Facebook messages, Wire chats, and Threema chats." (Bates # 00015645.) This report notes exchanges such as this one: "The CHS was allowed to provide war stories about being injured during combat and what it was like to fight for the US in the Middle East. When Pete Musico asked the CHS to turn the American flag patch on his ballistic armor upside down, the CHS removed the American flag patch." (Bates # 00015646.) Later, on the same page of the report, this notation of an informant assertion appears: "The CHS advised members of the Wolverine Watchmen that he/she did not consume any controlled substances."

A September 21, 2020 FBI FD-1087a form (Bates # 00021573) notes: "Include [sic] below are pertinent summaries from the CHS debrief of the consensual recordings." (Bates # 00021574.) This form even refers to specific writings aimed at detailing CHS interactions and statements that may not have been recorded. For

example, on Bates-numbered page 00021583, the form refers to "CHS report

999252-A-344 for details of the telephone call" (a call between a CHS and Ty

Garbin). Later, on the same page, the form refers to other reports that detail

conversations that occurred while the parties drove or engaged in field-training

exercises.

An FBI form FD-1023 from September 21, 2020, beginning with a Bates

number of 00021586, details numerous CHS statements. Given the volume of

discovery here, counsel could go on and on with citations like these. The fact is:

government employee-agents recorded numerous CHS statements in formal reports,

detailing those statements and making a clear record of them. (And the informants'

handlers' statements, of course, fall completely outside this concern about formal

recording/notation.)

The agents here drove the informants' communications with the defendants,

and the agents shaped the informants' assertions, statements, and claims. The

agents monitored the CHS conversations and other communications with the

defendants, and not only approved them but used the information they gathered

from them to direct further activity. After monitoring the communications, FBI

agents paid the lead informant with an envelope filled with cash. When the same

informant reported to the FBI that he was making no progress ("Right, but yea, and

I keep trying to push, press on them where are you guys wanting to go with this?

Because I'm wanting know are you wasting my time in a sense?"), the FBI

continued to push its plan. Eventually, the relationship between this CHS and his

handlers became so close that they sat together while the CHS called Adam Fox and, with agents whispering in his ear, the CHS tried to prod Fox into action. The informants' relationships with the agents were far from "tenuous."[6]

In the Ninth Circuit, appellate courts have assumed that agent statements constitute party-opponent statements in this context. In *United States v. Clyne*, 752 F. App`x 436, 438 (9th Cir. 2018), the defendant asserted "that out-of-court statements by government agents constituted admissions by the government" and the court assumed, "without deciding, that statements by government agents within the scope of their agency are not treated differently from those of others in a principal-agent relationship." Ultimately, that court excluded the statements because the probative value of the evidence was substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and the like, but the fact remains: the court assumed admissibility of the statements. *Clyne*, 752 F. App`x at 438.

State courts have weighed in and analyzed this federal issue. In *Bellamy v. State*, 403 Md. 308, 320-22, 941 A.2d 1107 (Md. Ct. App. 2008), the Maryland Court of Appeals traced the development of federal (and state) trends on admission of

---

[6] Skeptical courts have said that "the government's use of an agent neither signifies that it has adopted an informant's statements, nor that it authorized them," and in *Rodriguez-Landa*, the district court noted that "the repeated allegations that CS-1 committed violations of law suggest the informant had the type of 'tenuous relationship with the police officers with whom [CS-1] work[ed],' which led the Third Circuit to conclude that admitting informant statements was contrary to intention of the Rules' drafters." *Rodriguez-Landa*, 2019 U.S. Dist. LEXIS 67298, at *8 (alterations in original). Obviously, given the sort of interaction evidenced in the discovery and touched on here, no concerns about a "tenuous" relationship can exist in the case at hand. The CHSs and their handlers were very close.

agent-informant statements as party-opponent statements. Ultimately, that state court allowed for admission of government-attorney statements. *See Bellamy*, 403 Md. at 326 ("In light of the facts of the present case, we find the rationale in the line of cases that treat statements of government attorneys as eligible admissions to be more persuasive than the rationale offered in [*United States v.*] *Santos*[, 372 F.2d 177 (2d Cir. 1967),] and [*United States v.*] *Kampiles*[, 609 F.2d 1233 (7th Cir. 1979)]."). While one can distinguish *Bellamy* in various ways, that court still rejected the old prohibition on making government-agent statements party-opponent statements.

