UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

**UNITED STATES OF AMERICA**
                Plaintiff,

v.

**ADAM FOX,
BARRY CROFT, JR.,
BRANDON CASERTA,
DANIEL HARRIS,** and
**KALEB FRANKS,**
                Defendants.

Case No. 1:20-cr-00183-RJJ

Hon. Robert J. Jonker
Chief United States District Judge

---

**RESPONSE TO MOTION TO EXCLUDE EVIDENCE [ECF No. 369]**

---

Defendants, by their respective counsel, oppose the government's motion to exclude the misconduct of its agents. The Defendants will address each request of the government in turn:

    **I. FORMER AGENT TRASK'S CONVICTION FOR AGGRAVATED ASSAULT ON HIS WIFE AND HIS FACEBOOK POSTS.**

        **a. Trask's conviction for aggravated assault.**

The defendants agree that Mr. Trask's misdemeanor conviction for beating his wife is not relevant to anything expected to be at issue in this case.

1

When the government sought concurrence in its proposed motion to exclude evidence of the Trask assault, Croft's counsel asked for a disclosure regarding the status of the Trask case. The government replied that "As you'll see in my motion, we don't believe those items are relevant or admissible, and you will not be receiving them unless we call those individuals as witnesses."

Defense counsel subsequently learned that Mr. Trask had an agreement to plead guilty to a misdemeanor offense which does not appear admissible under Rule 609.

### b. Trask's Facebook posts.

The Government has also requested that this Court issue an order excluding any of Mr. Trask's Facebook posts made during the investigation in this case. The Government has not provided the Court or Defendants with the Facebook posts which it proposes to exclude[1]. Mr. Trask's Facebook page is no longer available for review publicly. At a minimum, the request to exclude these Facebook posts is not ripe for adjudication as neither the defense nor the Court has sufficient information upon which to determine whether the subject Facebook posts are admissible.

### II.   AGENT IMPOLA'S PERJURY ALLEGATIONS.

Like the issue with Mr. Trask, the government refuses to make a disclosure regarding the status of the Impola perjury allegations which it passingly refers to as

---

[1] The government provided counsel with an email from a TV reporter asking questions about some inflammatory posts by Agent Trask one of which purportedly said "'I don't respect the leader who thinks 'poor white people with guns should be allowed to protest for haircuts and governors should bend to their wishes'". It is not clear if these or other posts are the intended target of the government's motion.

"unfounded". Mot. Exclude, ECF No. 369, PageID.2437. It is of record that a local attorney has filed a complaint with the FBI Office of Professional Responsibility alleging that Mr. Impola committed perjury in another case. *See* ECF No. 246-6, PageID.1490-1502.

### a. Impola's misconduct is subject to exploration under Rule 608(b).

In *United States v. Bryant*, 461 F.2d 912, 917 (6th Cir. 1972), relying on Fed. R. Civ. P. 43(b), the court explained that while "there is no companion provision in the Federal Rules of Criminal Procedure, there is even more reason for permitting such a practice [of calling adverse parties for cross examination] in criminal cases where every proper means of ascertaining the truth should be placed at the defendant's disposal." *Id.*

The perjury complaint to the FBI Office of Professional Responsibility and our United States Attorney details the fact that Agent Impola obtained a search warrant swearing to probable cause that a defendant had committed a crime; then testifying under oath twice that he did not have probable cause to believe that the defendant had committed a crime. This was the material issue at the hearings because the existence of probable cause at a border search would have triggered *Miranda* warnings which were not given. In short, there is ample reason to believe Mr. Impola lied under oath on a material issue to the suppression hearing when it suited his cause.

Fed. R. Evid. 608(b) permits a party to inquire on cross examination into specific instances of conduct which are probative of truthfulness. *See United States*

3

*v. Hurst,* 951 F.2d 1490, 1501 (6th Cir.1991) (upholding the cross-examination of a defendant regarding conduct amounting to subornation of perjury), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992); *United States v. Zidell*, 323 F.3d 412, 426 (6th Cir. 2003); *U.S. v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009) (a witness's credibility may be attacked on cross-examination through questioning on specific instances of conduct relevant to credibility); *U.S. v. Frost*, 914 F.2d 756, 767 (6th Cir. 1990) (noting that extrinsic evidence is prohibited under 608(b), and that defense counsel are "stuck" with the response given on cross-examination).

