THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

KALEB FRANKS,

    Defendant.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

---

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENSE MOTION TO ADMIT OUT-OF-COURT STATEMENTS

One of the most important issues in this case will be the presentation of statements by FBI agents, CHSs, and defendants that show how the FBI directed the defendants through the CHSs and how the defendants pushed back. Not surprisingly, because the evidence has overwhelming probative value for the defendants, the government opposes the introduction of this evidence. A fair evaluation of the evidence guts the government's claim that a conspiracy to kidnap existed[1] and is even more damaging to the government's opposition to the entrapment defenses that the defendants will raise at trial.[2] Kaleb Franks replies to the government's response as follows:

---

[1] Recent pleadings have focused on the overwhelming evidence of entrapment. It is, however, perhaps more important for the jury to receive admissible evidence establishing that there was no agreement to kidnap Governor Whitmer. Defendant is entitled to challenge the conspiracy allegation while raising the alternative defense of entrapment. The analysis here should not lose sight of the fact that the government's attempt to take advantage of inflammatory rhetoric does not prove the elements of a conspiracy to kidnap.

[2] It is shocking that the government is so opposed to having the jury learn the truth that the government seeks to improperly manipulate the rules of evidence. Since the government is taking this approach, however, Mr. Franks is entitled to respond.

## *Legal Discussion*

The government's response cries out for replies to a few key topics. In the end, that response tries mightily to distance the government from its less-than-favorable agent and informant conduct, applies incorrect claims that evidence is irrelevant, fails to support its position that statements that are not offered for their truth are inadmissible hearsay, ignores key aspects of the hearsay rules and the statements at issue, and seeks to inexplicably deprive the defense of its due-process-guaranteed opportunity to present a full defense.

> A. *Federal Rule of Evidence 801(d)(2)(C) is/may be applicable to certain statements, and proofs at trial will likely flesh out the frequency of its possible application.*

First, the government makes passing reference to the supposed inapplicability of Federal Rule of Evidence 801(d)(2)(C). *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2722 n.1. The government argues that the rule does not apply because "there is no evidence that any of the declarants were specifically authorized to make particular statements on behalf of the United States government." *See id.* The first problem with the government's position is that the statements are not offered for their truth and are therefore not hearsay. The next problem with the government's position with regard to the rule generally is that proofs at trial will flesh out some of the foggy areas here about exact application of the rules vis-à-vis specific evidence. The defense cannot anticipate every possible argument in favor of admission of a statement at this point, since evidence presented at trial may clarify additional avenues through which statements could be admitted.

More specifically, one can hardly argue that the government did not authorize CHSs to make statements when its agents were specifically telling these CHSs to do things like shape the mission as one "to kill the governor specifically."[3] *See, e.g.*, RE. 383: Motion to Admit Statements, PageID # 2562 (and RE. 383-1 at PageID # 2587). On multiple occasions, the government's agents directly and explicitly told CHSs what to say.

> B.   *The government reads too narrowly law on relevance and party opponents . . . and tries too hard to distance itself from its CHSs.*

The government engages in a little gymnastics routine to try to now distance itself from its agents and informants, going so far as to allege that certain statements "were the agents' own statements and not the statements of the United States government." *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2724-25. This position, however, ignores just how many of the agents' and CHSs' statements *did* find their way into agency reports. *Cf. id.* at 2724 ("The statements were not made under oath or even part of anything as formal as an agency report."). Mr. Franks will not repeat the explanations the defense has already provided about the volumes of statements captured in agency reports. *See, e.g.*, RE. 383: Motion to Admit Statements, PageID # 2561-62. But the fact remains: these statements were made by government agents and informants working in an official capacity and many have been memorialized in different ways.

The government also does a bit of juggling when it tries to assert that "[l]aw enforcement agents' actions or statements directly to Defendants may be relevant to

---

[3] This statement might serve as the best example of the government's misguided theory of relevance. A government agent tells a CHS to make sure the CHS works with the defendants to establish the precise goal of the defendants' supposed plan, and then the government argues that the agent's direction is not relevant.

