THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

   Plaintiff,

v.

KALEB FRANKS,

   Defendant.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

---

**DEFENDANT'S SUPPLEMENT TO DEFENSE MOTION TO DISMISS**

---

With the government's recent production of volumes of discovery, defendant Mr. Kaleb Franks, through his attorney Scott Graham, has discovered materials that reveal the government's awareness of its confidential human sources' overreaching in this case. Mr. Franks now offers this supplement to the defense's motion to dismiss, filed on December 25, 2021. *See* RE. 379: Motion to Dismiss, PageID # 2518-36. Given the Court's clear familiarity with these matters and the procedural posture of this case, Mr. Franks will not bother the Court with a factual or procedural summary. This new discovery simply affirms the FBI's pellucid appreciation of its informants' (at least one but likely more[1]) overreaching in this

---

[1] This recent discovery has also revealed statements from one of the defendants charged in the state proceedings paralleling this federal action. With regard to the defendants' supposed "surveillance" to further the alleged "conspiracy," that state defendant described another CHS as the "ring leader," "the guy that was sort of in charge of all this," and "the go-to guy that people were checking in with."

case: leading of conversations, shaping of plans, and concerted efforts to ingratiate himself with the defendants).

*Legal Discussion*

As the defense has already explained, government overreaching can constitute entrapment as a matter of law and can provide grounds for vacating a conviction. *See, e.g.*, RE. 379: Motion to Dismiss, PageID # 2519-20 (citing *Jacobson v. United States*, 503 U.S. 540, 542 (1992) ("Because the Government overstepped the line between setting a trap for the 'unwary innocent' and the 'unwary criminal,' . . . and as a matter of law failed to establish that petitioner was independently predisposed to commit the crime for which he was arrested, we reverse the Court of Appeals' judgment affirming his conviction.") *and United States v. McLernon*, 746 F.2d 1098, 1111 (6th Cir. 1984) (discussing how entrapment is established as a matter of law when undisputed evidence demonstrates government agents engaged in conduct which overbore an innocent person's will and induced them to commit an offense that they were not disposed to commit)). The defense has also presented to the Court the issue of the recent government production of voluminous discovery, production that has revealed notable evidence related to the government's appreciation of its informants' overreaching. *See, e.g.*, RE. 385: Motion to Continue, PageID # 2622-24.

Having now had the opportunity to dig into some of this new discovery, counsel has reviewed an FBI memorandum (dated April 1, 2021) detailing the

performance of one of the government's CHSs.² This memo explicitly refers to agents' concerns about this CHS's overreaching. On page four of this memo, a passage provides:

- CHS appeared to be fully cooperative with the FBI pertaining to militia matters and disrupting the plot kidnap the Governor of Michigan. CHS did not always appear to fully understand the scope and limitations of how the FBI conducted its investigations or what was expected of him. He was directed to be a sponge during conversations with subjects of interest. However, frequently, CHS could be heard taking control of conversations and providing a lot of input. CHS appeared to enjoy the role of being a person in charge, and relishes the respect and admiration of their peers. At times, CHS can be heard embellishing their deeds, background, and abilities in order to ingratiate themselves with the subjects. It was hard to determine at times if this was to increase his bona fides or for his own ego or if CHS was working to steer the investigations.

This passage demonstrates the firm ground supporting the defense's position that CHSs manipulated this investigation. First, it shows that this CHS controlled the alleged plans in questions. Second, it shows the CHS ingratiated himself with the defendants. Third, it demonstrates that the government appreciated the presence of these problems with its CHS and allowed that CHS to continue to function as such. Indeed, this CHS provided information related to key events included in the complaint initiating this case. *See, e.g.*, RE. 1-1: Continuation of Complaint, PageID # 7 (discussing Cambria FTX, an event the CHS actually helped host at another man's residence, and for which the CHS received authorization to engage in illegal conduct, namely his otherwise-illegal possession of firearms).³

---

² While the government seems ready and willing to now reveal the identities and dirty laundry of CHSs who have proved inauspicious for it, the defense will continue to try to avoid gratuitously revealing identities, out of respect for the original agreements and understandings in this case. *Compare* RE. 258: Motion to Compel, PageID # 1406 n.2 *and* RE. 396: Gov. Resp. to Motion to Admit Statements, PageID # 2728-29.

