UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,             No. 1:20-cr-183

      vs.                     Hon. Robert J. Jonker
                                     Chief United States District Judge

KALEB JAMES FRANKS,

                Defendant.
_____/

## PLEA AGREEMENT

This constitutes the plea agreement between Kaleb James Franks and the United States Attorney's Office for the Western District of Michigan. The terms of the agreement are as follows:

1.     <u>The Defendant Agrees to Plead Guilty.</u>    The defendant agrees to plead guilty to the superseding indictment, which charges him with kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c).

2.     <u>The Defendant Understands the Crime.</u>    In order for the defendant to be guilty, the following must be true:

        a. Two or more persons agreed to commit the federal offense of kidnapping;

        b. The defendant knowingly and voluntarily joined that agreement; and,

        c. A member of the conspiracy did one of the overt acts described in the superseding indictment for the purpose of advancing or helping the conspiracy.

The defendant is pleading guilty because he is guilty of the charge described above.

3.    The Defendant Understands the Penalty.    The statutory maximum sentence that the Court can impose is imprisonment for life, a fine of $250,000, five years of supervised release, and a $100 special assessment.

4.    Mandatory Restitution.    The defendant understands that he will be required to pay full restitution as required by law.

5.    Asset Forfeiture and Financial Accountability.    The defendant agrees to fully cooperate with the federal government in the seizure and forfeiture of assets, to include any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the offense of conviction, kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c), and any property used, or intended to be used, in any manner or part, to commit, or to facilitate a conspiracy to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a. The defendant agrees that illegal proceeds obtained as the result of the kidnapping conspiracy are subject to forfeiture pursuant to 19 U.S.C. §§ 1607-09 by 18 U.S.C. § 981(d) (administrative forfeiture), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 (criminal and civil forfeiture), that any proceeds or property used, or intended to be used, to facilitate a conspiracy to use weapons of mass destruction are subject to forfeiture pursuant to 19 U.S.C. §§ 1607-09 by 18 U.S.C. § 981(d) (administrative forfeiture), 18 U.S.C. §§ 981(a)(1)(C), (G), and 28 U.S.C. § 2461 (criminal and civil forfeiture), and that any firearm or ammunition involved in or used in any violation of any

2

other criminal law of the United States are subject to forfeiture pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

Specifically, the defendant consents to administrative forfeiture by the Federal Bureau of Investigation, and if necessary, the defendant consents to civil forfeiture in a future civil judicial forfeiture proceeding of any and all assets seized, including any firearms and ammunition, from the following locations on October 7, 2020 and October 8, 2020:

   a. a search of the defendant's person;

   b. 1034 Holbrook Avenue, Waterford, Michigan;

   c. a blue 2009 Chrysler PT Cruiser with Michigan plate DPX1928, VIN 3A8FY58949T576301 parked at 1034 Holbrook Avenue, Waterford, Michigan.

The defendant agrees that there was reasonable cause to search these locations and seize all assets from these locations on October 7, 2020 and October 8, 2020, and that the assets are subject to forfeiture by the Federal Government as either illegal proceeds or property that was used or intended to be used to violate federal criminal law, or as firearms and ammunition involved in or used in violations of federal criminal law. The defendant agrees to waive any and all rights in any administrative or future civil judicial forfeiture proceedings regarding these assets. The defendant also agrees to sign any paperwork that is necessary to ensure that the administrative or civil judicial forfeiture of these assets is completed.

The defendant also agrees not to assist any other individual in contesting the forfeiture of the assets described above in any type of subsequent administrative civil or criminal forfeiture proceeding the defendant further agrees to cooperate with the federal government in any type of subsequent administrative, civil, or criminal forfeiture proceeding and that such cooperation may include, but not be limited to, providing truthful testimony any future civil or criminal forfeiture hearing. The defendant also agrees to prevent the disbursement of any and all assets subject to this forfeiture provision if said disbursements are within the defendant's direct or indirect control.

