THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

THE UNITED STATES OF AMERICA,

        Plaintiff,

v.

KALEB FRANKS,

        Defendant.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
U.S. District Court Judge

---

## DEFENDANT'S SENTENCING MEMORANDUM AND MEMORANDUM IN SUPPORT OF DOWNWARD VARIANCE

---

After two years of allegations, accusations, disputes, objections, and media exposure, this case is finally winding down for defendant Mr. Kaleb Franks. With sentencing anticipated on October 6, 2022, at 4:00 p.m., Mr. Franks, though his attorney Scott Graham, offers this sentencing memo for the Court's consideration and in support of his motion for a downward variance, which he now makes.

For this discussion, counsel has broken out of the more traditional sentencing-memo approach. He has eschewed an enumeration of the sentencing factors under 18 U.S.C. § 3553(a). Indeed, maybe some frustrated novelist—or even philosopher—in him has caused him to let his prose wander farther than it usually would . . . but perhaps this liberality makes some sense here, where the Court knows so very well almost every facet of this case and hardly needs counsel to highlight jurisprudential concerns or procedural details. The Court, of course, has sat through *two* trials, heard

Mr. Franks testify twice, imposed sentence on one codefendant already, *lowered* that sentence already, and considered an extraordinary number of pre- and post-trial motions. Again, the Court hardly needs a "procedural-background" summation from counsel. Yet perhaps a return—briefly—to fundamentals could prove helpful: on October 6, 2020, the government accused six men, including Mr. Franks, of plotting to kidnap this state's governor. *See* RE. 1: Complaint, PageID # 1-2.

At any time, such allegations would undoubtedly set off a political and media feeding frenzy. In an election year, with the country at loggerheads of such proportions as to bring to mind high-school history like that of the caning of Senator Charles Sumner in the Senate in 1856, the not-merely-figurative hue and cry rose to almost deafening levels. People across the political spectrum shouted, the media rattled their mightier-than-the-sword pens, and counsel on both sides of this case dove into an electronic abyss of discovery . . . all while Mr. Franks and his codefendants sat in jail, speculating on, and awaiting delivery of, their fates.

On December 16, 2020, the government filed its indictment, charging Mr. Franks and his codefendants with a kidnapping conspiracy. *See* RE. 86: Indictment, PageID # 573-78. Trial preparations ratcheted up and emotions rose concomitantly. Then on January 27, 2021, Ty Garbin pleaded guilty to the charge. *See* RE. 143: Minutes of Garbin Change of Plea, PageID # 759. A superseding indictment followed on April 28, 2021, charging the remaining defendants with the conspiracy and adding weapons charges for some of the codefendants. *See* RE. 172: Superseding Indictment, PageID # 961-76. The media took an active role in the case. *See, e.g.*, RE. 210: Motion

to Compel Access, PageID # 1117-18. Pretrial motions rained down upon the electronic filing system. And Mr. Franks continued to sit in jail, alone and confused and slightly more than a little anxious.

Mr. Garbin received a sentence of seventy-five months on August 25, 2021. *See* RE. 294: Minutes of Garbin Sentencing, PageID # 1718. Not long after that, the case celebrated its one-year anniversary. The holiday season brought Christmas lights, motions in limine, and even a motion to strike. January glowed with more motions, and then on February 7, 2022, another plea agreement appeared on the docket: Mr. Franks's plea agreement. *See* RE. 445: Plea Agreement, PageID # 3115-33. With that filing, *everything* changed for Mr. Franks.

With that filing, Mr. Franks felt a weight lift. With that filing, Mr. Franks's anxiety rose even more, but he also felt his world stabilize a little. He was coming clean. And while one might believe that this plea agreement ended Mr. Franks's dreams of marrying his fiancée and living "happily ever after," of owning outright the home he'd so proudly bought and financed (using nearly all his resources) and begun furnishing around 2018, of staying fit and healthy, of helping others through his career as an addiction counselor/peer recovery coach working with a state circuit court, of perhaps even becoming a father, this idea of these dreams ending would be misplaced.

The truth is that these dreams ended in the late summer of 2020 when Mr. Franks lost what he truly believed was *everything* in his life. Kaleb once again in his young life stands before a court, this time convicted, through his own guilty plea, of

conspiring to kidnap Michigan's governor, a violation of 18 U.S.C. § 1201(c). *See, e.g.*, RE. 762: Final PSIR, PageID # 10014. He's twenty-eight years old and, for a second time in his twenty-some years, at a sort of rock bottom. Once, during his custody in this matter, in the summer of 2021, Mr. Franks even lapsed into drug abuse again (a huge misstep for someone so committed to his ongoing recovery), using suboxone. *See* RE. 762: Final PSIR, PageID # 10020, ¶ 17. So Mr. Franks's dreams burned away before he entered his guilty plea. They burned away when he fell into depression and hopelessness, fueled by mental health struggles, in the summer of 2020. Or at least he felt they did.