Even the dissent in *Bellamy* agreed with the majority's reasoning. It noted that prosecutor statements can qualify as party-opponent statements. *Bellamy*, 403 Md. 308, 336 (Wilner, J., dissenting) ("Because, at least in some circumstances, a prosecutor may be regarded as an agent of the State authorized to make or adopt such statements in the course of his or her official duties, those kinds of statements, when made or adopted under those circumstances and offered by a defendant against the State, are not excluded by the hearsay rule. I agree with that holding.").

Critically in this Circuit, and as even the Maryland court in *Bellamy* noted, the Sixth Circuit's decision in *Branham* does not sit in a vacuum. In *U.S. v. Reed*, 167 F.3d 984, 989 (6th Cir. 1999), the circuit reaffirmed *Branham*. In that case, the defense presented a theory about certain informants/cooperators acting "as the government's agents in taping [certain] conversations and that their taped statements thus [could] be admitted against the government." *Reed*, 167 F.3d at

989. The Sixth Circuit found that "[t]o a certain extent [the defense] [wa]s correct." *Id.* The cooperators "were acting as agents of the government, and this court has interpreted 'a matter within the scope of the agency' broadly enough that 'statements' of [those cooperators] would be admissible against the government." *Id.* (citing *Branham*).

So when CHSs like the one known simply as "Dan," or the one charged in a separate case in Wisconsin, said things about the *necessity* of not simply "taking brick and motor" and the need for a human target, these informants were (1) setting up the supposed "plan" and directing everyone involved, and (2) pressuring a group of people to fall into line—people who otherwise had absolutely no interest in a "human target" like the one advocated by these informants. When these informants urged and admonished these people at the direction of government-employee agents, the informants themselves were acting as government "agents."

Taking a specific example, on September 5, 2020, FBI Special Agent Jayson Chambers texted CHS Dan: "Mission is to kill the governor specifically."



Here, SA Chambers was acting as a government agent, directing the government's plan. He was specifically directing a government informant. Under *Branham* and *Reed*, the statement does not qualify as hearsay under Rule 801(d)(2)(D).[7] Tying into points made in the following sections, this statement is

---

[7] As important is the fact that, when the government was still manufacturing a "mission" on September 5, it is clear that there was no mission and no agreement or conspiracy.

also admissible as non-hearsay because it shows the agent and informant directing the target "action." The truth of the object of the supposed "mission" doesn't matter, so the truth of the statement is inconsequential. What matters is government agents specifically, and with particularity, managing the CHSs and "calling the shots." To show entrapment, rather than the truth of the statement, the statement is admissible as non-hearsay (as explored in Section C. below).

### B.   Statements made by the defendants, and others, should be admitted into evidence as present sense impressions, statements of then-existing conditions, or even as excited utterances.

As courts have said, "Statements of intent to perform a future act are admissible 'state of mind' testimony under Rule 803(3)." *Bishop*, 291 F.3d at 1110. Statements of an intent *not* to perform such a future act would thus also qualify as admissible state-of-mind evidence. Likewise, present sense impressions and excited utterances are admissible under Rules 803(1) and (2).

District courts have described the present-sense-impression hearsay exception, under Rule 803(1), as statements, describing or explaining an event or condition, made *while the declarant* was perceiving that event or condition, or immediately afterward. *See, e.g., United States v. Lentz*, 282 F. Supp. 2d 399, 410 (E.D. Va. 2002). Under the exception, a "declarant should be describing an event that is ongoing and startling or just occurred" and "[l]ittle time or no time must exist between the occurrence and the statement, which operates to negate the likelihood of a deliberate or conscious misrepresentation." *Id.* "The crucial provision of this exception is immediacy." *Id.*

In a related vein, courts have said that excited utterances, under Rule 803(2), involve declarants who "have (1) experienced a startling event or condition and (2) reacted with spontaneity excitement, or impulse rather than the product of reflection and fabrication." *Id.* "The key to this exception is that the statement must be made contemporaneously with the excitement of the startling event." *Id.*

For then-existing conditions, under Rule 803(3), a declaration should mirror a state of mind that, given the circumstances (like proximity), is reasonably likely to have been in the same condition existing at the subject time. *Id.* at 411. The statement should not look backward or describe the declarant's *past* memory or beliefs about another's conduct; it should be limited to a declaration showing the declarant's state of mind, rather than the factual occurrence giving rise to that state of mind. *Id.* at 411. As with the two exceptions just discussed, the declarant should not have had the "opportunity to reflect and possibly fabricate or misrepresent her thoughts." *Id.* Statements are "admissible whenever the declarant's intention itself is a distinct and material fact in the chain of circumstances." *Id.* Statements like these—regarding intent—are "admissible under the state of mind exception to the hearsay rule to promote an inference of the declarant's future conduct." *Id.*