Counsel has asked the government to disclose the status of the perjury investigation, but the government refuses to answer. The answer to whether Mr. Impola's alleged perjury is admissible or *even worth pursing* at trial likely turns on the outcome of the investigation. If, for example, Mr. Impola admitted to OPR investigators that he perjured himself to obtain a conviction or OPR has substantiated the allegations of perjury, it may be a different calculus for counsel than if OPR has cleared Mr. Impola. It is not clear why the government won't disclose the outcome of the investigation into allegations it characterizes as "unfounded" when a simple disclosure could very well clear Mr. Impola's name and moot this issue in its entirety.

In any case, the evidence is properly subject to exploration on cross examination pursuant to Rule 608(b) when the defense calls Agent Impola.

### III. SA CHAMBERS EXEINTEL BUSINESS IS REVEANT AND ADMISSIBLE

FBI Agent Jayson Chambers was one of the lead investigators in this case. He was the handler for CHS Dan along with Agent Impola. He authored 227 FD-1023 reports that were relied upon by other agents.

Before the FBI began investigating these Defendants, in summer of 2019, Agent Chambers incorporated a company known as Exeintel in New Mexico. Exeintel purported to provide intelligence services in the private sector utilizing the skillset Chambers acquired and developed as a Special Agent for the FBI. Although still employed with the Bureau, he was making plans to leave the FBI and monetize his skillset and knowledge for his own financial gain which is in violation of the longstanding Bureau policies. In late 2019, SA Chambers was actively pitching Exeintel's services and attempting to earn as much as $6,000,000 on these proposed contracts. *See* Business Proposal, Ex. A.

In April 2019, Chambers emailed one potential business partner that he planned on leaving the Bureau to begin to work with Exeintel *full time* as soon as it was "funded". *See* Email, Ex. B. In this email, he also mentioned that he had helped to pioneer a 3D laser scanning and modeling technique while he was working with the Bureau and that he planned on using it further once he was out of the public sector and working with Exeintel.

As part of Mr. Chambers' attempts to "make this enterprise a success", he shared his resume with the potential customer to show his qualifications. Chambers' resume highlighted his involvement in other domestic terrorism cases he

5

had investigated in his capacity as an FBI Special Agent, including one that was still pending. *See* Resume, Ex. C. At the time that Agent Chambers sent his resume to try to secure "fund[ing]" for Exeintel so that he could leave the FBI, the *Muse* case which he highlighted on his resume was still pending in this Court and no defendants had yet entered pleas. *See United States v. Muse et al,* 1:19-cr-00025-RJJ. On information and belief, neither Chambers nor the government disclosed to the *Muse* defendants that Mr. Chambers was trying to leverage his role in their prosecution for his own financial gain.

The government claims that Mr. Chambers "decided to remain with the FBI, and left the Exeintel project without ever making a deal with a client or deriving any financial benefit." Mot. Exclude, ECF No. 369, PageID.2431. However, what they don't say speaks volumes. The government doesn't say **when** Mr. Chambers "left the Exeintel project". However, public records show that Mr. Chambers didn't move to dissolve Exeintel LLC until October 29, 2021. *See* Cert. of Dissolution, Ex. D.

The government won't tell defendants whether Mr. Chambers ever disclosed Exeintel or received approval for this outside business from the FBI. Because of the apparent conflict of interest, Defense Counsel has asked for a disclosure regarding the outcome of any Office of Professional Responsibility or Inspector General investigations into Mr. Chambers' conduct. The government refuses to tell the defense what happened with these investigations.

Through its own investigation, the defense has found some people to whom Chambers pitched his services. The government refuses to make any disclosures regarding the other potential buyers of Chambers' services or the timing of any of his attempts to sell his services.

There is no question that Mr. Chambers was attempting to monetize his position as an FBI agent by using his prosecution of other defendants in the months leading up to defendants' arrests. There is also no question that Mr. Chambers owned the Exeintel company until October 2021 and held himself out as the CEO. *See* Business Proposal, Ex. A. There is no question that as late as Fall 2019, Mr. Chambers was providing quotes that ranged from tens of thousands of dollars to millions. *Id.*

Furthermore, there was a public twitter account that went by the handle @Ravagiing. The Twitter profile represented that it was run by the CEO of Exeintel. It put out cryptic tweets that related directly to the present case and throughout the supposed kidnapping plot against Governor Whitmer. The tweets would indicate that something was to happen "soon… MICHIGAN soon" and, just hours before the coordinated takedowns of the defendants here, the account tweeted that "a lot more [is] coming soon." Ken Bensinger, Jessica Garrison, *A Right-Wing Troll Appears To Have Tweeted About An FBI Investigation Into The Michigan Kidnapping Plot Before It Went Public*, Buzzfeed News (Aug. 26, 2021), https://www.buzzfeednews.com/article/kenbensinger/fbi-agent-michigan-right-wing-troll-cybersecurity-twitter.