3

inducement, but statements they made to each other or third parties are not." *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2725. Essentially, the government is asking the Court to ignore the effects of government agents using CHSs to do the government's proverbial "dirty work" in entrapping people. Its argument boils down to the idea that, if a government agent offers inducement, the offer could be relevant, but if an agent uses a CHS to offer inducement, the offer somehow becomes irrelevant.

Such a posture ignores clear case law holding that informants can and do act on the government's behalf in the entrapment context. Courts have emphasized that people acting on behalf of (or "under the auspices of") the government can entrap a defendant through persuasion or inducement. *See, e.g.*, *United States v. Pesaturo*, 519 F. Supp. 2d 177, 184 (D. Mass. 2007) (citing cases). So an agent's statements to a "third party" CHS can be extremely relevant on these questions. Courts have admonished that, with entrapment defenses, the identity of informants "is clearly relevant and helpful" to the defense. *Id.* at 186. A defendant cannot prepare an entrapment defense if the prosecution does not disclose the identity of informants, "for absent evidence of actions by an agent of the Government, the Defendant has no entrapment defense." *Id.*

This sort of discussion underscores both the agency issue inherent in the party-opponent-statement points in the section above and the relevance of handler statements to CHSs in this context. These factors also undermine the government's narrow reading of relevance. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2725-27. In *Pesaturo*, the court emphasized that information concerning an informant's cooperation with the government "is significant and helpful to the Defendant in that it suggests a motive for him to engage in the improper conduct which the Defendant has

4

alleged, under oath," and "supports the Defendant's proffered entrapment defense, which itself attacks an essential element of the Governments case—i.e., the Defendant's state of mind." *Pesaturo*, 519 F. Supp. 2d at 191. An informant's relationship with the government, evidence related to an informant's motives, and the like are "exculpatory and material under Brady and material under Rule 16." *Id.* In the related area of discovery obligations (which helps demonstrate the breadth of relevance here by touching on what materials may affect a defense and preparation for trial), in *Pesaturo*, the court concluded that materials don't even need to be exculpatory to be relevant/discoverable in this arena. *See id.* at 191-92. Contrary to the government's assertions here, courts read relevance broadly in the entrapment/inducement/predisposition context. *See id.*

The government's reading of Sixth Circuit law on party-opponent statements finds itself on likewise unstable ground. *See, e.g.*, RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2727-28. With regard to its presentation of the analysis in *United States v. Reed*, 167 F.3d 984, 989 (6th Cir. 1999), the prosecution has omitted a few key aspects of that decision, which bear a full exploration here. (Even though counsel does not love placing block quotes in briefs, the situation seems to demand them here to include fully the relevant material.) The government summarizes *Reed* this way:

> For example, in *United States v. Reed*, 167 F.3d 984 (6th Cir. 1999), the defendant asserted his innocence in a recorded conversation with a government informant. The informant "generally responded 'yeah' or 'I understand.'" *Id.* at 987. The defendant moved to admit that recording at trial, arguing that the informant's affirmative responses to his claims of innocence were statements by a party opponent. The Sixth Circuit affirmed the district court's exclusion of this evidence, finding that the informant's responses were not statements. *Id.* at 989.

The full discussion in *Reed*, however, goes like this:

5

> Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ." Reed's theory is that Sumpter and Maddox acted as the government's agents in taping the conversations and that their taped statements thus may be admitted against the government. To a certain extent Reed is correct. Sumpter and Maddox were acting as agents of the government, and this court has interpreted "a matter within the scope of the agency" broadly enough that "statements" of Sumpter or Maddox would be admissible against the government. *See Branham*, 97 F.3d at 851 (conversations between government informant and criminal defendant were designed to establish trust, and anything said by the informant was within the scope of the agency). With regard to the Sumpter tape, however, the district court determined that Sumpter's utterances were not "statements" and that Sumpter's failure to contest Reed's allegedly false assertions was not probative. Given that ruling, which was not clearly erroneous, the court did not err, and thus there could be no plain error in excluding this evidence despite Rule 801(d)(2)(D). Moreover, as noted above, Reed relinquished any argument related to the admissibility of the Maddox tape by failing to move to introduce this testimony at trial.