³ The memo at issue here also proves the defenses fears with regard to *Brady* material and government production. Under separate cover, Mr. Franks is renewing his motion to compel discovery of CHS files.

3

According to this memo, in exchange for his assistance to the government, this CHS received $19,328.79 for his work between October 2019 and October 2020. (The CHS also asked the government to purchase him a new laptop to allow him to function as a CHS online, namely with social media. The memo isn't clear on whether the government did indeed make the purchase. But the CHS *may* have received items like electronics as well as the actual payment(s).) This memo records the government's concerns related to this CHS's truthfulness, motivations, and loyalty. Yet the government used this CHS well into October 2020 . . . past its arrest of defendants. (The memo notes a conversation with the CHS on October 27, 2020, in which he "was informed that the FBI was closing him as a source.")

At least from July 11 to 13, 2020, the FBI granted this CHS permission to engage in "otherwise illegal activity" (OIA). This memo also lists at least one instance of CHS conduct that would generally be illegal, apparently occurring outside the noted OIA periods (the memo alludes to what seems like a grant of OIA permission that may have occurred after the fact).

Now, the government has tried to distance itself from some of its CHSs, including this one. *See, e.g.*, RE. 396: Gov. Resp. to Motion to Admit Statements, PageID # 2722-29. With the integrity of this investigation under the spotlight, it has tried to cut certain CHSs and agents loose. Yet this memo produced in discovery demonstrates that the government, despite concerns over its CHSs' behavior and tendencies, continued to use these CHSs right up until (and past) its investigation's end with the arrest of the defendants. The memo records the following:

- On October 8, 2020, the FBI received information that CHS was attempting to influence other individuals to dispose of items which may have had may be of evidentiary value to a federal investigation. CHS was also suspected of planning to travel to Michigan to harm another individual. CHS, who is a convicted felon, may also have been in possession of firearms outside the scope of the Otherwise Illegal Activity (OIA) that was provided by the FBI.

Yet the FBI continued the CHS's service for another three weeks, not terminating his role until October 27, 2020, though it did ask him to "lay low." (It bears noting that, according to the memo, the CHS's handler was thanking the CHS for his service on October 7, so one can't help but wonder (1) how closely was the FBI truly monitoring the CHS if they didn't suspect the October 8 revelations; and (2) did they suspect those revelations and look the other way as long as it was convenient to do so, casting out the CHS only once they had to because of concerns about this case's progress.)

The government can't now disclaim its responsibility for this CHS, whom it acknowledged as having engaged in overreaching in this case. The civil case of *McIntyre v. United States*, 336 F. Supp. 2d 87, 94 (D. Mass. 2004), provides a useful comparison. In that case, representatives of a decedent's estate sued the government because FBI agents used informants who murdered the decedent. In that case, the agents knew that the informants, despite cooperating with the government, were still engaged in crime. *See McIntyre*, 336 F. Supp. 2d at 98. Agents protected the informants from exposure of their offenses. *See id.* In considering the agents' actions, the court, "[a]s a prelude to the discussion of whether the murder of [the decedent] [wa]s to be considered government action," admonished that "it is worth noting that the federal courts have long held that the

government may not categorically absolve itself of responsibility for the actions of its informants simply by disclaiming any formal agency relationship with them." *Id.* at 116; *see also id.* at 125 ("It was also clearly established in 1984 that constitutional violations can be effectuated by private actors acting in concert with government actors.").