6.      Factual Basis of Guilt.      The defendant and the U.S. Attorney's Office stipulate to the following statement of facts which need not be proven at the time of the plea or sentencing:

a.      From at least on or about June 6, 2020, through and including October 7, 2020, in the Southern Division of the Western District of Michigan and elsewhere, the defendant willfully and knowingly conspired with Adam Dean Fox ("Fox"), Barry Gordon Croft, Jr. ("Croft"), Daniel Joseph Harris ("Harris"), Brandon Michael-Ray Caserta ("Caserta") and Ty Gerard Garbin ("Garbin") to kidnap the Governor of the State of Michigan ("the Governor").

b.      In the spring of 2020, the defendant connected online with members of the Wolverine Watchmen, a Michigan-based self-styled "militia" group, through a firearms group on Facebook. At their invitation, he attended a protest in Lake Orion, Michigan, where he met Harris. Harris showed the defendant how to

4

download the encrypted messaging application Wire, and invited him to join the
Wolverine Watchmen's chat group. The defendant understood they were using
encrypted communications to conceal discussion of illegal activity from law
enforcement. Harris and another Watchman told the defendant that he would have
to be "vetted" before he could join their organization. After passing their vetting
process, the defendant began attending their meetings to train and improve his
proficiency with firearms. The group included Harris, Caserta, and Garbin.

      c.    On or about June 28, 2020, the defendant met with Harris,
Caserta, Garbin, and other members of the Wolverine Watchmen for a "tactical
training" in Munith, Michigan. Fox arrived at the meeting as the defendant was
preparing to leave. This was the first time the defendant met Fox.

      d.    On or about July 7, 2020, the defendant met Caserta, Harris,
Garbin, and other Wolverine Watchmen in Milford, Michigan. A Watchman handed
out a list of code words to use in their communications, to conceal their discussion of
illegal activities, weapons, and tactics in case their group was infiltrated. The group
discussed one Watchman's proposal to "black bag politicians." The defendant and
Harris thought the plan wouldn't work at that time, but later changed their minds.
The group agreed that it remained an "open discussion" as to when exactly it was
appropriate to launch aggressive measures against the government.

      e.    On or about July 10, 2020, the defendant, Harris, Caserta, and
Garbin drove through the Western District of Michigan and the city of Chicago,
Illinois to attend a "field training exercise" in Cambria, Wisconsin. They discussed

what to do if they were stopped in Chicago with prohibited firearms, and Harris said, "you're all in the car with an illegal SBR." The defendant knew Harris had brought his short barreled rifle, which he frequently used for training exercises.

    f.  The defendant, Harris, Caserta, and Garbin met Fox and others in Cambria, where they trained from July 11-12, 2020. At that exercise, the defendant met Croft for the first time. Croft brought a "300 Blackout" AR-15 type semiautomatic assault rifle, with a short barrel, a silencer, and a 37-millimeter projectile launcher. Croft discussed modifying legal projectiles to launch explosive devices. Croft also brought materials for constructing improvised explosive devices ("IEDs") using gunpowder and BBs as shrapnel. Croft and Harris assembled two IEDs, which they unsuccessfully attempted to detonate.

    g.  On or about July 18, 2020, the defendant, Fox, Croft, Harris and others attended a meeting of regional "militia" members in Peebles, Ohio. Croft said the group needed to "do something," and proposed planting explosive devices at Michigan State Police posts. Fox said they could storm the Capitol with 200 men, using machine guns and snipers. The defendant and Garbin believed that plan was not feasible with the group's available manpower, training, and equipment. Fox also proposed kidnapping the Governor of Michigan ("the Governor") from other locations as an alternative. Fox and Croft discussed waiting until the upcoming election, when they thought law enforcement resources would be spread thin responding to civil unrest.

h.     On or about July 23, 2020, the defendant met Harris, Garbin,

and other members of the Wolverine Watchmen at Harris' residence in Lake Orion,

Michigan. The defendant, Harris, and Garbin told the other attendees about Fox's

original plan to storm the Capitol, which they did not favor. They told the other

attendees that they and Fox had another plan, and if they weren't "down" for

participating, they should leave the meeting. The defendant, Harris, and Garbin

knew the "other plan" was to kidnap the Governor. The defendant knowingly and

voluntarily joined that plan.

i.     On or about August 23, 2020, the defendant, Harris, Caserta,

Garbin and others met again at Harris' residence in Lake Orion. The attendees

were concerned that their group had been infiltrated by law enforcement, and

brought documents to prove their identities. Harris told the group to begin using a

new encrypted chat application that would allow them to instantly delete their

messages to avoid detection by the FBI. The defendant and Caserta discussed their

frustration with people who advocated anti-government action, but were unwilling

to use force themselves.

j.     On or about August 29, 2020, Fox conducted a daytime

surveillance of the Governor's vacation home, in the Western District of Michigan.