In fact, entering his plea actually rebooted his focus on recovery and redemption. It realigned his commitment to restoring himself and returning to his core values of family, community, and self-betterment.

The proverbial elephant in this proverbial sentencing room, of course, is then: how does a young man, who has unequivocally made himself into the poster child for criminal-justice success stories, who has turned addiction and drug abuse into a story of healing and even giving back to others, who has overcome childhood trauma and significant family loss—how does such a person find himself on the wrong side of some sort of anarchist/revolutionary squad of misfits and malcontents? Perhaps counsel's answer is too simple to sound anything but naïve and facile, but he will put it out there anyway: those misfits and malcontents gave Mr. Franks the family—the father, uncle, older brother . . . the role model . . . the *purpose* he'd never found in

"real life." Ty Garbin's sentencing video touched on the magnetism of groups like the Wolverine Watchmen, especially for young people searching for a place to "belong."

A look at Mr. Franks's cooperation may help explain counsel's position. On February 3, 2022, shortly before entering his guilty plea, Mr. Franks sat down with authorities and made a clean breast of it. *See, e.g.*, RE. 762: Final PSIR, PageID # 10034, ¶ 78. (Mr. Franks has also assisted state authorities. On August 2, 2022, he talked to prosecutors about the Jackson County case. And as the government explains in its sentencing memo, and as the Court knows so well, and as touched on at the start of this memo, Kaleb actually testified at *two* federal trials, following the first trial's hung jury. *See* RE. 764: Gov. Sent. Memo, PageID # 10072-73.) Kaleb explained his enjoyment of marksmanship and his appreciation of firearms, and how a friend took him to a Black Lives Matter rally and he met some of the Wolverine Watchmen, who appeared to just be other firearm enthusiasts. He got involved in electronic chats with his new acquaintances and then participated in some FTX events (field-training exercises and events). Except then things started spiraling: the group got more militant, and Mr. Franks became closer and closer to group "leaders" like Dan Chappel, who was (as has been chewed on so thoroughly in this case) actually a government informant (Mr. Franks saw Dan as larger than life, as a role model, as a father figure, and as a military "leader" and "hero" of sorts—one might, without hitting the hyperbole wall, even say Mr. Franks idolized Dan).[1]

---

[1] Counsel has debated with himself about how much psychological and social literature to cite here. While that literature provides some helpful background, counsel wants to keep Kaleb Franks—the complicated, kind, confused, intelligent, vulnerable, forgiving, impressionable, young, unassuming, sensitive human being who has faced trauma and abuse, who has vanquished drug abuse, and who

People like Dan were starting to fill the gaping holes in Mr. Franks's life, the holes left by the deaths of his stepbrother, second stepfather, and mother in 2014, 2016, and 2018, respectively. (Kaleb has repeatedly affirmed how much he looked up to Dan, telling undersigned counsel, a defense paralegal, a defense investigator, and a defense psychologist how much he thought of Dan and Dan's skills and perceived accomplishments. He didn't want to disappoint Dan.) But these people couldn't fill the holes completely, and Mr. Franks continued to struggle with suicidal ideations that sprang, at least in part, from feelings of loneliness, isolation, and hopelessness.

One can hardly wonder at these mental-health struggles. Besides the loss of so many people close to him, he had grown up with alcoholic parents and adults around him; a violent first stepfather who abused drugs, alcohol, and everyone around him; older siblings and stepsiblings who abused drugs, partied, and got Kaleb involved in

---

has already started over from scratch once—front and center. But counsel would still point the Court toward certain literature for enlightening reading, including Adeno Addis's "Role Models and the Politics of Recognition" in the University of Pennsylvania's *Law Review* in 1996, which discusses the concept of role model and distinguishes between role models, mentors, and heroes. In Mr. Franks's case, Dan filled all three roles: he functioned as a *personal*, *involved* mentor for Mr. Franks *and* as a more impersonal, aloof, aspirational role model (yet could still be admired) *and* as an admirable hero. *See* Adeno Addis, *Role Models and the Politics of Recognition*, 144 U. Pa. L. Rev. 1377, 1389-90 (1996). In this context, one should not fail to discuss the sometimes coercive power of role models—or the vulnerability of those who follow them. *See id.* at 1394. Nor should one overlook the idea that role models figure in the "politics of recognition." *See id.* at 1410 (discussing role models in the context of race and gender). While Mr. Franks may have been a "nobody," a former drug addict, a guy financially stretched, a kid searching for meaning in his life, with Dan (and indirectly, through the government's own efforts coming through Dan as a government agent within the group) Kaleb could see people like himself enjoying recognition and notoriety. He could see a path toward some measure of "success" (being skilled with firearms, having outdoor survival skills, gaining the admiration of friends) for a person like himself. Dan was a "reference individual" for all of the guys involved in this case. *See id.* at 1411 (discussing scholarship on "reference individuals"). Kaleb identified with Dan and sought "to approximate the behavior and values" of Dan "in his several roles." *See id.* (citation omitted). And their relationship absolutely involved an "authority-vulnerability social nexus," with Dan placed in an authority role by the government (and the Watchmen), and Kaleb being extremely vulnerable because of his history of childhood trauma and his personality issues. *See id.* (discussing nexus).