Courts have said that statements related to things like prior abuse qualify under the state-of-mind hearsay exception if they show a declarant's state of mind *at the time period in question. Id.* at 412. In this context, courts have reasoned, statements that a declarant fought with a defendant "are inadmissible hearsay under the state of mind exception to the hearsay rule because [the declarant's]

statement merely reports on a past event (the fight) and does not exemplify any state of mind that [the declarant] may have had at the time of the encounter." *Id.* Admissible statements should "exemplify . . . state of mind." *See id.* They should show "plan, motive, design, mental feeling, pain, or bodily health being experienced." *Id.*  An observation that someone had bruises on their arms is not hearsay, and a declarant may testify regarding "what physical condition she observed, which is subject to cross-examination." *Id.*

In *Rodriguez-Landa*, where the court was skeptical about informant statements qualifying as party-opponent statements, the court still concluded that the informant's "forward-looking statements of future intent [we]re admissible under Federal Rule of Evidence 803(3) to show that [the informant] was more likely to have acted in accordance with his present sense intention." *Rodriguez-Landa*, 2019 U.S. Dist. LEXIS 67298, at *9.

In this case, where entrapment is at issue for at least some of the defendants, the defense must show government inducement and a lack of predisposition. The statements at issue here go to exactly these points. The statements showing the government's plan and coordination of events show inducement. The statements pushing back against the government's plan show both the lack of agreement and the lack of predisposition. The *Lentz* court addressed an analogous situation, where the government was "required to show [the alleged victim's] state of mind and belief around the time of her disappearance"; it found that "statements of intent and belief by [the alleged victim] surrounding the date of her disappearance are admissible

under the state of mind exception to the hearsay rule to promote an inference that she did in fact engage in such conduct [supposedly getting tricked into traveling to Maryland to pick up her daughter]." *See Lentz*, 282 F. Supp. 2d at 420.

With these principles in mind, one can see that the statements the defense wishes to present here are admissible. For example, on July 20, 2020, Ty Garbin said, "Captin Autisim cant make up his mind."[8] This statement qualifies as a present sense impression under Rule 803(1) and as one related to a then-existing state of mind under Rule 803(3): it shows the speaker's impression of another (Adam Fox) at the time the speaker made the remark (describing Fox and the condition of his lack of planning then), and it conveys "the declarant's then-existing state of mind" (skepticism about any intent or plan) under Rule 803(3). (This statement also demonstrates a lack of predisposition in the entrapment context—no one, even Adam Fox himself—was actually predisposed to make any decisions with regard to possible wrongdoing.)

With regard to the assertion that the defendants were not "down with kidnapping," the same is true. On July 7, 2020, multiple defendants and others were together when someone apparently broached the subject of kidnapping. Someone in the group immediately said that they were "not cool with offensive kidnapping" and others, including defendants Franks and Harris, echoed this

---

[8] The defense hopes to record here the exact statements. With texting and recordings, of course, grammar often falls victim to a lack of attention. Adding multiple [sics] would make the reading here cumbersome, so the defendants have decided to forgo such a measure. Conversely, in capturing and listing (for the attached chart) all the statements, if the defendants may have left off an apostrophe here or there or misspelled a word, they apologize.

sentiment. Such a statement represents a description of a present sense and mental condition/disposition *and* affirms a state of mind—a lack of disposition to plan a kidnapping, a lack of motivation to engage in such conduct, and a lack of a plan to do so, and a mental/emotional condition opposed to engaging in such conduct. *Compare* Fed. R. Evid. 803(1) & (3). Also, given the stress/stimulation of a situation that might prompt one to blurt out a thing like that, the statement could constitute an excited utterance. *Compare* Fed. R. Evid. 803(2).

The probative value of this vigorous opposition to kidnapping is clear. It establishes that there was no agreement to kidnap. In addition, it demonstrates that there was no predisposition to commit the crime.[9]

Many, many more statements fall into these categories. The attached chart demonstrates the application of these hearsay exceptions to these statements.

### C.   *Statements offered to prove entrapment (or other points)—rather than for the statements' truth—do not qualify as hearsay and thus may come in at trial.*

At the risk of stating the very obvious, statements offered to show the investigators' entrapping tactics here—rather than offered for their truth—do not constitute hearsay and should be presented to the jury. *See, e.g.*, Fed. R. Evid. 801(c)(2); *see also Bishop*, 291 F.3d at 1111, *and Branham*, 97 F.3d at 851. For example, in *Lentz*, the court clarified that testimony regarding a declarant saying something like, "if anything ever happens to me, so-and-so did it," may be

---

[9] The Sixth Circuit has analyzed these hearsay exceptions in the context of possibly exculpatory statements by defendants themselves. *See, e.g.*, *United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995) (looking at Rule 803(3)).

admissible as non-hearsay to show the point at which the declarant feared someone. *See Lentz*, 282 F. Supp. 2d at 416.