7

All evidence indicates that Mr. Chambers was trying to turn Exeintel into a profitable business. And the government doesn't deny this. This becomes a clear source of bias and motive when Mr. Chambers has proven that he has used his professional position and expertise for his own financial gain by touting his role in the prosecution of the *Muse* defendants and others. *See* Chambers' Resume, Ex. C. If he is willing to monetize other ongoing investigations for his own gain, it is not a stretch to believe that the arrests in this case, which has been characterized as one of the highest profile domestic counterterrorism operations in the history of the United States, was also driven by Chambers' desire to write his own ticket for Exeintel.

### a. Chambers was an integral part of the investigation whose misconduct infected the actions of other agents.

Agents routinely rely on the investigative work of other agents as being accurate and undertaken in good faith. Mr. Chambers was a leading figure in the investigation and his misbehavior, even if unknown to the other agents, altered the course of the investigation.

The government has taken the position that telling the jury about his misconduct with Exeintel would cause the jury to be misled or invite it to punish Chambers for his subversion of basic professional practices. The concern being that the jury would resolve the case on Chambers' wrongdoing and not on the questions of guilt or innocence of the defendants for the crimes charged.

The existence of Exeintel and the possibility of the financial incentive it created for Chambers is relevant to more than just the question of whether Chambers

8

broke the rules. The existence of the side business, which attempted to monetize his FBI investigative work for his own benefit, is also relevant to the raised entrapment defense, which at its core, challenges the integrity and good faith of the investigation.

The government writes:

> Even assuming for the sake of argument that SA Chambers leaked law enforcement information to Exeintel (like the agent in Malpeso) that evidence simply does not support the inference that dozens of FBI agents, State Troopers and other law enforcement personnel set up innocent people for his private pecuniary gain.

Mot. Exclude, ECF No. 369 PageID.2437.

The Government attempts to minimize the involvement of Chambers and the unique level of influence his work had on the investigation. Chambers was the primary FBI contact with the central informant in this case, CHS Dan. Chambers recruited CHS Dan for the mission to infiltrate the Wolverine Watchman in March of 2020. Chambers supervised CHS Dan on a near daily basis the following seven months.

The FBI maintains a reporting system to assure the proper and reliable reporting and memorializing of its investigative efforts. Each FBI contact with a CHS is documented on form FD-1023. CHS Dan reported nearly exclusively to Chambers throughout the course of the investigation.

Mr. Chambers was in a unique position to control the direction of the investigation and craft the paper trail which influenced other agents. Chambers was responsible for tasking CHS Dan during the investigation. He listened in real time to CHS Dan's recordings and committed them to writing through 227 separate

9

FBI-1023 reports which were relied upon by other agents.[2] The defense expects to show at trial that Chambers' reports did not accurately reflect what happened at various recorded meetings, but rather reflected Chambers' pervasive narrative that the defendants intended to kidnap the governor.

### b. Defendants have a right to present a complete defense which exposes the shortcomings in the investigation and the motive of the agents to entrap them.

Chambers' ownership interest in Exeintel is the "why" behind what Chambers did during his investigation: the inaccurate reports, the tasking of CHS Dan, violating CHS handling policies, his creative efforts to design and implement a plot to kidnap the governor, and his efforts to entrap the defendants.

It is an undeniable facet of our jurisprudence that whether "in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690 (S.C. 1986) (quotations omitted). It is integral to the defense case to be able to present a complete defense by showing that Chambers had an interest, bias, and motive in utilizing this investigation to promote his business as he has shown that he has utilized previous ongoing cases in his attempts to make money from Exeintel. The government is free to dispute it, but one view of the evidence is that Chambers ignored CHS policies or directed CHS

---

[2] See Ex. E. – Chart identifying the FD-1023 forms relating to the management and activities of CHS Dan.

10

Dan to entrap these defendants to help sell his services for Exeintel and personally profit.

This incentive may explain why SA Chambers participated in the August 9, 2020 phone call with CHS Dan and Adam Fox, wherein CHS Dan suggested that Mr. Fox may wish to engage in alternate, less serious property crimes involving Governor Whitmer. CHS Dan was specifically admonished by the FBI to not "suggest ideas". Yet SA Chambers participated in, was privy to, and a part of this conversation where CHS Dan was violating the admonishment.