*Reed*, 167 F.3d at 989 (alterations in the original).

So yes, the *Reed* court cited, approvingly, the Sixth Circuit's earlier decision in *Branham* and concluded that the cooperators/informants in *Reed* "were acting as agents of the government," and that the circuit "has interpreted 'a matter within the scope of the agency' broadly enough that 'statements' of [the informants] would be admissible against the government." *Id.* The Sixth Circuit allows for admission of these informant statements.

> C. *The government cannot now cut its CHSs adrift just because those CHSs are no longer helpful to it and may have even created liabilities for it.*

Unsurprisingly, given the Sixth Circuit's clear holdings on the admission of informant statements in this context, the government is also trying to distance itself from CHSs it no longer views as helpful or favorable for its positions. *See, e.g.*, RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2728-29. For example, the

government has attempted to jettison its CHS Steve. *See id.* The government has gone so far as to accuse its CHS of being a "double agent." *See id.* at 2729.

The fact remains, though: the government brought its CHSs aboard. It authorized them to work on the case. It used them. Through these CHS, the government arranged the trainings, meetings, and discussions at issue in this case. Basically, through its CHSs, the government hatched this scheme, influenced the defendants, cultivated trust, and tried to entrap the defendants. It cannot now cry "foul" at its CHSs and cut them loose to avoid unfavorable presentations at trial.

The government's support of CHSs emboldened them. So if these people did later spin off in their own directions, they did so having enjoyed the government's support at some point. The government can't stuff the proverbial "genie" back in the "bottle." These CHSs acted to induce the defendants to say and do certain things *because* the government permitted, encouraged, pushed, and pressured the CHSs to act that way. That a CHS took the "ball" and "ran with it" doesn't change the fact the government initiated the whole thing.

The Supreme Court has long recognized the lynchpin role informants can play in entrapment defenses. *See, e.g.*, *Roviaro v. United States*, 353 U.S. 53, 64 (1957) (requiring disclosure of a confidential informant's identity because, among other things, the informant's "testimony might have disclosed an entrapment"). The government can't minimize this role now.

D. *The government stretches its present-sense-impression arguments to the breaking point.*

In comparing private, excited conversations between the defendants and/or other individuals to a suspect making self-serving statements to police, the government strains its hearsay analysis to an irredeemable point. *Cf.* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2731. The Court hardly needs counsel to explain the differences between a suspect telling police (some fifteen minutes after a shooting) that he thought he was being robbed . . . and a group of private individuals gathered to talk and adamantly affirming that they were "not cool with offensive kidnapping." *Compare id. with* RE. 383: Motion to Admit Statements, PageID # 2569-70.[4]

Counsel would point out, briefly, that the government has conveniently narrowed its reading of Federal Rule of Evidence 803(1). For example, it claims the "Captain Autism" remark "is also not a present sense impression because there was no event." *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2732. On this point, it continues, "Nor Garbin [sic] personally observe Fox being indecisive; he was speculating as to why it was taking a long time for Fox to text him back with a phone number to call." *Id.* This reading of the rule ignores the rule's application to statements describing or explaining "an event *or* condition." *See* Fed. R. Evid. 803(1) (emphasis added).[5] Garbin was

---

[4] The government continues making unsupportable comparisons when it discusses excited utterances. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2734. It takes very little effort to distinguish the government's statements-to-police examples from the circumstances of the statements at issue here.

[5] The government persists in this erroneous reading of the rule elsewhere in its memo as well. *See, e.g.*, RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2732-33. It also bears noting, as the defense said in its chart attached to its earlier motion, that many of these statements qualify for admission under multiple subsections of Rule 803. With the "black-bagging" remark explored below in particular, the defense has said it fits under Rules 803(1) and (3). *See* RE. 383-1: Attachment, Motion to Admit Statements, PageID # 2591.

8

observing and explaining the condition of his facing Fox's vacillation. (The government also reads the significance of this remark too narrowly. Addressing someone as "Captain Autism" hardly implies respect for that person's leadership or a willingness to take that person's leadership or direction seriously. As the defense has already explained, admission of this remark does not hinge on hearsay exceptions. No one cares at this point whether Mr. Fox had autism. The truth of the statement is inconsequential, so the statement does not qualify as hearsay. *See* RE. 383: Motion to Admit Statements, PageID # 2571-72.)