Regarding *Sherman v. United States*, 356 U.S. 369 (1958), about which the defense has already spoken at length (as in RE. 379: Motion to Dismiss, PageID # 2520-21, 2523-24, 2533-36), the *McIntyre* court noted that, "[a]lmost half a century ago, in *Sherman v. United States*, . . . the Supreme Court held that an unpaid informant was acting as an agent of the government when he persuaded a criminal defendant to procure narcotics." *Id.* at 116. "Because the informant had repeatedly attempted to have the defendant obtain drugs, including by appealing to the defendant's sympathy and by inducing the defendant to return to his narcotics habit, the Court held that the defendant was not criminally liable because the government, through the informant, had entrapped the defendant." *Id.* With this ruling, "the Court explicitly stated that the informant had acted as an agent of the government, even if the government, by turning a blind eye to the informant's tactics, was not aware of all of the informant's activities." *Id.*

The *McIntyre* court went so far as to observe, and cite case law to the effect that, "[l]ower courts have likewise held that an informant's misconduct in investigating a criminal suspect may constitute 'outrageous conduct,' violative of the suspect's due process rights, requiring that an indictment against the

6

suspect/defendant be dismissed." *Id.* at 116-17. It also noted a "common theme" in precedent: "when a government actor participates in the conduct of private actors that would violate the constitution if the conduct were solely that of the government actor, the conduct is government action for purposes of analyzing whether a constitutional violation has occurred." *Id.* at 119.

While the facts in *McIntyre* are far more extreme in terms of the illegal conduct (murder) at issue, the case still shows that the government and its agents are liable for informant misconduct. *See id.* at 116-17. (In a parallel context, one might also consider Agent Impola's suggestion to frame the innocent Trent as an informant. *See, e.g.*, RE. 383: Motion to Admit, PageID # 2571 & RE. 383-1: Attachment, PageID # 2580). The *McIntyre* decision also demonstrates the gravity with which courts consider agent-informant misconduct. *See McIntyre*, 336 F. Supp. 2d at 117 n.25 (collecting cases, including cases involving dismissal of the indictment).[4]

For basically a year, the government used (and paid almost $20,000 to) a CHS it viewed as overly involved in planning and discussions with defendants, as overly concerned with ingratiating himself with defendants, and as notably unreliable. It allowed this person to break the law on multiple occasions. It seems to have issued ex post facto coverage for unauthorized law breaking. It continued to use him, even after his behavior raised serious concerns. Essentially, the

---

[4] Mr. Franks would also turn back to the defense's brief exploration of "objective" entrapment in its motion to dismiss. *See* RE. 379: Motion to Dismiss, PageID # 2534 n.6. As more evidence comes to light with this recent discovery, the grounds for finding objective entrapment increase.

government injected into the defendants' sphere a person bent on shaping a scheme and getting people to like and trust him . . . exactly the entrapping behavior the law forbids.

### *Conclusion*

Based on these points and those already made in the defense's original motion, Mr. Franks reiterates his request that the Court dismiss this matter. *See* RE. 379: Motion to Dismiss, PageID # 2518-36.

                                      Respectfully submitted,

Date: January 11, 2022                **SCOTT GRAHAM PLLC**

                                      By:  /s/ Scott Graham
                                              Scott Graham
                                              Attorney for Defendant
Business Address:
    1911 West Centre Avenue, Suite C
    Portage, Michigan 49024
    (269) 327.0585

# CERTIFICATE OF COMPLIANCE

In accordance with Local Criminal Rule 47.2(b)(ii), counsel asserts that this brief contains 1,816 words, as counted by Microsoft Word, version 16.50.

Date: January 11, 2022　　　　　　**SCOTT GRAHAM PLLC**

By:　/s/ Scott Graham
　　　Scott Graham
　　　Attorney for Defendant
Business Address:
　　　1911 West Centre Avenue, Suite C
　　　Portage, Michigan 49024
　　　(269) 327.0585