After the surveillance, Fox posted pictures of the house to the defendants' encrypted

group chat.

k.     On or about September 12-13, 2020, the defendant, Fox, Croft,

Harris, Caserta, and Garbin attended a "field training exercise" at Garbin's

property near Luther, Michigan. The defendant helped Garbin construct a firing range, using earth-moving equipment and hundreds of used tires the defendant acquired from a tire shop. The defendants constructed a "shoot house" and used it to practice breaching a residence with firearms. Fox and Croft said it would serve as a "mockup" of the Governor's home.

l.     During the afternoon of September 12, 2020, the defendant, Fox, Croft, Harris, Caserta and others discussed the plot to kidnap the Governor. The defendant, Fox, Croft, Garbin and others left Luther, Michigan in three cars to conduct a nighttime reconnaissance of the Governor's home. Before departing, Fox and Croft changed out of their tactical clothing into "street clothes" to be less conspicuous. Fox was armed with a semiautomatic pistol. They left Harris and Caserta behind because they had been drinking.

m.     On the way to the Governor's house, the surveillance team stopped at a hotel in Big Rapids, Michigan where Croft had rented a room. As they were leaving the hotel parking lot, Croft said "I'm going to get eyes on the bridge," or words to that effect.

n.     After leaving Big Rapids, the surveillance team drove to a Wal-Mart parking lot, where the defendant got in a car with Garbin and a driver from Wisconsin. Fox gave the driver the Governor's address. Fox and Croft departed in the second car. The three cars next drove to a VFW post in a town near the Governor's home, where they had a final discussion about the surveillance plan. The defendant, Garbin and the driver from Wisconsin were instructed to find the home,

8

and Croft and Fox would attempt to signal them with lights from a boat ramp on the opposite shore of the nearby lake. The individuals in the third car would drive around to make sure no one was following them.

o.  The three cars departed the VFW post, and the defendant's car attempted to find the Governor's house. They were unable to locate it with certainty in the dark, because as they later learned, Fox had reversed digits in the street address. The defendant later told Fox that Fox should have been in the car going to the home, since he had been there before in the daylight. After surveilling the Governor's house, the reconnaissance team returned to Garbin's property in Luther.

p.  The next morning, the defendant, Fox, Croft, Harris, Caserta, and Garbin gathered for a debriefing about the reconnaissance, and to discuss their future plans. Harris told the defendant, "I wish I would've made it, you guys left without me," or words to that effect.

q.  Fox told the other defendants they had found a place to put explosives under a bridge near the Governor's house and asked the group to contribute $4,000 to purchase them. Croft said they could use the 37-millimeter projectile launcher on his assault rifle to take out the lead vehicle in the Governor's protective detail. Croft also said if they used IEDs to ambush the Governor's convoy, they wouldn't need to blow up the bridge.

r.  Later on September 13, 2020, Croft produced a larger IED he had constructed, and several paper human silhouette targets. Croft said he wanted to hang the targets around the device, and see what kind of "damage" the shrapnel

9

would cause. The defendant saw Croft, Harris, and Caserta walk to a location just off Garbin's property with the bomb, and heard it detonate.

        s.    Before the group left Garbin's property in Luther on September 13, 2020, Fox told the group they needed to do more "recon" to prepare. He also said they needed to be "opportunistic," and be ready to act "when the asset arises," (in other words, when the Governor arrived at the vacation home). The defendants agreed to meet again for a final field training exercise in October, but were arrested first.

        t.    The defendant became aware after his arrest that several individuals whom he believed to be fellow conspirators were actually undercover informants or agents, including Confidential Human Sources (CHS) "Dan" and "Steve." The defendant was not entrapped or induced to commit any crimes by these individuals. The defendant also knows Fox, Croft, Harris and Caserta were not entrapped, based on personal observation and discussions. For instance, Fox proposed assaulting the Capitol the first time the defendant met him, which was also the first time Fox met CHS Dan. The defendant frequently heard Fox and Croft initiate conversations about fighting government authority and kidnapping the Governor without prompting. The defendant also heard Harris and Caserta express similar anti-government sentiments during his private discussions with them, when no government informant was present. During all their months of training together, the defendant never heard Fox, Croft, Harris, or Caserta say they were doing anything because CHS Dan, CHS Steve, or any other informant had advocated it.