drugs; and the presence of law enforcement, who had to come when his first stepfather would beat his mother. When his first stepfather left, Kaleb and his family found themselves homeless. They lived with unsanitary hoarders, often went hungry, and spent a year without heat, even in the winter.[2]

With this family history, Mr. Franks's criminal history seems less than remarkable. As a teen, he possessed alcohol, tried to shoplift from a Walmart, abused drugs, and stole a piggy bank from his step-uncle's home. Once he got clean and sober, he clawed his way up from these depths, ensured he enjoyed the right to possess a firearm, and took up marksmanship, fitness, and motorcycles as recreation. He worked as an addictions counselor/peer recovery coach and even volunteered in a similar role. He wanted to find his version of the American dream, with a home, some financial stability, a loving fiancée, and a chance to help others in his community. Basically, he did everything right.

But he was still vulnerable, still lacking something to make himself whole. And he thought he had found that something in the subculture of firearms and training . . . in the social support of the Wolverine Watchmen. He wasn't a leader among these guys. He was always a follower, always "going along"—because "going along" was

---

[2] This kind of trauma cannot help but change a person. It literally alters the brain. *See, e.g.*, Joan Luby, et al., *The Effects of Poverty on Childhood Brain Development: The Mediating Effect of Caregiving and Stressful Life Events*, 167 JAMA Pediatrics 1135, 1141 (2013) ("The finding that experiences of stressful life events also mediated the relationship between poverty and left hippocampal volume is consistent with the extensive body of animal data that have elucidated the negative effects of early stress on hypothalamic-pituitary-adrenal function and hippocampal volume.").

what his childhood had trained him to do. Again, as the PSIR details, Kaleb was a minor participant in all this. *See, e.g.*, RE. 762: Final PSIR, PageID # 10037, ¶ 93.

The government recognizes some of the vulnerabilities and emotional complexities here. Its sentencing memo affirms, "While he [Mr. Franks] accumulated some criminal history, it mostly involved property crimes motivated by drug addiction," and "[a]t the time of the offense, Franks was 26 years old" while "Fox was 40, and Croft was (at 45) old enough to be Franks' father." RE. 764: Gov. Sent. Memo, PageID # 10074-75. "Franks' decision to accept responsibility and testify showed more maturity than the older men who led him." *Id.* at 10075. Even as a minor participant, however, Kaleb's guidelines are (unsurprisingly) quite high. As calculated in the PSIR, he has an offense level of 33, a criminal-history category of II, and an advisory range of 151 to 188 months. *See* RE. 762: Final PSIR, PageID # 10061.[3]

As Mr. Franks looks outward, toward sentencing and even toward release from custody, he shudders. He feels like he has abandoned his fiancée, left her alone to struggle financially and emotionally. He feels he has shamed himself and tarnished his family's name and reputation. His family's confusion and disappointment magnify his consciousness of guilt. As someone who lost his stepbrother to a drug overdose, lost his second stepfather to a heart attack, and lost his mother to a motorcycle accident . . . as someone who suffered abuse at the hands of his first stepfather and watched that man beat his mother . . . as someone who suffered privations and

---

[3] Mr. Franks will not pursue his objection to the scoring of his criminal history. *See, e.g.*, *United States v. Hill*, 769 F. App`x 352, 354 (6th Cir. 2019) (finding that a guilty plea under HYTA constitutes a "prior sentence" for purposes of calculating the advisory guidelines).

homelessness as a kid when his mother got away from this abuse . . . well, as someone like that, Mr. Franks is no stranger to confusion, disappointment, and shame. But now those feelings are focused on him because of the terrible choices he knows he made.

He owns these choices. He recognizes he made them. This ownership and recognition motivated him to enter his plea. But they don't make the bitterness of his own shame any more palatable. Mr. Franks only hopes that he can serve his time, mend his relationships (especially with his fiancée, whom he still hopes to make a life with), and launch himself afresh (for the *second* time in his young life—with his prior drug convictions, he's no stranger to having to repair relationships and remake a life) somewhere new, like South Carolina.