Here, statements showing the FBI agents directing the supposed "action" go to entrapment, rather than any truth in the statement. Dovetailing with the examples already discussed (like that of the object of the alleged mission having to be the governor), on August 29, 2020, SA Chambers directed an informant: "Have him post his pictures." So SA Chambers told the informant to induce the target individual to post pictures. Whether or not pictures were posted, or even existed, does not matter. What matters is SA Chambers issuing directives. On August 9, 2020, SA Chambers told an informant to "Bring B-Puff in," and on August 27, 2020, he said, "I default to getting as many other guys as possible, so whatever works to maximize attendance." Again, from a truth perspective, B-Puff's participation or the maximization of participation do not matter to the defense here.

The same reasoning applies with SA Impola's July 11, 2020 order to CHS Dan: "Best thing to do is deny and accuse somebody else like Trent." Whether or not such a denial and accusation constituted the best plan does not matter at all—this statement matters because it shows SA Impola choreographing the entire proverbial dance, down to accusing an innocent bystander. What matters with all these statements is the agents' specific, emphatic direction of behavior.

Likewise, with the "Captain Autism" remark discussed above, the truth of the remark is inconsequential. The meaning of it lies in the defendants' recognition that Adam Fox had no actual disposition toward truly committing wrongdoing . . . with a

18

true plan and viability. No one would have conspired with Adam Fox because no one believed he had any ability to form, much less carry out, a plan.

As touched on very briefly in Section A. above, on June 6, 2020, a CHS admonished, "You can't just grab brick and mortar. Without a fucking human to go with it, you've done nothing but grab brick and mortar." Frankly, the defense isn't too worried about whether "grabbing brick and mortar" alone could prove efficacious for any reason. The import of the statement lies in the CHS directing people to go *beyond* "grabbing brick and mortar."

Likewise, with statements like CHS Dan's August 9, 2020 query of "A Huey would probably be more ideal, think about it, can the average person get a Huey, yeah. The average person get a Black Hawk?," no one is worried about whether or not the average person can actually obtain a Huey or Black Hawk helicopter. Rather, the statement shows the fantasy aspect of much of the defendants' behavior. These defendants gathered to practice firearm training and immerse themselves in a sort of role-playing world. Statements like these affirm that role playing and simply do not qualify as hearsay.

Role playing becomes very important in this case. Defendants and others have referred to "LARPing" or Live Action Role Playing." Statements regarding LARPing should be admitted in order to show the full picture of what happened here. For example, a statement that an alleged co-conspirator was going to use a Blackhawk helicopter as part of some mission will not be offered for its truth, but it

will be offered to show that some of the alleged conspirators lived in a dream world where they fantasized about being real-life combat operators.

### Conclusion

Following this memorandum of law is a chart showing proposed statements and applicable hearsay exceptions. The defendants hope this list will save the Court some time in considering each statement individually. Because hearsay exceptions apply to each statement, or because certain statements do not qualify as hearsay, all of these out-of-court statements should be admitted at trial.

Date: December 17, 2021          By:     */s/ Christopher Gibbons*
                                          Christopher Gibbons
                                          Attorney for Defendant Fox

Date: December 17, 2021          By:     */s/ Joshua A. Blanchard*
                                          Joshua A. Blanchard
                                          Attorney for Defendant Croft

Date:  December 17, 2021         By:     */s/ Scott Graham*
                                          Scott Graham
                                          Attorney for Defendant Franks

Date: December 17, 2021          By:     */s/ Julia Kelly*
                                          Julia Kelly
                                          Attorney for Defendant Harris

Date: December 17, 2021          By:     */s/ Michael Hills*
                                          Michael Hills
                                          Attorney for Defendant Caserta

## **CERTIFICATE OF COMPLIANCE**

In accordance with Local Criminal Rule 47.2(b)(i), counsel asserts that this brief contains 5,235 words, as counted by Microsoft Word, version 16.54. Knowing that this word count exceeds the limit set in Local Rule 47.2(b)(i), counsel have moved this Court for permission to file an oversized brief.

By: */s/ Scott Graham*

Dated: December 17, 2021

SCOTT GRAHAM
Attorney for Defendant Franks
Business Address:
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585
sgraham@scottgrahampllc.com