The defense has the ability and opportunity, "to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation. . ." *United States v. Cook*, No. 3:17-CR-65 (SRU), 2019 WL 4247938, at *18 (D. Conn. Sept. 6, 2019), *aff'd sub nom. United States v. Mickens*, No. 20-258, 2021 WL 3136083 (2d Cir. July 26, 2021), *cert. denied sub nom. Hunter v. United States*, 142 S. Ct. 515 (2021), and *cert. denied,* No. 21-6081, 2021 WL 5763284 (U.S. Dec. 6, 2021), and *cert. denied sub nom. Cook v. United States*, No. 21-6091, 2021 WL 5763285 (U.S. Dec. 6, 2021) *quoting Kyles v. Whitley*, 514 U.S. 419, 445 (S.C. 1995).

The *Cook* court elaborated on the *Kyles* analysis by explaining that the government in *Kyles* had committed a *Brady* violation by not revealing exculpatory evidence made by an informant who "made the case" against the defendant. *Cook*, WL 4247938 at 18. If the defense had the statements made by the informant, then the informant could have been called as an adverse witness or used the statements

11

in their questioning of the police and "attacked the reliability of the investigation." *Id*. While, the *Cook* court says that *Kyles* does not stand for the proposition that the defense can call into question the government's investigative techniques "based on mere speculation with respect to an alternative suspect, about whom there was no evidence in the record," here it is beyond question that Mr. Chambers was attempting to leverage his success in criminal investigations performed for the FBI for his personal profit. *Id*. at 19.

In this case, looking into Chambers' history with Exeintel and his desire to monetize it during an ongoing investigation is not calling into question the investigation "with respect to an alternative suspect," but rather it is "attack[ing] not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation. . ." *Kyles*, 514 U.S. 419 at 445. When an agent, like Chambers, is focused on using his active investigations on behalf of the government as a selling point to make money in his private business, it raises a serious question about whether the agent is conducting the investigations in good faith or is instead motivated to make arrests for personal financial gain.

Trying to make a financial gain off an ongoing investigation by a special agent assigned to the case would unequivocally give the agent a bias or a motive to ensure a conviction or at the very least an arrest. Bias includes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, [her] testimony in favor of or against a party." *In re Davol, Inc./C.R.*

12

*Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*, 510 F.Supp.3d 538, 555 (S.D. Ohio 2020). If Chambers had a bias or motive to make money off this investigation through his private intelligence company, this would raise a *Kyles*-type of situation where the thoroughness and even the good faith of the investigation could be called into question. *Davol* goes on to say that, "Extrinsic testimony, or that elicited by cross examination to show the bias or interest of a witness in a cause, covers a wide range and the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only." *Id.* at 556, *quoting Majestic v. Louisville & N.R. Co.*, 147 F.2d 621, 627 (6th Cir. 1945).

Furthermore, this evidence is, as *Davis v. Alaska* states, "subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska*, 94 S.Ct. 1105, 1110 (S.C. 1974). The government may say it does not intend to call Chambers and thus his testimony is out of reach, or rather that this evidence or his testimony is precluded by Rule 608(b), but *Davol* and, ironically, *Chambers v. Mississippi* rebuff this proposition. *Davol* states that when evidence is offered to show bias, rather than untruthfulness, is not precluded by Rule 608. *In re Davol*, 510 F.Supp.3d 538, 557. The court goes on to quote the Supreme Court in saying that, "'[i]t would be a strange rule of law which held that relevant, competent evidence which tended to show a bias on the

13

part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.'" *Id.* Likewise, *Chambers* states a defendant's Sixth Amendment rights are not predicated upon whether a witness is called by either the state or the defense. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

However, even if Chambers is not called as a witness, his motive behind the investigation was improperly slanted to make money for his own personal benefit. The Supreme Court has said that Congressional investigations "conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins v. U.S.,* 354 U.S. 178, 187 (S.C. 1957). While Chambers is not a congressman, he is an arm of the executive branch and an agent of the Federal Bureau of Investigation; an agency tasked with carrying out the laws that Congress enacts. His work with Exeintel had improperly slanted his investigation and it was conducted for his "personal aggrandizement". Regardless of his status as a government witness or not, his improper bias and motive should not be held out of reach simply because the government does not want to bring his misdeeds of the lead case agent to the stand.