    *E.    The government persists in its mischaracterization of the statements and evidentiary rules when it discusses excited utterances.*

In discussing excited utterances, the government carries on with its mischaracterizations of the circumstances of the statements at issue . . . and of the parameters of the rules. With regard to a Harris-Franks expression of July 7, 2020, the government argues, "First, the initial statement about 'taking' or 'black-bagging' people was not an exciting event." RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2734. The government says, "It was the continuation of a conversation that members of this group had been routinely discussed [sic] for more than a month." *Id.* Having someone discuss "black-bagging people" (even if that person discusses it repeatedly) can certainly qualify as an "exciting event." If someone were to suggest to counsel the idea of "black-bagging" a person, counsel's heartrate would rise and he would feel agitated and exclaim disapproval. Suggestions of disturbing ideas and activities can certainly qualify as "startling" events or "startling" conditions, and responses made to these suggestions/events/conditions can qualify as made "under the stress of excitement" that the suggestions/events/conditions caused. *Compare* Fed. R. Evid. 803(2).

It is the government here who is trying to use the evidentiary rules in self-serving ways. In suggesting that Harris and Franks would only react as they did because of a fear of government informants, the government ignores the context of the exchange—people were discussing "black-bagging" individuals. Given this topic, one can hardly argue that the attendees of the discussion were terribly worried about being overheard/reported. Someone there was comfortable enough to raise the subject . . . and Harris and Franks were uncomfortable enough to disclaim any interest in it.

The government's citation of *United States v. Sewell*, 90 F.3d 326, 327 (8th Cir. 1996), cannot help it. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2735. Pointing to *Sewell*, the government argues "when a person believes that law enforcement has caught them, it takes only the 'briefest reflection to conclude that a denial and plea of ignorance is the best strategy.'" *Id.* In *Sewell*, though, the statement at issue was the defendant's statement to police officers who had searched his vehicle and discovered a loaded ammunition clip. *See Sewell*, 90 F.3d at 326. With the Harris-Franks statements focused on here, there was simply no similar police interaction, no motivation for self-serving statements to authorities. If anything, Harris and Franks were being completely honest and taking the severe social risk of having this group ostracize them.

The *Sewell* decision does underscore the nature of excited utterances as stemming simply from "stress of nervous excitement or physical shock": nervous excitement suffices to invoke the rule. *See id.* at 327. An upsetting suggestion like that of "black-bagging" or kidnapping people can certainly create the necessary "stress of nervous excitement." The government has simply understated the nature of "nervous excitement" to serve its ends here. *Cf.* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2735

(arguing that the July 18, 2020 meeting in Peebles, Ohio, at which an informant stated "he was 'pissed' because the group did not accomplish anything" failed to rise to "the level of 'an event startling enough to cause nervous excitement'").

> F. *The government's arguments continue on their wayward trajectory with regard to statements related to then-existing conditions.*

Counsel will not repeat his arguments and assessments related to the ease with which one can distinguish the government's case law here. Suffice it to say: the government cites cases one can easily distinguish, such as cases involving statements made *after* a criminal conspiracy had ended. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2737.

The government also pulls out its crystal ball to explain the defendants' thoughts . . . and to contravene other evidence. For example, with regard to a supposed kidnapping discussion, the government argues, "Harris replied, 'No, shut up,' not because he disagreed, but because he was concerned that there could be law enforcement present and that continuing the conversation would endanger the success of their kidnapping plan." *See id.* at 2738. This stance, however, ignores Harris's and Franks's earlier repudiations of kidnapping (just discussed above). While the government may want to argue its perspective, one cannot ignore that two sides to the coin exist: Harris very well could have been continuing his strident commentary against kidnapping, and expressing his "then-existing state of mind" or "emotional" condition (including a mental feeling averse to kidnapping). *Compare* Fed. R. Evid. 803(3).