10

7.     Cooperation in Criminal Investigations.     The defendant agrees to

fully cooperate with the FBI, the U.S. Attorney's Office, the Michigan State Police,

the Michigan Attorney General, and any other law enforcement agency in their

investigation of the charges contained in the superseding indictment, as well as the

investigation of crimes over which they have actual or apparent jurisdiction. The

defendant's cooperation will consist of all steps needed to uncover and prosecute

such crimes, including, but not limited to, providing investigators with a full,

complete and truthful statement concerning his knowledge of any and all criminal

activity of which he is aware; truthfully answering investigators' questions; meeting

with prosecutors before testifying; truthfully testifying before grand juries and in

any court proceedings; and providing all relevant tangible evidence in his

possession or under his control, including, but not limited to, objects, documents,

and photographs. The defendant's obligation to cooperate under this paragraph is

an affirmative one and includes the obligation to voluntarily come forward with any

and all information which he should reasonably know will assist in the

investigation of other criminal activity. The defendant will not commit any criminal

offense during the course of his cooperation with the United States. The defendant

will submit to polygraph examination upon request. The defendant's obligation

under this paragraph is a continuing one, and shall continue after sentencing until

all investigations and prosecutions in which his cooperation is deemed relevant by

the U.S. Attorney's Office have been completed.

11

8.    The U.S. Attorney's Office Agrees:

a.    No Additional Charges.    The U.S. Attorney's Office agrees not to bring additional criminal charges against the defendant arising out of the conspiracy to kidnap as charged in the superseding indictment, including conspiracy to use weapons of mass destruction in violation of 18 U.S.C. § 2332a, possession of unregistered weapons in violation of 26 U.S.C. § 5861, and conspiracy to sell firearms to a convicted felon in violation of 18 U.S.C. § 922(d), provided that the conduct is disclosed to the government by the defendant or his attorney prior to the date of this agreement. This promise of non-prosecution shall not include any crimes of violence that are entirely unrelated to the conspiracy to kidnap charged in the superseding indictment or criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371).

b.    Acceptance of Responsibility.    The U.S. Attorney's Office agrees not to oppose the defendant's request for a two-level reduction of his offense level for acceptance of responsibility under Section 3E1.1(a) of the Sentencing Guidelines.  However, the U.S. Attorney's Office reserves the right to object to such request if it subsequently learns of conduct by the defendant that is inconsistent with the criteria set forth in the Commentary to Section 3E1.1.  Should the Court grant a two-level reduction as provided herein, the U.S. Attorney's Office will move the Court to grant an additional one-level reduction if the adjusted offense level is 16 or greater pursuant to Section 3E1.1(b).

c.    <u>Protection for Proffered/Cooperative Statements.</u>    The U.S.
Attorney's Office agrees that information provided by the defendant through his
proffer, and any information provided pursuant to his promise to cooperate as
described in this agreement, will not be used by the Government to enhance his
sentence, in accordance with Sentencing Guidelines § 1B1.8, and according to the
terms of the written agreement entered into between the parties immediately prior
to the proffer. It is expressly understood, however, that such information may be
used by the Government at sentencing if the defendant takes a position at
sentencing that contradicts information he provided pursuant to this agreement or
any proffer agreement.

d.    <u>Possibility of Sentence Reduction Motions.</u>    The U.S.
Attorney's Office will decide whether to file a motion for departure or reduction of
sentence pursuant to Sentencing Guidelines § 5K1.1, 18 U.S.C. § 3553(e), and/or
Rule 35(b) of the Federal Rules of Criminal Procedure. The defendant fully
understands that such a motion may be made pursuant to law if, and only if, he
fully cooperates with the Government and materially and substantially assists the
Government in the investigation or prosecution of others. The determinations of
whether the defendant has provided substantial assistance to the United States, or
to designated state or local law enforcement authorities, and of which type of
motion to file, will be made in the sole discretion of the U.S. Attorney's Office. The
defendant fully understands that this paragraph is not a promise by the
Government to file a motion for departure or to reduce a sentence.

13

Additionally, the defendant understands that, even if such a motion were filed, the Court has complete discretion to grant or deny the motion. Furthermore, if the Court were to grant the motion, the Court—not the government—would decide how much of a departure or sentence reduction the defendant receives based upon the nature and extent of his assistance. The defendant acknowledges and agrees that he may not appeal the Court's exercise of its discretion in granting or denying a motion for departure or reduction of sentence, if such a motion is made.

9. <u>The Sentencing Guidelines.</u>    The defendant understands that although the United States Sentencing Guidelines (the "Guidelines") are not mandatory, the Court must consult the Guidelines and take them into account when sentencing him. The defendant understands that the Court, with the aid of the presentence report, will determine the facts and calculations relevant to sentencing. The defendant understands that he and his attorney will have the opportunity to review the presentence report and to make objections, suggestions, and recommendations concerning the calculation of the Guideline range and the sentence to be imposed. The defendant further understands that the Court will make the final determination of the Guideline range that applies in this case, and may impose a sentence within, above, or below the Guideline range, subject to the statutory maximum penalties described elsewhere in this agreement. The defendant further understands that disagreement with the Guideline range or sentence shall not constitute a basis for withdrawal of his plea.