Counsel sees in Kaleb a guy who can probably make it happen—and a guy who doesn't seem to need a lot of time in prison to get himself together to make it happen. A sentence similar to Ty Garbin's could suffice. Following his testimony, Mr. Garbin received a reduction in sentence and now faces only thirty months. *See, e.g.*, RE. 757: Order Reducing Garbin Sentence, PageID # 9963. As Mr. Franks's PSIR points, against this background of Mr. Garbin's ultimate sentence, concerns surrounding the potential for unwarranted sentencing disparity support a downward variance here. *See* RE. 762: Final PSIR, PageID # 10058, ¶ 184.

Giving Mr. Franks a sentence similar to Mr. Garbin's won't undermine ideas about deterrence. First, Kaleb just wasn't a leader here. Crafting a sentence to "deter" him won't stop people from forming groups like this one. He wasn't catalyst for any

of this. Second, as he testified to multiple times, his mental health served as the impetus for his terrible decision making in the summer of 2020. *See, e.g.*, RE. 600: Excerpt of Franks Testimony, 3/25/22, PageID # 5703 (cross-examination regarding mental-health struggles), 5785 (affirming suicidal ideations at time of participation in trainings). Further counseling, support groups, and education will do far more for Kaleb Franks than custody. *Compare* 28 U.S.C. § 994(k) (directing the Sentencing Commission to craft guidelines that recognize "the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment"); *see also Tapia v. United States*, 564 U.S 319, 321 (2011) (the Supreme Court prohibits imprisonment for rehabilitative reasons).

Mr. Franks is no stranger to therapy—either as a participant or as an advocate and facilitator of therapeutic programs. He has participated in his own therapy through programs at Meridian Health Services (where he later worked as a peer recovery coach), Ascension Eastwood Behavioral Health, Maple Grove Center, and elsewhere. Sadly, he had a terrible experience, when he was around fifteen or sixteen years old, when a "therapist" became overtly suggestive and sexual with him. But even as a kid faced with such inappropriate behavior from an authority figure, he didn't stop believing in the power of therapy, and his life has demonstrated his commitment to counseling and personal growth.

A defense psychologist has described Kaleb as (among other things) "dependent." This expert described Kaleb:

Characteristic of him is a need for praise, nurturance and security. He manifests a fear of autonomy that is likely to lead him to seek a responsive partner. He is likely to be naïve about problems in his life and to manifest shortsighted or scattered thinking. ***In an effort to meet his need for attention, he may be excessively accommodating and responsive to the needs of others, soliciting praise and tending to be entertaining to those around him.*** Noteworthy too is an effort to be in harmony with others. ***He demonstrates a preoccupation with the need for approval from those around him, something that may have left him without a clear sense of his own identity. In addition, he may*** **feel inept when faced with responsibilities that demand competence and autonomy.** ***The loss of significant support from others may cause confusion and acute distress and lead him to openly solicit reassurance and approval from others.***

In short, Kaleb wants desperately to have the love, security, and assurance that he never received as a child. In many ways, he started to think he could get some semblance of these things—of acceptance, at least—in the Wolverine Watchmen. Instead, all he got was chaos and pain. Those circumstances, however, have *not* undercut his fundamental values, and he still remains a man committed to making himself better, to making himself valuable to the community, to making himself dependable.

## *Conclusion*

Kaleb's older half-sister Samantha calls her little brother "a follower." According to her, he's "100% a people follower." Tragically, he followed the wrong people here. He did not lead them. He masterminded nothing. He simply went looking for community . . . and, later (while in a suicidal spiral), for a means to end the pain he was suffering emotionally. This background isn't offered as an *excuse* but rather only as *explanation.* Contrary to what a wounded, confused, spiraling-out-of-control Kaleb felt in 2020, Kaleb Franks still enjoys a lot of support: from his sister, from long-time friends from high school, from his father. Mr. Franks, of course, ultimately seeks a sentence sufficient, but not greater than necessary, to serve the purposes of

sentencing under 18 U.S.C. § 3553(a). Such a sentence can likely be found in something along the lines of what Mr. Garbin received. A counseled, stabilized, educated Kaleb can leave custody ready to once again rebuild his life in positive ways, with positive support. The government itself has asked that Kaleb's sentence reflect his "part in bringing the conspirators to justice." RE. 764: Gov. Sent. Memo, PageID # 10075. When one considers prison violence against cooperators, the violence of extremist groups, and the fortitude it took for Kaleb to come forward as he did, such a sentence need not be lengthy—Kaleb has already paid, and will continue to pay, for his offense in innumerable ways, and the risks inherent in his cooperation only add to that payment.

<div style="margin-left:40%">
Respectfully submitted,
</div>

Date: September 29, 2022   **SCOTT GRAHAM PLLC**

      By: /s/ Scott Graham
        Scott Graham
        Attorney for Defendant
      Business Address:
        1911 West Centre Avenue, Suite C
        Portage, Michigan 49024
        (269) 327.0585