It is undeniable that Chambers was trying to monetize Exeintel as early as 2019 and given the pricing quotes that he was sending to a potential customer, he was trying to make an exorbitant amount of money off of this business. He was even willing to use an ongoing investigation in *United States v Muse* to try and prove his credentials and qualifications to a potential customer. The case of *Ray v. Bauman*

14

states that bias includes mere "'employment or business relationships' with a party. . ." *Ray v. Bauman*, 326 F.Supp.3d 445, 470 (E.D. Mich. 2018). The fact that Chambers was attempting, in his own words, to "make this enterprise a success" by using an ongoing investigation as proof of his skillset, running Exeintel as the CEO while he was still employed with the FBI, and actively working on this case would show a bias on his behalf to keep the investigation going and secure a conviction(s) or a motive to keep it going to earn money through this business. This would cast a very negative light on the "good faith" of the investigation as a whole.

### c. It is irrelevant that the government claims Chambers never actually earned money through Exeintel.

Chambers remained as the CEO of Exeintel until October 29, 2021, when he dissolved the company. Meaning, throughout the investigation and post-arrest all the way until after the initial trial date he remained in his capacity as the owner and CEO of Exeintel. The government claims, while refusing to answer basic questions about Mr. Chambers' involvement, that he was a failure in his attempts to earn money through Exeintel, but this is irrelevant considering the bias that it cast upon the investigation.

Failure or not, Chambers had an expectancy interest in acquiring money for Exeintel. Within the Sixth Circuit, it is well established that expectancy interests are subject to cross-examination during trial.

In *United States v. Stewart*, two witnesses for the prosecution were cross-examined on "any 'deals' they had struck with the government in exchange for their testimony." *U.S. v. Stewart*, 5 Fed.Appx. 402, 407 (6th Cir. 2001). While each, at

15

first denied having been offered anything, both witnesses admitted that they knew of the possibility of a Rule 35 motion. *Id.* Additionally, while the defendant ultimately lost on his *Brady* and *Jencks* violation arguments for not having their deals revealed, the court stated that the defense had the ability, and utilized it, to cross the witnesses about any deals that may have been made, even if it was not effective in achieving their goal. *Id.* Similarly, in *Balark*, defense counsel cross-examined other witnesses and co-defendants about "their motivation to testify and benefits they expected to receive." *U.S. v. Balark*, 412 Fed.Appx. 810, 812 (6th Cir. 2011). Much like a snitch who has no promise of leniency and relies instead upon the expectation of relief, Chambers too had a pecuniary expectancy in utilizing this case and the *Muse* case to bring profit and contacts to Exeintel.

The difference that separates the average CEO looking to protect and expand his company from Chambers, is that the latter was one of the three lead investigators on the case and was utilizing his position, skills, and resources to ensure a "successful" thwart of what could be considered one of the biggest alleged domestic terrorism plots in the United States. All with his name stamped on it and helping to organize and orchestrate the plot through CHS "Dan".

## CONCLUSION

Because Impola's prior false testimony is relevant to his truthfulness, the Defense should be permitted to inquire into it on cross examination, subject to the limitations on the use of extrinsic evidence.

16

Because Chambers' used his active investigations working for the FBI in order to attempt to make millions of dollars for himself, the Defense should be permitted to explore how this financial incentive impacted the good faith and integrity of the investigation in this matter.

                                      Respectfully submitted:

Dated: December 31, 2021           /s/ Joshua A. Blanchard
                                                Joshua A. Blanchard
                                                Attorney for Barry Gordon Croft, Jr.
                                                BLANCHARD LAW
                                                309 S. Lafayette St., Ste. 208
                                                Greenville, MI 48838
                                                616-773-2945
                                                josh@blanchard.law

Dated: December 31, 2021           /s/ Christopher Gibbons
                                                Christopher Gibbons
                                                Attorney for Adam Fox

Dated: December 31, 2021           /s/ Scott Graham
                                                Scott Graham
                                                Attorney for Kaleb Franks

Dated: December 31, 2021           /s/ Michael Hills
                                                Michael Hills
                                                Attorney for Brandon Caserta

Dated: December 31, 2021           /s/ Julia Kelly
                                                Julia Kelly
                                                Attorney for Daniel Harris

**Certificate of Compliance with LCrR 47.2(b)(ii)**

I certify that this motion and brief contains 4,140 countable words as defined by LCrR 47.2(b)(i) and as calculated by Microsoft Word 16.55.

Dated: December 31, 2021                 /s/ Joshua A. Blanchard
                                          Joshua A. Blanchard