With regard to informants' states of mind, the government again ignores the central position in which informants (and their motivations) sit in entrapment cases. *Cf.* RE. 396:

11

Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2738. It also ignores the influence of third parties in this context. As the government explains, "Paul Bellar said, 'We're not going to be fucking black-bagging fucking politicians out of their cars, getting fucking warrants and arresting them, we're not dealing with that.'" *Id.* The government's attempt to minimize this statement ("Bellar is not alleged to have been Defendants' coconspirator and is not charged with any federal crimes in this case, so his state of mind is not relevant.") ignores the position people like Bellar had in relation to the defendants and how people like Bellar shaped the group's inclinations and reflected the group's repudiation of kidnapping here. *See id.*

      The government offers only a conclusory assertion that Rule 803(3) does not allow for admission of statements related to third parties' intent. *See id.* at 2741. Such an assertion reads the rule too narrowly and flies in the face of analogous case law. In *United States v. Houlihan*, 871 F. Supp. 1495, 1498 (D. Mass. 1994), for example, the court noted that Rule 803(3) "is silent as to whether such statements are admissible against third parties." It also observed that, "[u]nfortunately, the legislative history of Rule 803(3) only serves to obfuscate the analysis." *Houlihan*, 871 F. Supp. at 1498. That court considered the statement of an alleged victim to the effect that this alleged victim was going to meet one of the defendants; the court considered the statement "clearly" admissible, if relevant, as a statement of the alleged victim's own intention, but mused initially that the admissibility of the statement was unclear with regard to admissibility against others, namely the defendants, "as evidence that the meeting actually took place"—namely as a statement of the relevant defendant's intent to meet. *See id.*

In diving into the question, the *Houlihan* court explored the Advisory Committee's Note to Rule 803(3), which "states that 'the rule of *Mutual Life Insurance Co.* v. *Hillmon,* allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed," and how "the Report of the House Judiciary Committee states that 'the committee intends that the rule be construed to limit the doctrine of *Mutual Life Insurance Co.* v. *Hillmon,* so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person.'" *Id.* at 1498-99. The court also explained that the "Senate Report and the Conference Report are silent on this point." *Id.* at 1499.

Courts that have considered the application of Rule 803(3) have divided on these questions. "Some courts have held that a declarant's statement of intent may be admitted against a non-declarant only when there is independent evidence connecting the declarant's statement with the non-declarant's conduct." *Id.* The Ninth Circuit has found "that statements of a declarant's intent are admissible under Rule 803(3) to prove subsequent conduct of a person other than the declarant without corroborating evidence." *Id.* For its part, the *Houlihan* court adopted this Ninth Circuit approach. *See id.* at 1501. Case law like this demonstrates that courts, in parallel circumstances, read the rule more broadly than the government implies.

The government simply oversimplifies the idea of "intent" here. It also tries to undercut the defendants' right to present a full defense, as explored in the last section below. As another example, the government says, "a statement about someone else's intent is not admissible" and then argues that "[s]everal of Defendants' proposed statements purport to do exactly that," citing "Statement #7 – 'They (the WW) are going to do

13

Michigan;' Statement #170 – 'I've got a guy right now drawing up the paperwork to fucking legitimatize this shit and actually charge Whitmer with her charges that she violated the Constitution. How she has violated our constitutional rights and the fucking laws that she has broken. So I have a guy working on that right now.'" RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2741.

Adam Fox made this latter statement. It shows *his* intent, as the defense has already pointed out. *See* RE. 383-1: Attachment, Motion to Admit Statements, PageID # 2610. When one has someone working on an issue for one, a statement to that effect shows one's intent to address that issue.

G. *The government oversimplifies the potential application of Rule 804(b)(3).*

With regard to Rule 804(b)(3), the government has, again, oversimplified. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2742-44 (discussing rule). For example, the government looks at Statement #17, which involves Agent Impola texting an informant and telling him, "Best thing to do is deny and accuse somebody else like Trent." *See id.* at 2744. According to the government, this statement relates to Agent Impola advising the informant that, if the informant gets accused of, well, being an informant, "he should suggest that another person in the group, like Trent, was working with police." *See id.* The government then argues that the defense has failed to "suggest how this was in any way against Agent Impola's penal interests." *Id.*

Rule 804(b)(3), however, is not limited to statements against *penal* interests. It applies to statements against "pecuniary or proprietary interests" and those that could "subject the declarant to civil . . . liability" as well. *See* Fed. R. Evid. 804(b)(3). As the defense has already explained, Agent Impola does not enjoy a sterling record as an agent.