14

10.    There Is No Agreement About the Final Sentencing Guidelines Range.

The defendant and the U.S. Attorney's Office have no agreement as to the applicable Sentencing Guidelines factors or the appropriate guideline range. Both parties reserve the right to seek any sentence within the statutory maximum, and to argue for any criminal history category and score, offense level, specific offense characteristics, adjustments and departures.

11.    Waiver of Constitutional Rights.        By pleading guilty, the defendant gives up the right to persist in a plea of not guilty and the right to a speedy and public trial by jury or by the Court. As a result of the defendant's guilty plea(s), there will be no trial. At any trial, whether by jury or by the Court, the defendant would have had the following rights:

a.    The right to the assistance of counsel, including if he could not afford an attorney, the right to have the court appoint an attorney to represent him;

b.    The right to be presumed innocent and to have the burden of proof placed on the government to prove his guilt beyond a reasonable doubt;

c.    The right to confront and cross-examine witnesses against him;

d.    The right, if he wished, to testify on his own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify;

e.    The right not to be compelled to testify, and, if he chose not to testify or present evidence, to have that choice not be used against him.

15

By pleading guilty, the defendant also gives up any and all rights to pursue in this court or on appeal any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

12. Limited Waiver of Appeal and Collateral Attack.

a. Waiver: In exchange for the promises made by the government in entering this plea agreement, the defendant waives all rights to appeal or collaterally attack his conviction, sentence, or any other matter relating to this prosecution, except as listed below.

b. Exceptions: The defendant may appeal or seek collateral relief to raise a claim, if otherwise permitted by law in such a proceeding, on the following grounds:

i. The sentence on any count of conviction exceeded the statutory maximum for that count;

ii. The sentence was based on an unconstitutional factor, such as race, religion, national origin, or gender;

iii. The district court incorrectly determined the Sentencing Guidelines range, if the defendant objected at sentencing on that basis;

iv. The sentence is above the Sentencing Guidelines range as determined by the court at sentencing and is unreasonable;

v. The guilty plea was involuntary or unknowing;

vi. An attorney who represented him during the course of this criminal case provided ineffective assistance of counsel.

16

13.     FOIA Requests.     The defendant hereby waives all rights, whether asserted directly or by representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

14.     The Court Is Not a Party to This Agreement.     The defendant understands that the Court is not a party to this agreement and is under no obligation to accept any recommendation by the U.S. Attorney's Office or the parties regarding the sentence to be imposed. The defendant further understands that, even if the court ignores such a recommendation or imposes any sentence up to the maximum established by statute, he cannot, for that reason withdraw his guilty pleas, and he will remain bound to fulfill all his obligations under this agreement. The defendant understands that no one can make a binding prediction or promise regarding the sentence that he will receive, except that it will be within the statutory maximum.

15.     This Agreement Is Limited to the Parties.     This agreement is limited to the U.S. Attorney's Office for the Western District of Michigan, and cannot bind any other Federal, State or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the defendant. This agreement does not apply to or preclude any past, present, or for future forfeiture or civil actions.

17

16.   <u>Consequences of Breach</u>.  If the defendant breaches any provision of this agreement, including any promise of cooperation, whether before or after sentencing, the United States shall have the right to terminate this agreement, or deny any or all benefits to which the defendant would otherwise be entitled under its terms. In the event the United States elects to terminate this agreement, the agreement shall be considered null and void, and the parties shall return to the same position they were in prior to the execution of this agreement, as though no agreement ever existed. In such event, the defendant shall remain liable for prosecution on all original charges, and the United States shall be free to bring such additional charges as the law and facts warrant. The defendant further agrees to waive and forever give up his right to raise any claim that such a prosecution is time-barred if the prosecution is brought within one year of the breach that gives rise to the termination of this agreement.

17.   <u>This is the Complete Agreement</u>.      This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any additional agreements, understandings or conditions be entered into unless in writing signed by all parties or on the record in open court.

ANDREW BYERLY BIRGE
United States Attorney

2/7/22
Date

NILS R. KESSLER
Assistant United States Attorney

18

I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

2-6-22
_____
Date

_____
KALEB JAMES FRANKS
Defendant

I am Kaleb James Franks' attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

2-6-22
_____
Date

_____
SCOTT G. GRAHAM
Attorney for Defendant

19