*See, e.g.*, RE. 343: Appeal, PageID # 2148 (citing Agent Impola's perjury in *United States v. Gadola*, No. 1:17-CR-80 (W.D. Mich. 2017)).[6] Suggesting framing an innocent person (and, if the government's version of this group is to be believed, exposing them to great risk) would not be in the *pecuniary*/professional interests of an agent (this kind of behavior seems like it could perhaps lead to admonishment or termination), especially one who has already found himself answering perjury accusations on occasion.

Throughout its memo, the government simply attempts to deny the defense its due-process right to present a complete defense of entrapment. It ignores relevant law and cites cases that do not address the circumstances at hand. It is scrambling to bar from the jury's presence the reams of evidence that demonstrate the defendants' lack of predisposition to commit the offenses suggested by the government's agents and informants . . . and the defendants' repudiation of the government's suggestions.

> H.  *The defendants have a due-process right to present a complete defense of entrapment, and denial of admission of these statements would violate that right.*

In summing up the situation here, the government is doing its utmost to distance itself from agents and informants who went south on it . . . and to limit the defense's ability to present a full picture of what happened leading up to the defendants' arrest in 2020. It argues that a third party's intent isn't relevant, that "intent" statements related to events or plans that did not occur are inadmissible. *See* RE. 396: Gov. Resp. to Motion to Admit Out-of-Court Statements, PageID # 2740. It tries to minimize the distinct role-playing

---

[6] Counsel is also aware of a similar issue with Agent Impola that arose in an immigration case in the Eastern District of Michigan, but counsel has not been able to obtain a case number or records from that case yet.

15

aspect of the defendants' conduct, suggesting that Garbin's aluminum (if counsel remembers correctly) fishing boat was a legitimate tool to undertake a military operation and that Shawn Fix could actually steal a military helicopter. *See id.* at 2740 n.12. And it struggles to show that non-hearsay statements should be inadmissible (especially statements made by its own [now arguably discredited, as discussed in other filings] agents as they put the pressure on informants and defendants in an effort to make their entrapment work). *See id.* at 2746.

As the defendants have already touched on, they enjoy a constitutional right to present this evidence. *See* RE. 383: Motion to Admit Statements, PageID # 2558-59. And as an overarching theme here, informants are agents of the government in the entrapment context. As the Ninth Circuit has explained, it doesn't matter whether officers "badgered, cajoled, or importuned" a defendant personally if "their decoy did." *See Bradley v. Duncan*, 315 F.3d 1091, 1096 (9th Cir. 2002). A "decoy" whom officers manipulate "constitutes a police agent" in the entrapment context, even if that decoy doesn't know of the authorities' object. *Id.* The government has tried to minimize both of these aspects of the entrapment defense here.

Due-process rights include the right to present a full defense, including entrapment evidence. *See, e.g., id.* at 1098 ("The failure to instruct the jury on entrapment deprived [the defendant] of his due process right to present a full defense."). Due process requires criminal prosecutions to comport with prevailing notions of fundamental fairness. *Id.* Criminal defendants must receive "a *meaningful* opportunity to present a complete defense." *Id.* at 1098-99 (citation omitted).

*Conclusion*

Based on these points and those already made in the defense's original motion and its response to the government's motion to preclude admission of statements, Mr. Franks asks the Court to admit at trial the out-of-court statements at issue. *See* RE. 383: Motion to Admit Statements, PageID # 2554-2620 (including attachment); RE. 390: Def. Resp. to Gov. Motion to Preclude, PageID # 2694-2700.

Respectfully submitted,

Date: January 7, 2022                **SCOTT GRAHAM PLLC**

By:   /s/ Scott Graham
    Scott Graham
    Attorney for Defendant
Business Address:
    1911 West Centre Avenue, Suite C
    Portage, Michigan 49024
    (269) 327.0585